# EXHIBIT A

**MORGAN, LEWIS & BOCKIUS LLP**
Debra L. Fischer (Bar No. 142516)
Email: *debra.fischer@morganlewis.com*
Seth M. Gerber (Bar No. 202813)
Email: *seth.gerber@morganlewis.com*
2049 Century Park East
Suite 700
Los Angeles, CA 90067
Telephone: 310.907.1000
Facsimile: 310.907.1001

Attorneys for Plaintiff Mark Pastorius

**Electronically FILED by Superior Court of California, County of Los Angeles 5/08/2024 5:43 PM David W. Slayton, Executive Officer/Clerk of Court, By D. Williams, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

| | |
|---|---|
| Mark Pastorius, an individual,<br><br>Plaintiff,<br><br>v.<br><br>LOCKTON COMPANIES, LLC – PACIFIC SERIES, a Missouri series limited liability company, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 24STCV11627<br><br>**COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF;**<br><br>**(2) VIOLATION OF BUSINESS & PROFESSIONS CODE § 16600.5; and**<br><br>**(3) VIOLATION OF BUSINESS & PROFESSIONS CODE §§ 17200, *et seq*.** |

Plaintiff Mark Pastorius ("Plaintiff") alleges causes of action for declaratory relief and for violations of California Business and Professions Code sections 16600.5 and 17200 *et seq*. against Defendant Lockton Companies, LLC—Pacific Series ("Lockton" or "Defendant"), a Missouri series limited liability company, and DOES 1 through 50, inclusive, as follows:

## I. Introduction

1. Plaintiff was a California resident when he entered into his association with Lockton—an insurance brokerage firm and employer operating in California that, for years, required Plaintiff as a California resident to enter into various unlawful, void, and unenforceable restrictive covenants. Plaintiff now seeks a judicial declaration that he may freely and fairly compete against Lockton, including by calling upon, soliciting, accepting, engaging in, servicing or performing business for, his actual and prospective clients during his former employment at Lockton; that a California court is an appropriate forum for this action; that California law, and not Missouri law or the law of any other state, governs the restrictive covenants contained in Plaintiff's agreements with Lockton (namely, his Stakeholder Agreement) that he entered into while residing in California, and that the restrictive covenants are void and unenforceable under California's fundamental, unwaivable public policy in favor of free and open competition and employee mobility, as codified in California Business and Professions Code section 16600. Plaintiff also seeks relief under California Business and Professions Code section 16600.5 because Lockton's attempts to enforce the contractual provisions that are void and unenforceable under section 16600 constitute a civil violation. Plaintiff also seeks relief under California Business and Professions Code section 17200 *et seq*. because Lockton's use of contractual provisions that violate Section 16600 constitute unlawful and unfair business practices.

2. At issue is the legality of a contractual scheme intended to evade California public policy and law involving restrictive covenants combined with Missouri forum and choice-of-law provision. The restrictive covenants contained in Plaintiff's agreements with Lockton broadly seek to prohibit Plaintiff, for up to two years after termination of his affiliation with Lockton, from soliciting or attempting to solicit customers and prospective customers of Lockton (and multiple entities and/or affiliates of Lockton) throughout the world, including customers and prospective customers Plaintiff never worked with or knew of while affiliated with Lockton; and accepting business from, servicing, working on

competitive business, or doing any business with these customers and prospective customers. The restrictive covenants at issue would prevent Plaintiff from working with clients who want to do business with him. The restrictive covenants are void and unenforceable under California law. Knowing this, through a forum and choice-of-law provision in Plaintiff's Stakeholder Agreement, Lockton purported to require Plaintiff to litigate any controversies regarding the restrictive covenants in his Stakeholder Agreement in a Missouri court according to substantive Missouri law (which, unlike California law, broadly enforces restrictive covenants) in an effort to circumvent California's fundamental, unwaivable public policy in favor of employee mobility and open competition.

3. Plaintiff is informed and believes that Lockton has sought to enforce such covenants through court proceedings against people who have left Lockton to pursue better opportunities with a competitive insurance brokerage firm.

4. On May 6, 2024, Lockton terminated its relationship with Plaintiff merely for speaking with a competitor about a potential job opportunity. Plaintiff is informed and believes, and based thereon alleges, that Lockton has informed Lockton producers, members, associates, employees, customers, and insurance carriers that Lockton has parted ways with Plaintiff and stated that Plaintiff was purportedly "shopping" around his book of business and that Lockton made those statements in order to cause irreparable harm and damage his reputation and personal goodwill and thereby thwart fair and open competition. Plaintiff now works for Alliant Insurance Services, Inc., a brokerage firm incorporated in California and headquartered in Irvine, California. Alliant has offices throughout California. Plaintiff seeks to pursue his employment and profession with Alliant without being constrained by the prohibitions and limitations asserted in the restrictive covenants at issue.

5. Plaintiff is informed and believes that Lockton intends to seek to enforce against Plaintiff the restrictive covenants and the associated Missouri forum and choice-of-law

provision contained in Plaintiff's Stakeholder Agreement with Lockton.

## II. The Parties

6. Plaintiff was a resident of California at the time he entered into the underlying agreements at issue in this dispute. Plaintiff worked for Lockton in its Los Angeles office from 2002 until 2020, when he moved to Idaho during the COVID-19 pandemic. Plaintiff maintains a home in California. Lockton terminated Plaintiff's employment on May 6, 2024, and Plaintiff now works for Alliant, a California-based insurance brokerage firm.

7. Plaintiff is informed and believes, and on that basis alleges, that Defendant is now, and at all times mentioned in this Complaint was, a series limited liability company and has been organized and existing under the laws of the State of Missouri with its principal place of business in Kansas City, Missouri. Defendant previously was known as the Southern California Series of Lockton Companies, LLC. Defendant provides insurance and risk management services.

8. Plaintiff is informed and believes, and on that basis alleges, that Defendant, at all times mentioned in this Complaint, was qualified to do business in California, and currently is doing business in California, including in Los Angeles County, California.

9. Venue is proper in Los Angeles County, California, as Lockton's liability arises in Los Angeles County and the contracts at issue were made and/or were to be performed in Los Angeles County, where Plaintiff lived at the time that Lockton required him to enter into such contracts.

10. Defendants DOES 1 through 50, inclusive, are sued in this Complaint under fictitious names. Their true names and capacities are unknown to Plaintiff at this time. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named DOE defendants is legally responsible in some manner for the events, acts, occurrences, and liabilities alleged and referred to in this Complaint. Plaintiff will seek leave to amend this Complaint to insert the true names and capacities of DOE defendants when Plaintiff has ascertained their names and identities. Any reference in this Complaint

to "Defendants" shall include each and every DOE Defendant.

11. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint, each of the Defendants was an agent, partner, successor, joint venturer, aider and abettor of, or engaged in a joint enterprise with, each of the remaining Defendants, and at all relevant times was acting within the course and scope of such an agency, service, joint venture, joint enterprise, and the aiding and abetting of any of such entities and operations.

## III. Lockton's Agreements with Plaintiff contain an unlawful combination of restrictive covenants and a foreign forum and choice-of-law provision.

### A. Plaintiff's Stakeholder Agreement

12. At Lockton's direction and insistence, Plaintiff, as a California resident, entered into a Stakeholder Award Plan Agreement with the Southern California Series of Lockton Companies, LLC with an effective date of February 19, 2008 ("Stakeholder Agreement"). A copy of the Stakeholder Agreement is attached as **Exhibit 1**.

13. Section 3(a)(i) of the Stakeholder Agreement broadly defines Lockton's "Confidential Information" as follows:

> "(i) 'Confidential Information' means information of the Series and Company and information of the other Series of Lockton Companies, LLC ('Other Series') disclosed to Stakeholder (whether or not in writing), whether original, duplicated, electronic, memorialized, handwritten or in any other form, that is related to the business of the Series, the Company, or the Other Series, and as to which the Series, the Company, or the Other Series take reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; methods or policies, prices or price formulas; procedures; the identity of and information concerning former, current or prospective customers of the Series, the Company and/or the Other Series; financial information; computer software (including without limitation design, programming techniques, flow charts, source code, object code, and

> related information and documentation); business strategies; customer needs and preferences; terms of engagement and transactions between the Series, the Company or the Other Series and its/their customers; Stakeholder and personnel information including without limitation Stakeholder or employee compensation information and the internal operational structure of the Series, the Company, or the Other Series; customer levels of satisfaction; and all other information of any kind or character relating to the development, improvement, manufacture, sale or delivery of products or services by the Series, the Company or the Other Series. Notwithstanding the foregoing, Confidential Information does not include information that (A) is or becomes generally available or known to (or is readily ascertainable by) the public or competitors other than by reason of the fault of Stakeholder or (B) becomes available to Stakeholder on a non-confidential basis from a source other than the Series, the Company or any Other Series, provided that the source is not prohibited from disclosing such information to Stakeholder by any contractual or other obligation to the Series, the Company or the Other Series, which obligation is known to Stakeholder at the time Stakeholder makes any further disclosure of such information ..."

14. Section 3(c) of the Stakeholder Agreement purports to bar Plaintiff from disclosing or using Lockton's "Confidential Information" while working for Lockton and "at all times thereafter."

15. Section 3(h) of the Stakeholder Agreement, titled "Non-Solicitation of Employees," purports to bar Plaintiff, for two years after leaving Lockton, from soliciting other Lockton employees to leave Lockton:

> "Non-Solicitation of Employees. While Stakeholder is affiliated with the Series, and for a period of two (2) years following the Triggering Event or termination of Stakeholder's employment, if later, Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any employee, member, producer or consultant (if substantially all of the services performed by such consultant are on behalf of the Series) to terminate his/its employment, membership, producer or consultant relationship with, or to render services for any competitor of, the Series, the Company or the Other Series."

16. Section 3(i) of the Stakeholder Agreement, titled "Non-Solicitation of Customer

Accounts," purports to bar Plaintiff, for two years after leaving Lockton, from soliciting or doing business with any of Lockton's "Customer Accounts":

> "(i) Non-Solicitation of Customer Accounts. While Stakeholder is affiliated with the Series and for a period of two (2) years following the Triggering Event or termination of Stakeholder's employment, if later, Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage the Customer Accounts described below, that qualified as Customer Accounts within the two (2) years immediately preceding the Triggering Event, to reduce or terminate any of their business with the Series or the Other Series, or to transfer any of their business with the Series or the Other Series or otherwise to do business with a competitor of, the Series, the Company or the Other Series. Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, accept, service or in any way do business with any of the Customer Accounts that he may not solicit. The Customer Accounts to which this restriction applies are:
>
> > "(i) any of the Customer Accounts of the Series (A) serviced by Stakeholder, (B) serviced by employees of the Series who are supervised by Stakeholder, or (C) with which Stakeholder had business contact,
> >
> > "(ii) any of the other Customer Accounts of the Series, and
> >
> > "(iii) any of the Customer Accounts of the Other Series."

Section 3(a)(ii) of the Agreement defines "Customer Accounts" as follows:

> "'Customer Accounts' means the accounts of all Customers of the Series and the Other Series, and shall also include prospective Customers of the Series and Other Series (but only if a proposal has been made by such Series to, or an invitation to propose has been received by such Series from, such prospective Customer and such proposal or invitation is pending). 'Customer' as used in the definition 'Customer Accounts,' shall include any individuals affiliated with a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm with whom any Stakeholder has a relationship and from which a Series sources or receives referrals of potential Customers of insurance or insurance-related products or services."

17. Section 3(j) of the Agreement, titled "Reasonableness of Restrictions," purports to acknowledge the reasonableness of the above restrictive covenants, stating that "it is reasonable that the restrictive activities are not limited to a geographical scope or region; rather, [such restrictions] extend to any geographical location where the restricted activities could be conducted." In other words, the restrictive covenants in the Stakeholder Agreement operate without restriction and apply worldwide.

18. Section 5 of the Stakeholder Agreement, titled "Governing Law," purports to require Plaintiff to initiate any legal proceeding relating to the Agreement in a Missouri state or federal court, and further purports to provide that the Agreement shall be governed by Missouri law without regard to choice-of-law rules:

> "Governing Law. This Agreement and all disputes hereto shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to conflict of laws principles, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action to enforce the provisions of this Agreement shall be brought in any Federal Court in Kansas City, Missouri, or in the Circuit Court in Jackson County, Missouri. Such courts shall have exclusive jurisdiction over these matters and Stakeholder hereby consents and agrees to the personal jurisdiction of and venue in such courts."

## B. First Amendment to Plaintiff's Stakeholder Agreement

19. At Lockton's direction and insistence, Plaintiff, as a California resident, signed the First Amendment to the Stakeholder Award Plan Agreement with the Southern California Series of Lockton Companies, LLC, with an effective date of December 1, 2018 ("2018 Amendment"). A copy of the 2018 Amendment is attached as **Exhibit 2**. The 2018 Amendment includes various amendments to Plaintiff's existing Stakeholder Agreement and, "[e]xcept as specifically set forth in this Amendment, all provisions of the [Stakeholder Agreement] shall be unmodified and shall remain in full force and effect. The [Stakeholder Agreement], as amended by [the] Amendment, is hereby ratified and confirmed." The 2018 Amendment did not address the restrictive covenants or forum and

choice-of-law covenants in the Stakeholder Agreement. Therefore, such covenants were ratified and confirmed by the 2018 Amendment.

## C. Plaintiff's Deferred Compensation Agreement

20. At Lockton's direction and insistence, on December 31, 2008, Plaintiff, as a California resident, entered into a Deferred Compensation Agreement with the Southern California Series of Lockton Companies, LLC ("Deferred Compensation Agreement"). A copy of the Deferred Compensation Agreement is attached as **Exhibit 3**.

21. Section 10(a)(i) of the Deferred Compensation Agreement broadly defines Lockton's "Confidential Information" as follows:

> "(i) 'Confidential Information' means information of the Series and Company and information of the other Series of LLC ('Other Series') disclosed to Grantee (whether or not in writing), whether original, duplicated, electronic, memorialized, handwritten or in any other form, that is related to the business of the Series, LLC, or the Other Series, and as to which the Series, LLC, or the Other Series take reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; methods or policies, prices or price formulas; procedures; the identity of and information concerning former, current or prospective customers of the Series, LLC and/or the Other Series; financial information; computer software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation); business strategies; customer needs and preferences; terms of engagement and transactions between the Series, LLC or the Other Series and its/their customers; member and personnel information including without limitation member or employee compensation information and the internal operational structure of the Series, LLC, or the Other Series; customer levels of satisfaction; and all other information of any kind or character relating to the development, improvement, manufacture, sale or delivery of products or services by the Series, LLC or the Other Series. Notwithstanding the foregoing, Confidential Information does not include information that (A) is or becomes generally available or known to (or is readily ascertainable by) the public or competitors other than by reason of the fault of Grantee or (B) becomes available to Grantee on a non-confidential basis from a

> source other than the Series, LLC or any Other Series, provided that the source is not prohibited from disclosing such information to Grantee by any contractual or other obligation to the Series, LLC or the Other Series, which obligation is known to Grantee at the time Grantee makes any further disclosure of such information …"

22. Section 10(c) of the Stakeholder Agreement purports to bar Plaintiff from disclosing or using Lockton's "Confidential Information" while working for Lockton and "for a period of two (2) years following Grantee's termination as an officer of the Series[.]"

23. Section 10(h) of the Deferred Compensation Agreement, titled "Non-Solicitation of Employees," purports to bar Plaintiff, for two years following Plaintiff's termination as an officer of the Series, from soliciting other Lockton employees to leave Lockton:

> "Non-Solicitation of Employees. During the Term of this Agreement and for a period of two (2) years following Grantee's termination as an officer of the Series, Grantee shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any employee, member, producer or consultant (if substantially all of the services performed by such consultant are on behalf of the Series) to terminate his/its employment, membership, producer or consultant relationship with, or to render services for any competitor of, the Series, LLC, or the Other Series."

24. Section 10(i) of the Deferred Compensation Agreement, titled "Non-Solicitation of Customer Accounts," purports to bar Plaintiff, for two years following Plaintiff's termination as an officer of the Series, from soliciting or doing business with any of Lockton's "Customer Accounts":

> "(i) Non-Solicitation of Customer Accounts. During the Term of this Agreement and for a period of two (2) years following Grantee's termination as an officer of the Series, Grantee shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage the Customer Accounts described below, that qualified as Customer Accounts within the two (2) years immediately preceding Grantee's termination as an officer of the Series, to reduce or terminate any of their business with the Series or the Other Series, or to transfer any of their business with the Series or the Other Series or otherwise to do business with a competitor of, the Series, LLC or

> the Other Series. Grantee shall not, directly or indirectly, for himself or on behalf of any other person, accept, service or in any way do business with any of the Customer Accounts that he may not solicit. The Customer Accounts to which this restriction applies are:
>
> > "(i) any of the Customer Accounts of the Series (A) serviced by Grantee, (B) serviced by employees of the Series who are supervised by Grantee, or (C) with which Grantee had business contact,
> >
> > "(ii) any of the other Customer Accounts of the Series, and
> >
> > "(iii) any of the Customer Accounts of the Other Series."

25. Section 10(a)(ii) of the Agreement defines "Customer Accounts" as follows:

> "'Customer Accounts' means the accounts of all Customers of the Series and the Other Series, and shall also include prospective customers of such Series (but only if a proposal has been made by such Series to, or an invitation to propose has been received by such Series from, such prospective Customer and such proposal or invitation is pending). 'Customer' as used in the definition 'Customer Accounts,' shall include any individuals affiliated with a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm with whom any Series member has a relationship and from which a Series sources or receives referrals of potential customers of insurance or insurance-related products or services."

26. Section 10(j) of the Agreement, titled "Reasonableness of Restrictions," purports to acknowledge the reasonableness of the above restrictive covenants, stating that "it is reasonable that the restrictive activities are not limited to a geographical scope or region; rather, [such restrictions] extend to any geographical location where the restricted activities could be conducted." In other words, the restrictive covenants in the Deferred Compensation Agreement operate without restriction and apply worldwide.

27. Section 11(f) of the Deferred Compensation Agreement, titled "Governing Law," states that the "interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of California without regard to the choice of law

doctrine of such state."

### D. First Amendment to Plaintiff's Deferred Compensation Agreement

28. At Lockton's direction and insistence, Plaintiff, as a California resident, signed the First Amendment to Plaintiff's Deferred Compensation Agreement with Pacific Series of Lockton Companies, LLC with an effective date of December 31, 2018 ("2018 Amendment to the Deferred Compensation Agreement"). A copy of the 2018 Amendment to the Deferred Compensation Agreement is attached as **Exhibit 4**. The 2018 Amendment to the Deferred Compensation Agreement includes various amendments to Plaintiff's existing Deferred Compensation Agreement and, "[e]xcept as specifically set forth in this Amendment, all provisions of the Agreement shall be unmodified and shall remain in full force and effect. The Agreement, as amended by [the] Amendment, is hereby ratified and confirmed." The 2018 Amendment to the Deferred Compensation Agreement did not address the restrictive covenants in the Deferred Compensation Agreement. Therefore, such covenants were ratified and confirmed by the 2018 Amendment.

### E. Plaintiff's Executive Award Plan Participation Agreement

29. At Lockton's direction and insistence, on or about October 14, 2016, Plaintiff, as a California resident, signed an Executive Award Plan Participation Agreement with the Pacific Series of Lockton Companies, LLC with an effective date of May 1, 2016 ("Award Plan Agreement"). A copy of the Award Plan Agreement is attached as **Exhibit 5**.

30. Section 1(g) of the Award Plan Agreement broadly defines Lockton's "Confidential Information" as including:

> "information, of or pertaining to any Lockton Entity, disclosed to Participant, or to which Participant has or had access (whether or not in writing and whether original, duplicated, electronic, memorialized, handwritten or in any other form), that is related to the Business of any Lockton Entity, and as to which the applicable Lockton Entity has taken reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, trade secrets, non-public proprietary information, formulas, patterns, compilations, programs, devices, methods,

techniques, or processes; sales and other business methods or policies; prices or price formulas; procedures; the identity of and information concerning former or current Customer Accounts of the Company, the Other Series, and/or any Affiliate, including but not limited to Customer Account needs and preferences, levels of satisfaction and the terms of engagement and transactions between the Company, the Other Series and/or any Affiliate and/or its or their Customer Accounts; revenues, expenses, budgeting, finances and other financial information; computer systems, programs and software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation) and other technology; business, marketing and development strategies and plans[.]"

31. Section 10(b) of the Award Plan Agreement purports to bar Plaintiff from disclosing or using Lockton's "Confidential Information" while working for Lockton and "at all times thereafter."

32. Section 10(g) of the Award Plan Agreement, titled "Nonsolicitation of Producer Members, Employees and Others," purports to bar Plaintiff, for two years after leaving Lockton, from soliciting other Lockton employees to leave Lockton:

"Nonsolicitation of Producer Members, Employees, and Others. While Participant is employed by the Company, and in the event Participant's employment is terminated by Participant or the Company for any reason, Participant shall not, for a period of two (2) years following the last day of Participant's employment with the Company, directly or indirectly, for himself or on behalf of any other Person, solicit, recruit, induce, persuade or encourage, or attempt to solicit, recruit, induce, persuade or encourage, any employee, member or consultant of the Company, or any Other Series or Affiliate (if, with respect to a consultant, substantially all of the services performed by such consultant are on behalf of the Company or the Other Series or Affiliates) to terminate his/ its employment, membership, or consultant relationship with, or to render services for, any competitor of the Company, or any Other Series or Affiliate, as applicable, and shall not otherwise take any action to interfere with, or attempt to interfere with, any employee's, producer member's or consultant's relationship with the Company or any Other Series or Affiliate, as applicable. This nonsolicitation restriction will apply to any employee, consultant, or member (i) with whom Participant was personally acquainted or worked; or (ii)



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

whom Participant supervised directly or indirectly."

33. Section 10(h) of the Award Plan Agreement, titled "Non-Solicitation of Customer Accounts," purports to bar Plaintiff, for two years after leaving Lockton, from using Lockton's purported trade secrets to solicit or do business with any of Lockton's "Customer Accounts":

> "(iii) Non-Solicitation of Customer Accounts. While Participant is employed by the Company, and in the event Participant's employment is terminated by Participant or the Company for any reason, Participant shall not, for a period of two (2) years following the last day of Participant's employment with the Company,(is this the same amount of time in our non-compete – if yes, ok, if not it should mirror such?) directly or indirectly, for himself or on behalf of any other Person, utilize any trade secrets of the Company or any Lockton entity in order to solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the last day of Participant's employment with the Company, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Company, the Other Series, or any Affiliate. Participant shall not, directly or indirectly, for himself or on behalf of any other Person, (i) accept, service or work on, or attempt or threaten to accept, service or work on, any such competitive business from any of the Customer Accounts that Participant may not solicit, or (ii) in any way do business with any of the Customer accounts that Participant may not solicit to the extent such business is the same or substantially similar to that provided by the Company, the Other Series or any Affiliate.
>
> "The Customer Accounts to which this restriction applies are:
>
>> "(i) any of the Customer Accounts of the Company (1) serviced or worked on by Participant; (2) serviced or worked on by associates who were supervised by Participant; (3) for or about which Participant obtained or had access to Confidential Information, or (4) with which Participant has or had business contact;
>>
>> "(ii) any of the Customer Accounts of the Other Series (1) serviced or worked on by Participant; (2) serviced or worked on

> by associates who were supervised by Participant; (3) for or about which Participant obtained or had access to Confidential Information, or (4) with which Participant has or had business contact ; and
>
> "(iii) any of the Customer Accounts of any Affiliate (1) serviced or worked on by Participant; (2) serviced or worked on by associates who were supervised by Participant; (3) for or about which Participant obtained or had access to Confidential Information, or (4) with which Participant has or had business contact ."

34. Section 1(h) of the Award Plan Agreement defines "Customer Accounts" as follows:

> "(h) 'Customer Accounts' means:
>
> "(i) the accounts of all customers of one or more of the Company, the Other Series or any Affiliate, including, but not limited to, a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm in its capacity as a buyer or when it has engaged the Company, the Other Series or any Affiliate to perform due diligence or other prospecting activities with respect to a potential investment in or the acquisition of another entity; and
>
> "(ii) prospective customers of either one or more of the Company, the Other Series or any Affiliates in the event:
>
> "(1) a proposal has been made by the Company, the Other Series or any Affiliate and such proposal is pending or was pending within the six (6) month period before the last day of Participant's employment with the Company; or
>
> "(2) the Company, the Other Series or any Affiliate has been engaged by a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm to perform due diligence or other prospecting activities with respect to potential investment in or acquisition of another entity (the "target entity"), at any time during the six (6) month period preceding the last day of Participant's employment with the Company, in which case such target entity shall be considered a prospective customer."

35. Despite the reference to "utilize[ing] any **<u>trade secrets</u>**" in the customer non-solicitation covenant, the Agreement does not define "trade secrets" or identify or

describe Lockton's purported "trade secrets" categorically, with reasonable particularity, or otherwise. Moreover, during Plaintiff's association with Lockton, Lockton did not provide Plaintiff with training about what information constituted trade secret information, any trade secret classification policy identifying what information constituted trade secret information, or any other documents identifying what information constituted trade secret information.

36. Section 10(i) of the Agreement, titled "Reasonableness of Restrictions," purports to acknowledge the reasonableness of the above restrictive covenants, stating that "it is reasonable that the restrictive activities are not limited to a geographical scope or region; rather, [such restrictions] extend to any geographical location where the restricted activities are or reasonably could be conducted." In other words, the restrictive covenants in the Deferred Compensation Agreement operate without restriction and apply worldwide.

37. Section 12(f) of the of Award Plan Agreement, titled "Governing Law and Forum Selection," states that the Agreement "shall be subject to, governed by, and construed in accordance with the laws of the State of California without reference to conflict of law principles," and any "action to enforce the provisions of this Agreement shall be brought in any state or federal court in Los Angeles, California."

## II. Lockton's scheme of combining restrictive covenants with a Missouri forum and choice-of-law provision constitutes an unlawful attempt to evade fundamental, nonwaivable California Public Policy

### A. Lockton's restricted covenants are void and unenforceable under Cal. Bus. & Prof. Code § 16600

38. The California Supreme Court has declared that it is California's stated public policy to favor "open competition and employee mobility" so "'that every citizen shall

retain the right to pursue any lawful employment and enterprise of their choice.'"[1] California codified prohibitions against restrictions on employee mobility in California Business & Professions Code section 16600, which states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Courts have noted that Section 16600 is "an expression of public policy" that the "interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change."[2] Rights under Section 16600 are not waivable.[3]

39. California courts have applied Section 16600 not only to invalidate absolute prohibitions on the exercise of a profession, trade, or business, but also to invalidate restrictive covenants—including post-employment covenants purporting to prohibit soliciting business from, accepting business from, and doing business with a former employer's past or prospective clients. For example, in *Edwards v. Arthur Andersen LLP*, the California Supreme Court affirmed the invalidation of an employment agreement that prohibited the employee from performing services for his prior employer's clients for 18 months, if he previously worked on the account, and for 12 months if he had not worked on the account.[4]

40. Courts have also recognized that Section 16600 protects California-based employers (including Plaintiff's current California-based employer Alliant), as well as California employees, by ensuring that "California employers will be able to compete

---

[1] *Edwards v. Arthur Andersen LLP* (2008) 44 Cal. 4th 937, 946 (citations omitted).

[2] *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859, 860.

[3] *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659.

[4] *Edwards,* 44 Cal.4th at 948.

effectively for the most talented, skilled employees in their industries, wherever they may reside."[5]

41. Courts have held that restrictive covenants that purport to bar a departed employee from soliciting employees of a former employer violate Section 16600.[6]

42. There is no statutory "trade secrets" exception to Section 16600. California courts recognize that a covenant not to compete is unnecessary to protect trade secrets where other provisions in an agreement serve that purpose.[7] Such covenants are also unnecessary because the California Uniform Trade Secrets Act and the federal Defendant Trade Secrets Act provide sweeping protections against the misappropriation of trade secrets.

43. Last year, the California legislature passed two new laws, California Business and Professions Code sections 16600.1 and 16600.5, effective January 1, 2024, which reinforce California's prohibition on post-employment restrictive covenant agreements. These laws prohibit employers from using restrictive covenants in an employment contract; impose a requirement that businesses notify employees that existing restrictive covenants in their contracts are void; define any attempt to enforce an unlawful restrictive covenant as a civil violation; and provide that violations of these laws constitute acts of unfair competition.

44. California Business and Professions Code section 16600.5, for example, provides that an "employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was

---

5 *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 901.

6 *See, e.g.*, *Barker v. Insight Glob., LLC* (N.D. Cal. Jan. 11, 2019) 2019 WL 176260 at *3 ("California law is properly interpreted post-*Edwards* to invalidate employee nonsolicitation provisions"); *WeRide Corp. v. Kun Huang* (N.D. Cal. 2019) 379 F.Supp.3d 834, 851-52, modified in part, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (invalidating employee nonsolicit as contrary to California public policy); *Conversion Logic, Inc. v. Measured, Inc.* (C.D. Cal. Dec. 13, 2019) 2019 WL 6828283, at *4 (same).

8 Cal. Bus. & Prof. Code § 16600.5(b), and (c).



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

maintained outside of California," and that an "employer shall not enter into a contract with an employee or prospective employee that includes a provision that is void under this chapter."[8] It further provides that an employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation.[9]

45. The California Legislature recited several findings supporting the enactment of Section 16600.5. The Legislature reported that, despite Section 16600's ban on restrictive covenants, research "shows that California employers continue to have their employees sign noncompete clauses that are clearly void and unenforceable under California law," and that "Employers who pursue frivolous noncompete litigation has a chilling effect on employee mobility."[10] The Legislature stated that California has "benefited significantly" from its public policy and law favoring employee mobility and open competition," stating that the policy has fueled "competition, entrepreneurship, innovation, job and wage growth, equality, and economic development."[11]

46. The California Legislature further reported that:

> "Over the past two decades, research on the harm of noncompete clauses and other contract clauses involving restraint of trade to pursue one's profession has been accelerating. Empirical research shows that noncompete clauses stifle economic development, limit firms' ability to hire and depress innovation and growth. Noncompete clauses are associated with suppressed wages and exacerbated racial and gender pay gaps, as well as reduced entrepreneurship, job growth, firm entry, and innovation."[12]

---

[8] Cal. Bus. & Prof. Code § 16600.5(b), and (c).

[9] Cal. Bus. & Prof. Code § 16600.5(d).

[10] *See* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB699 (Section 1(a) of SB 699).

[11] *See* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB699 (Section 1(b) of SB 699).

[12] *See* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB699 (Section 1(c) of SB 699).

47. The second of the new California laws passed last year amended Section 16600, adding interpretive guidance to the courts that the section "shall be read broadly" to "void the application of any noncompete in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored."[13] The amendments to Section 16600 confirm that it they do not "constitute a change in, but [are] declaratory of existing law."[14]

48. The California legislature also added a new Section, codified at California Business and Professions section 16600.1. This Section imposed an affirmative obligation on employers to notify any employees or former employees (employed after January 1, 2022) whose contracts included a non-compete clause that the non-compete provisions in their agreements were void. Under the law, an individualized communication to the employee was required to be sent on or before February 14, 2024.[15] Failure to provide the required notice "constitutes an act of unfair competition" within the meaning of California's Unfair Competition Law, codified at California Business and Professions Code sections 17200, *et seq*.[16]

49. Likewise, courts have held that a former employer's attempts to enforce restrictive covenants against a former California employee constitutes unfair competition in violation of California Business and Professions Code section 17200.[17]

50. Section 16600, 16600.1, and 16600.5 protect California-based ***employers***, like Alliant, as well as California workers, by ensuring that "California employers will be able to compete effectively for the most talented, skilled employees in their industries,

---

[13] Cal. Bus. & Prof. Code § 16600(b)(1).

[14] Cal. Bus. & Prof. Code § 16600(b)(2).

[15] Cal. Bus. & Prof. Code § 16600.1(b).

[16] Cal. Bus. & Prof. Code § 16600.1(c).

[17] *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal. App. 4th 564, 575-76.

wherever they may reside."[18] Courts have similarly recognized that California law protects California employers from "anticompetitive conduct by out-of-state employers... who would interfere with or restrict these freedoms" based on efforts by those out-of-state employers to enforce an agreement containing a covenant not to compete even when the California employer is not a party to the agreement.[19]

51. The Federal Trade Commission apparently believes that California's public policy, which dates back to 1872, should become national policy. The FTC recently voted in favor of a final rule that would prohibit businesses throughout the nation from using noncompete clauses in contracts with workers. In a statement supporting the proposed rule, FTC Chairperson Lina M. Khan stated that noncompete clauses drive down national income:

> "noncompete clauses reduce competition in labor markets, suppressing earnings and opportunity even for workers who are not directly subject to a noncompete. When workers subject to noncompete clauses are blocked from switching to jobs in which they would be better paid and more productive, unconstrained workers in that market are simultaneously denied the opportunity to replace them. This collective decline in job mobility means fewer job offers and an overall drop in wages, as firms have less incentive to compete for workers by offering higher pay, better benefits, greater say over scheduling, or more favorable conditions. The FTC estimates that the proposed ban on noncompetes would increase workers' total earnings by close to $300 billion per year."[20]

In further support of the proposed rule, Ms. Khan continued that outlawing noncompete clauses would be a boon for the economy and consumers:

> "the existing evidence indicates that noncompete clauses reduce innovation and competition in product and service markets. Studies

---

[18] *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 901 (1998).

[19] *Id.*

[20] Statement at p. 2 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/statement-of-chair-lina-m-khan-joined-by-commrs-slaughter-and-bedoya-on-noncompete-nprm.pdf).

> show that locking workers in place reduces innovation, likely by decreasing the flow of information and knowledge among firms. By preventing workers from starting their own businesses and limiting the pool of talent available for startups to hire, noncompetes also limit entrepreneurship and new business formation. This in turn reduces product quality while raising prices. Indeed, existing evidence from the health care sector suggests that the proposed ban would decrease consumer prices, potentially to the tune of $150 billion a year."[21]

52. Ms. Khan also noted that "research shows that some employers continue to use noncompetes even in states that have declared them null and void. As a result, workers in states where noncompetes are unenforceable are about as likely to have one in their contract as workers in other states," and that "this causes confusion and uncertainty for workers about whether they are bound by an enforceable noncompete, which can dissuade them from seeking or accepting another job."[22] In fact, in support of the final rule, the FTC found that "[e]mployers can exploit the fact that many workers lack knowledge of whether non-competes are unenforceable under State law by representing to workers that they are subject to a non-compete when they are not or when the non-compete is unenforceable. Such misrepresentations can have ***in terrorem*** effects on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition that the Commission is concerned about."[23]

53. Ms. Khan further noted that "employers may seek to circumvent state laws restricting noncompetes through the use of choice-of-law provisions and forum selection

---

[21] Statement at p. 2 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/statement-of-chair-lina-m-khan-joined-by-commrs-slaughter-and-bedoya-on-noncompete-nprm.pdf).

[22] Statement at p. 3 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/statement-of-chair-lina-m-khan-joined-by-commrs-slaughter-and-bedoya-on-noncompete-nprm.pdf). *See also* Proposed Text of Non-Compete Clause Rule NPRM at p. 16 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/p201000noncompetenprm.pdf).

[23] Proposed Text of Final Non-Compete Clause Rule at p. 217 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/noncompete-rule.pdf ).

clauses, so that one state's lenient approach to noncompetes may have spillover effects into other states."[24]

54. Courts have long recognized that employers may attempt to misuse overly broad confidentiality provisions in employment agreements. Such provisions restrain competition and limit employee mobility. As the Ninth Circuit explained in *Winston Research Corp. v. Minnesota Mining & Mfg. Co.,*

> "restrictions upon the use and disclosure of such information limit the employee's employment opportunities, tie him to a particular employer, and weaken his bargaining power with that employer. Such restrictions interfere with the employee's movement to the job in which he may most effectively use his skills. They inhibit an employee from either setting up his own business or from adding his strength to a competitor of his employer, and thus they diminish potential competition. Such restrictions impede the dissemination of ideas and skills throughout industry. The burdens which they impose upon the employee and society increase in proportion to the significance of the employee's accomplishments, and the degree of his specialization."[25]

55. Confidentiality provisions cannot be so broad as to deny former employees their "right to use their general skill, knowledge, and experience, even though acquired in part during their employment" with the prior employer.[26]

56. Confidentiality provisions that are unreasonably long in duration, or purport to apply in perpetuity, "would subvert the public's interest in allowing technical employees to make full use of their knowledge and skill and in fostering research and development."[27]

---

[24] Statement at p. 3 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/statement-of-chair-lina-m-khan-joined-by-commrs-slaughter-and-bedoya-on-noncompete-nprm.pdf). *See also* Proposed Text of Non-Compete Clause Rule NPRM at pp. 54-55 (available at https://www.ftc.gov/system/files/ftc_gov/pdf/p201000noncompetenprm.pdf).

[25] *Winston Research Corp. v. Minnesota Mining & Mfg. Co.* (9th Cir. 1965) 350 F.2d 134, 137-38.

[26] *Winston,* 350 F.2d at 144.

[27] *Winston,* 350 F.2d at 142.

57. California courts have held that a confidentiality provision based on an overly broad definition of "Confidential Information" can operate as a de facto noncompete provision and is void and unenforceable under Business and Professions Code section 16600.[28]

58. "In order for the taking of information to constitute wrongdoing, the information must be property. Information is not property unless some 'positive law' makes it so."[29]

59. California has adopted a "positive law" to establish a property interest in information that a company or person has developed that has independent economic value by virtue of it being kept secret from the public, and that the company or person has taken reasonable steps to keep secret. That "positive law" is the California Uniform Trade Secrets Act (CUTSA), which provides owners of information protection against the improper acquisition, disclosure or use of information that satisfies the Act's definition of a "trade secret."[30] CUTSA is based on the Uniform Trade Secrets Act (UTSA), which was published by the Uniform Law Commission in 1979 (and amended in 1985). Forty-nine states and the District of Columbia have adopted a version of the UTSA.

60. Before states adopted the UTSA, a party could only seek to protect information claimed to be confidential or proprietary through the common law or through contract law. Due to the variance in state law about the enforceability of restrictive covenants, the result was a lack of uniformity throughout the American legal system about what kind of information was legally protectible. A "prime purpose" of CUTSA "was to sweep away" the

---

[28] *Brown v. TGS Management Co., LLC* (2020) 57 Cal.App.5th 303, 319.

[29] *SunPower Corp. v. SolarCity Corp.* (N.D. Cal. Dec. 11, 2012) 2012 WL 6160472, at *5. *See also Silvaco Data Sys. v. Intel Corp.* (2010) 184 Cal. App. 4th 210, 239 ("But 'information' cannot be 'stolen' unless it constitutes property. And information is not property unless some law makes it so.").

[30] Cal. Civ. Code § 3426 et seq. The Uniform Trade Secrets Act was promulgated in 1979 and amended in 1985. It has been adopted by 49 states and the District of Columbia.

> "bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is—and is not—liable for acquiring, disclosing, or using 'information ... of value.' (See § 3426.8.) Central to the effort was the act's definition of a trade secret. (See § 3426.1, subd. (d).) Information that does not fit this definition, and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen."[31]

Accordingly, "If the plaintiff identifies no property right outside of trade secrets law, then he has no remedy outside that law, and there is nothing unsound or unjust about holding other theories superseded."[32]

61. Following the near universal adoption of the UTSA[33] (and the federal Defend Trade Secrets Act of 2016), which solidified a two-tiered protective scheme in which commercial information is classified only as either protectable "trade secrets" or unprotectable "general skill and knowledge," companies have sought to create another category of legally protectible information through contract provisions that seek to bar the acquisition, use or disclosure of so-called "Confidential Information." However, the California Legislature intended for CUTSA, with its "comprehensive structure and breadth," to "occupy the field" of protecting information in which the holder of information

---

[31] *Silvaco,* 184 Cal. App. 4th at 239 n.22.

[32] *Silvaco,* 184 Cal. App. 4th at 239 (footnote omitted). *See also SunPower*, 2012 WL 6160472, at *5 ("in order to state a claim based on the taking of information, a plaintiff must show that he has some property right in such information (*i.e.* that the information is proprietary)."

[33] The background material on the UTSA documents the history of Assembly Bill 501 of 1984, which enacted CUTSA in California. The background materials show that in drafting the UTSA, a majority of Subcommittee A of Committee 402, ABA Section of Patent, Trademark, and Copyright Law, recommended that the National Conference of Commissioners on Uniform State Laws reject a proposed Uniform Intellectual Property Act, which included trade secrets as "confidential intellectual property." Moreover, in 1985, CUTSA's "Effect on Other Law," section 3426.7(b)(1), was amended as follows: "contractual ~~or other civil liability or relief that is~~ remedies, whether or not based upon misappropriation of a trade secret."



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

has a claimed property interest.[34] Thus, CUTSA "serves to preempt all claims premised on the wrongful taking and use of confidential business and proprietary information, ***even if that information does not meet the statutory definition of a trade secret***."[35] "To permit otherwise would allow plaintiffs to avoid the preclusive effect of CUTSA (and potentially plead more favorable common-law claims) by simply failing to allege one of the elements necessary for information to qualify as a trade secret."[36]

62. Thus, "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies 'based upon misappropriation of a trade secret,'" and "confidential information."[37] This includes breach of contract claims to the extent they are based on the alleged violation of contract terms that purport to cover and restrict the use of confidential and proprietary information that does not meet the CUTSA's statutory definition of a trade secret. While California Civil Code section 3426.7 provides that CUTSA "does not affect . . . contractual ***remedies***, whether or not based upon

---

[34] *MedImpact Healthcare Sys., Inc. v. IQVIA Inc.* (S.D. Cal. Aug. 27, 2020) 2020 WL 5064253, at *16, quoting *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal. App. 4th 939, 954-957.

[35] *Silvaco,* 184 Cal. App. 4th at 236 (emphasis added).

[36] *SunPower*, 2012 WL 6160472, at *5. *See also Robert Half Int'l, Inc. v. Ainsworth* (S.D. Cal. 2014) 68 F.Supp.3d 1178, 1188 (collecting cases holding CUTSA supersedes claims based on misappropriation of information that does not satisfy the definition of trade secrets); *Monolithic Power Sys., Inc. v. Dong* (N.D. Cal. June 22, 2021) No. 20-6752, 2021 WL 4522291, at *5 (dismissing fraud claim based on allegations of misappropriation of confidential information); *Heller v. Cepia, L.L.C.* (N.D. Cal. Jan. 4, 2012) No. 11-1146, 2012 WL 13572, at *7 (holding that common law claims premised on "the wrongful taking and use of confidential business and proprietary information, regardless of whether such information constitutes trade secrets, are superseded by the CUTSA."); *Mattel, Inc. v. MGA Entm't Inc.* (C.D. Cal. 2011) 782 F.Supp.2d 911, 986-87 (concluding the "UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret"); *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc.* (2010) 123 Hawai'i 314, 327 (same);

[37] *Silvaco,* 184 Cal. App. 4th at 236.

misappropriation of a trade secret,"[38] this provision allows contract claims that seek contractual remedies for the alleged breach of confidentiality provisions that protect "trade secrets" as defined by the CUTSA to survive supersession. In other words, where the gravamen of the complaint concerns the misuse of company information, CUTSA's supersession provision only allows a plaintiff to sue for misappropriation of trade secrets and for breach of contract ***with respect to alleged misuse of trade secret information*** (or for breaches of contractually specified duties of loyalty or contract provisions that do not concern "confidential information" or trade secrets). It does not allow litigants to destroy the uniformity of the Uniform Trade Secrets Act and CUTSA by self-crafting overly broad definitions of confidential and proprietary information which embrace information that does not qualify as trade secrets under the UTSA/CUTSA.[39] California Business and Professions Code section 3426.8 provides that CUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this

---

[38] Cal. Civ. Code. § 3426.7(b) (emphasis added).

[39] Plaintiff is mindful of the court's ruling in *Angelica Textile Servs., Inc. v. Park* (2013) 220 Cal.App.4th 495, which involved claims for misappropriation of trade secrets, violation of Bus. & Prof. Code § 17200, unfair competition, interference with business relationships, and breach of contract. In that case, the court stated the "UTSA by its terms does not displace a contract claim, even if it is based on the misappropriation of a trade secret." *Id.* at 502. That statement was *dicta*. The plaintiff's breach of contract claim was not based, in whole or in part, on a confidentiality provision—it alleged breach of a noncompete covenant, and the court noted the claim was "*not* based on any misappropriation of a trade secret but on Park's entirely independent violation of the noncompetition agreement. Thus, it is outside the scope of UTSA displacement …" *Id.* at 508. Furthermore, the defendants did not argue in the summary judgment proceedings that the breach of contract claim was superseded by CUTSA. *Id.* at 502. Finally, the court repeatedly suggested CUTSA displaces breach of contract ***claims*** when the wording of the statute only refers to displacing contract ***remedies***. *Compare id.* at 505 (quoting statute as stating CUTSA does not "does not affect *(1) contractual remedies, whether or not based upon misappropriation of a trade secret*") with *id.* at 506 ("UTSA by its terms does not displace a contract claim"), *id.* at 508 ("breach of contract claims, even when they are based on misappropriation or misuse of a trade secret, are not displaced by UTSA").

title among states enacting it."

## B. Courts have held that contractual schemes like Lockton's violate California law

63. In *Application Group, Inc. v. Hunter Group, Inc.*, the California Court of Appeal found a Maryland choice-of-law provision included in a restrictive covenants agreement to be unenforceable, finding that the

> "trial court did not err when it declined to enforce the contractual conflict of law provision in [the defendant's] employment agreements. To have done so would have been to allow an out-of-state employer/competitor to limit employment and business opportunities in California. As the [California Supreme Court has] held, California courts are not bound to enforce a contractual conflict of law provision which would thus be 'contrary to this state's fundamental policy.'"[40]

64. In the matter styled as *Giblin v. Lockton Companies, LLC—Pacific Series*, Superior Court Case No. 22STCV39876 (Los Angeles County), plaintiff Sallie Giblin, who had worked as a Producer Partner in Lockton's Pacific Series, was a member of Lockton Partners, and had served as the president of Lockton's San Diego office, left Lockton in November 2022 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are "nonwaivable" and that "the restrictive covenants contained in the agreements between Plaintiff and Defendants appear to be unenforceable restraints on trade pursuant to California law."[41] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not diminish in any way Giblin's rights under California

---

[40] *Application Group, Inc. v Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 902.

[41] 3.29.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 10, 17 (attached to this Complaint as **Exhibit 6**).

law.[42] Lockton's efforts to overturn the ruling have failed. The trial court denied Lockton's motion for reconsideration and in an order issued on September 25, 2023, the California Court of Appeal denied Lockton's petition for a writ of mandate.[43] The California Supreme Court has accepted Lockton's petition for review on a grant and hold basis pending the disposition of a related issue in *EpicentRx v. S.C. (EpiRx)*, S282521.

65. In the matter styled as *Kaufman v. Lockton Investmen, S28t Advisors, LLC, et al*. Superior Court Case No. 22STCV23460 (Los Angeles County), plaintiff Eric Kaufman, who had worked as a Producer Member for Lockton's Pacific Series in Los Angeles, left Lockton in July 2022 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are "unwaivable" and that "***[u]nder California law, there is no doubt that the covenants are unlawful," that "Lockton made no attempt to comply with California law," that "[i]n light of the density of the language and complex structure of the Member Agreements, on this motion, it appears that Lockton had a well thought out plan to attempt to create locked-down iron-clad covenants with Kaufman,"*** and that ***"Lockton made no effort to create lawful covenants***."[44] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not diminish in any way

---

[42] 3.29.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 17, Ex. 6.

[43] 9.25.23 Order (attached to this Complaint as **Exhibit 7**.)

[44] 12.13.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 6, 8, 14 (attached to this Complaint as **Exhibit 8**) (emphasis added).

Kaufman's rights under California law.[45] The California Supreme Court has accepted Lockton's petition for review on a grant and hold basis pending the disposition of a related issue in *EpicentRx v. S.C. (EpiRx)*, S282521.

66. In the matter styled as *Canales v. Lockton Companies, LLC—Pacific Series, et al.*, Superior Court Case No. 23STCV24107 (Los Angeles County), plaintiff Scott Canales, who had worked as a Producer Partner for Lockton's Pacific Series in Los Angeles and was a member of Lockton Partners, left Lockton in October 2023 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are "nonwaivable statutory right[s]" and that Lockton's restrictive covenants do "***not appear to satisfy the requirements of Section 16602.5***" so as to fall within an exception to Section 16600.[46] The Court further stated that "Defendant Lockton Companies LLC – Pacific Series has itself argued that a similar forum selection clause would violate nonwaivable rights under Section 16600. Pacific Series previously filed a substantially similar lawsuit (Aon case) making the same arguments that Plaintiff makes here. ***Defendants cannot make one argument when they want to freely compete, and make the opposite argument when someone else wants to compete against them.***"[47] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not diminish in any way Canales's rights under California

---

[45] 12.13.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 17, Ex. 8.

[46] 12.6.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 3, 5 (attached to this Complaint as **Exhibit 9**) (emphasis added).

[47] 12.6.23 Order Re: Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 4-5, Ex. 9 (internal citations omitted; emphasis added).

law. The California Supreme Court has accepted Lockton's petition for review on a grant and hold basis pending the disposition of a related issue in *EpicentRx v. S.C. (EpiRx)*, S282521.

67. In the matter styled as *Barnes v. Lockton Companies, LLC—Pacific Series, et al.*, Superior Court Case No. 23STCV24040 (Los Angeles County), plaintiff Gregory Barnes, who had worked as a Producer Partner for Lockton's Pacific Series in Los Angeles and was a member of Lockton Partners, left Lockton in October 2023 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are unwaivable and that Lockton's restrictive covenants do not comply with Section 16602.5's statutory exception because "***[t]he non-compete contract here not only contains no geographic limit, but specifically disclaims its existence***."[48] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not diminish in any way Barnes's rights under California law.[49]

68. In the matter styled as *Roderick v. Lockton Companies, LLC—Pacific Series, et al.*, Superior Court Case No. 23STCV24101 (Los Angeles County), plaintiff Richard Roderick, who had worked as a Producer Partner for Lockton's Pacific Series in Los Angeles and was a member of Lockton Partners, left Lockton in October 2023 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants

[48] 1.26.24 Order Re: Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 10 (attached to this Complaint as **Exhibit 10**) (emphasis added).

[49] 1.26.24 Order Re: Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 11, Ex. 10.

and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are unwaivable and that Lockton's restrictive covenants do not comport with California law.[50] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not diminish in any way Roderick's rights under California law.[51]

69. In the matter styled as *Racunas v. Lockton Companies, LLC—Pacific Series, et al.*, Superior Court Case No. 23STCV24054 (Los Angeles County), plaintiff Mark Racunas, who had worked as a Producer Member for Lockton's Pacific Series in Los Angeles, left Lockton in October 2023 to join Alliant and filed suit in California seeking a judicial declaration that Lockton's restrictive covenants and associated Missouri forum and choice-of-law clauses were unenforceable under California law. Lockton moved to dismiss or stay the action based on the Missouri forum clause. The court denied Lockton's motion, finding that the rights under Section 16600 are "unwaivable" and that "***it appears the restrictive covenants set forth in the Agreements would likely not be enforceable under California law***."[52] The court declined to enforce Lockton's Missouri forum clause because Lockton had failed to satisfy its burden of showing that enforcement of the clause would not

[50] 2.23.24 Order Re: Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 9, 17-18 (attached to this Complaint as **Exhibit 11**) (emphasis added).

[51] 2.23.24 Order Re: Defendants' Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 18, Ex. 11.

[52] 3.1.24 Order Re: Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 8-9 (attached to this Complaint as **Exhibit 12**) (emphasis added).

diminish in any way Racunas's rights under California law.[53]

## C. Lockton has admitted in public filings that its contractual scheme is contrary to California law and public policy

70. On January 12, 2022, two employees of Aon's Los Angeles office—Paul Rodriguez and Michael Szot—resigned from Aon and joined Lockton in Los Angeles. Rodriguez and Szot's stock purchase agreements with Aon included noncompete covenants forbidding them from soliciting, accepting business from, or servicing the business of their Aon clients. The agreements also provided that the covenants were governed by Illinois law (which enforces restrictive covenants) and that any legal action relating to the agreements had to be brought in Illinois. On the same day of their resignation, Rodriguez and Szot filed a lawsuit in California state court seeking a judicial declaration that Aon's restrictive covenants and associated choice-of-law and forum-selection clauses were void and unenforceable under California Business & Professions Code section 16600 and California's fundamental public policy in favor of employee mobility and open competition. The Series joined Rodriguez and Szot as a plaintiff.

71. In their complaint, the Lockton plaintiffs alleged Aon was well aware of Section 16600 and California public policy, but "intentionally sought to deprive its California employees of the right to seek new employment with competitors in the marketplace by imposing patently unlawful restrictive covenants."[54] The Lockton plaintiffs alleged that Aon's unlawful "scheme" to "circumvent" California law and public policy involved the use of "stock purchase agreements" that "contain unlawful restrictive covenants" and "provisions directing the use of Illinois law and requiring that these California matters

---

53 3.1.24 Order Re: Defendants' Motion for Order Staying Proceedings Pending Resolution in California Supreme Court and Defendants' Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum *Non Conveniens* at 17, Ex. 12.

54 *Lockton v. Aon* Complaint ¶ 1 (attached to this Complaint as **Exhibit 13**).

involving California residents and employees be litigated … in an Illinois forum."[55] The Lockton plaintiffs alleged that the "net effect" of these provisions, if enforced, would be "devastating" to Aon's California employees:

> "Aon could use Illinois law to block those departing California employees from moving to competitors in California and freely competing, in complete disregard for California's fundamental public policy supporting free employee mobility in the workplace … Aon's scheme represents a uniquely punitive combination of burdens imposed on California employees specifically designed to evade Section 16600."[56]

72. The Lockton plaintiffs further alleged that Aon was employing its triad of noncompete provisions (restrictive covenants/Illinois choice-of-law/Illinois forum) to unfairly compete against Lockton:

> "Lockton's ability to compete freely (as it is entitled to do under California law) is dependent on others playing fairly as well. ***Lockton is happy to go toe-to-toe in the marketplace with Aon, where the best brokerage firm may succeed***. Aon, however, has chosen a different path—designed to hamstring its competition by unfairly and unlawfully preventing it from assembling its desired team and from serving the clients that wish to follow their preferred brokers."[57]

The Lockton plaintiffs alleged that if Lockton "dare chooses to hire talented Aon employees in California, it will suffer an unfair competitive scheme resulting in lawsuits in Illinois in

---

[55] *Lockton v. Aon* Complaint ¶¶ 4-5, Ex. 13. *See also id.* ¶ 43 ("Rather than abide by the law, and compete fair and square in the marketplace, however, Defendants conspired to develop a strategy to evade California law and to unlawfully restrict its California employees from freely competing should they leave Aon."); *id.* ¶ 47 ("Notwithstanding their intended application for California residents, Aon intentionally drafted these RSU Agreements to sidestep California law by including a choice of law provision stating that Illinois law—which provides significantly less protection for an employee's right to mobility—governs the agreement. Aon also began including in the RSU Agreements forum-selection clauses stating that any litigation would take place in Illinois, evidently as a response to California court decisions that refused to enforce choice-of-law clauses inconsistent with an employee's rights under Section 16600.").

[56] *Lockton v. Aon* Complaint ¶ 6, Ex. 6.

[57] *Lockton v. Aon* Complaint ¶ 12, Ex. 6 (emphasis added).

contravention of settled California law and policy."[58]

73. The Lockton plaintiffs also alleged that allowing Aon to get away with its "scheme" to circumvent California law would harm innocent third-party clients, who "have the right to choose the broker with whom they wish to work and Rodriguez and Szot have the right, under California law, to accept, service, and pursue this business."[59]

74. The Lockton plaintiffs declared they were filing their suit "to shine a light on Aon's sordid practice" and to ask the court to shut down "Aon's illegal gambit to elude California's clear and unequivocal prohibition against hindering employee mobility."[60] In support of their asserted claims, the Lockton plaintiffs cited three cases in which the court found that Aon's schemed constituted an illegal attempt to evade California law. Those three cases all involved Aon employees in California ***who went to work for Alliant in California***:

- The Lockton plaintiffs informed the court that in the case of *Arkley v. Aon Risk Servs. Companies, Inc.,* No. CV 12-1966 (C.D. Cal. 2012) (June 13, 2012 Order), the "court ruled against Aon and in favor of the former employees and their new employer, finding that (1) the covenants not to compete were governed by California law, (2) the covenants not to compete were void and unenforceable under California Business and Professions Code §16600, and (3) Aon's use of illegal non-compete agreements violated the UCL as a matter

---

[58] *Lockton v. Aon* Complaint ¶ 13, Ex. 6. *See also id.* ¶ 38 ("Having grown dissatisfied with working at Aon, Szot and Rodriguez should be able to leave their jobs and join a company that is a better fit with their personalities, skills, growth potential, and goals and would thereby better serve their customers. Lockton's Pacific Series is entitled to hire the employees of their choosing in California, free from unfair and illegal interference by former employers.").

[59] *Lockton v. Aon* Complaint ¶ 84, Ex. 6. *See also id.* ¶ 7 (alleging Aon's "agreements also deprive clients of their broker of choice and hinder the ability of competitors (like Plaintiff Lockton) from competing fairly").

[60] *Lockton v. Aon* Complaint ¶ 14, Ex. 6.

of law."[61]

- The Lockton plaintiffs informed the court that in the case of *Baldwin v. Aon Risk Services Cos.* (Fresno Superior Court Case No. 14CECG00572), the court "granted summary adjudication holding that: 'The covenants not to compete contained in the [RSU Agreements] are unenforceable pursuant to Business and Professions Code section 16600'" and that "the restrictive covenants should be governed by California law notwithstanding the Illinois choice of law clause in the former employee's agreements."[62] The Lockton plaintiffs quoted the court's order, which stated: '"[P]arties cannot avoid Business and Professions Code section 16600 by including provisions designating another state's law as governing their employment agreement. ***The 'strong public policy' underlying section 16600 overrides any contractual provision designating another state's law as controlling as to the validity of a noncompete clause***.'"[63] The Lockton plaintiffs also informed the court that, after a jury trial, in "its final July 12, 2017 Judgment and Statement of Decision, the court found that Aon's assertion of the restrictive covenants also constituted unfair competition in violation of California Business and Professions Code section 17200."[64]
- The Lockton plaintiffs informed the court that in *Heffernan v. Aon Risk Services Cos.* (Santa Clara County Superior Court Case No. 16CV29077), after a bench trial, the court ruled that "Heffernan's RSU Agreement was governed by California law and that California was the proper forum to hear disputes

---

[61] *Lockton v. Aon* Complaint ¶ 50, Ex. 6.

[62] *Lockton v. Aon* Complaint ¶¶ 53-54, Ex. 6.

[63] *Lockton v. Aon* Complaint ¶ 54, Ex. 6 (quoting Oct. 16, 2015 Order; emphasis in Lockton's Complaint).

[64] *Lockton v. Aon* Complaint ¶¶ 55, Ex. 6.

relating to the agreement. The court concluded that the Illinois choice of law and forum selection clauses in the agreement would effectively eviscerate California public policy and deprive Heffernan of having a California court determine his rights and obligations under the agreement."[65] The Lockton plaintiffs further noted that the court in *Heffernan* granted Heffernan's "request for declaratory relief and held that Aon's non-compete provisions were unenforceable, null and void."[66]

## FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF

## (By Plaintiff against Defendant)

75. Plaintiff re-alleges and incorporates by reference the preceding allegations as if fully set forth here.

76. An actual, present and justiciable controversy has arisen and now exists between Plaintiff and Defendant concerning (a) the enforceability of the confidentiality clause and the post-employment restrictive covenants in Plaintiff's agreements with Lockton and (b) whether enforcement of the Missouri forum and choice-of-law provision in Plaintiff's Stakeholder Agreement would eviscerate California's fundamental, unwaivable public policy in favor of workplace mobility and competition.

77. Plaintiff contends the confidentiality clause and post-employment restrictive covenants found in his agreements with Lockton are void and unenforceable under California Business & Professions Code section 16600 and California's fundamental, unwaivable public policy in favor of employee mobility and open competition.

78. The confidentiality clause and post-employment restrictive covenants found in Plaintiff's agreements with Lockton are not necessary to protect trade secrets because the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act provide

[65] *Lockton v. Aon* Complaint ¶ 58, Ex. 6.

[66] *Lockton v. Aon* Complaint ¶ 59, Ex. 6.

legal protection for Lockton's purported trade secrets. The covenants in the agreements against soliciting "Customer Accounts" involving the use of "trade secrets" fail to define "trade secrets." In fact, the agreements' definition of "Confidential Information" includes "trade secrets" as just one of many categories of purported "Confidential Information." This ambiguity creates an *in terrorem* effect and leaves Plaintiff in the impossible position of not knowing what "Customer Accounts" he can freely solicit, service, or accept business from.

79. Moreover, during Plaintiff's association with Lockton, Lockton did not provide Plaintiff with training about what information constituted trade secret information, any trade secret classification policy identifying what information constituted trade secret information, or any other documents identifying what information constituted trade secret information.

80. Lockton's definition of "Confidential Information" asserts the definition only covers information Lockton maintains is not generally known to the public because Lockton "has taken reasonable steps to maintain confidentiality." Thus, the overly broad provisions in Lockton's agreements that purport to bar the use and disclosure of Lockton's asserted "Confidential Information" are superseded by CUTSA. As the court explained in *SunPower Corp. v. SolarCity Corp.*:

> "If the basis of the alleged property right is in essence that the information is that it is 'not ... generally known to the public,' ... then the claim is sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that the information fails to meet the definition of a trade secret. To permit otherwise would allow plaintiffs to avoid the preclusive effect of CUTSA (and thereby plead potentially more favorable common-law claims) by simply failing to allege one of the elements necessary for information to qualify as a trade secret."[67]

81. Plaintiff further contends the Missouri forum and choice-of-law provision in the

[67] *SunPower Corp. v. SolarCity Corp.* (N.D. Cal. Dec. 11, 2012) 2012 WL 6160472, at *5: (citation omitted)



MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

Stakeholder Agreement is void and unenforceable under California Business and Professions Code section 16600 and California's fundamental, unwaivable public policy in favor of workplace mobility and competition. In addition, the Missouri forum and choice-of-law provision included in the Stakeholder Agreement entered into or modified or extended after January 1, 2017 is unlawful under Cal. Labor Code section 925, which prohibits an employer from requiring "an employee who primarily resides and works in California, as a condition of employment, to agree to a provision" that would require "the employee to adjudicate outside of California a claim arising in California" and/or "[d]eprive the employee of the substantive protection of California law with respect to a controversy arising in California."

82. Because Plaintiff worked for Lockton in California and entered into the Agreements in California, California is the appropriate forum for this action. Enforcing the Missouri forum clause in Plaintiff's Stakeholder Agreement with Lockton would be unreasonable because it "would contravene California's strong public policy against noncompete agreements" and "would substantially diminish the rights of California residents in a way that violates our state's public policy."[68]

83. Because California has a materially greater interest than Missouri in this controversy, California law, and not Missouri law, should govern the enforceability of the restrictive noncompete covenants. Enforcing the Missouri forum and choice-of-law provision in Plaintiff's Stakeholder Agreement with Lockton would contravene California's fundamental, unwaivable public policy in favor of open competition and employee mobility.

84. Unless the confidentiality clause and post-employment restrictive covenants and

---

68 *America Online, Inc. v. Superior Court* (2001) 90 Cal. App. 4th 1, 12. *See also Verdugo v. AlliantGroup LP* (2015) 237 Cal. Ap. 4th 141, 151 (declining to enforce Texas forum selection and choice of law clauses where California citizen sued employer for violation of rights codified in California Labor Code); Cal. Civ. Code § 3513 (a "law established for a public reason cannot be contravened by a private agreement").

the associated Missouri forum and choice-of-law provision are found void and unenforceable, (1) Plaintiff will be unable to freely engage in his chosen profession and provide services that actual and prospective customers desire, and (2) Alliant will be foreclosed from availing itself of Plaintiff's experience and expertise in the insurance industry, much of which Plaintiff acquired in California.

85. Plaintiff is informed and believes and on that basis alleges that Lockton contends that the confidentiality clause and post-employment restrictive covenants in his agreements are enforceable under Missouri law, that Missouri law governs the interpretation of Lockton's agreements with Plaintiff, and that any legal proceedings relating to the agreements must be pursued in Missouri state or federal court per the Missouri forum clauses in the agreements.

86. Plaintiff desires a judicial declaration that the confidentiality clause and post-employment restrictive covenants in Plaintiff's agreements with Lockton are facially void and unenforceable under California Business and Professions Code section 16600 and California public policy in favor of employee mobility and open competition, and that the confidentiality covenants are superseded by the California Uniform Trade Secrets Act, and are thereby unenforceable as to Plaintiff, especially to the extent they cover confidential and proprietary information not qualifying as trade secrets under CUTSA.

87. Plaintiff desires a judicial declaration that California is the appropriate forum for this action.

88. Plaintiff desires a judicial declaration that each of the aforementioned restrictive covenants are governed by California law, including those in Plaintiff's Stakeholder Agreement.

89. Plaintiff desires a judicial declaration of his rights and duties under the agreements, and seeks a declaration that he may fairly compete with Lockton.

90. The aforementioned judicial determinations are necessary and appropriate at this time so Plaintiff may confirm his legal rights and duties and freely and fairly engage

in open competition with his former employer.

## SECOND CAUSE OF ACTION FOR VIOLATION OF BUSINESS & PROFESSIONS CODE § 16600.5

## (By Plaintiff against Defendant)

91. Plaintiff re-alleges and incorporates by reference all of the preceding allegations as if fully set forth here.

92. The confidentiality clause and post-employment restrictive covenants in Plaintiff's Stakeholder Agreement, Deferred Compensation Agreement, and Award Plan Agreement are void and unenforceable under California Business and Professions Code section 16600 and California's fundamental, unwaivable public policy in favor of employee mobility and open competition.

93. Plaintiff further contends the Missouri forum and governing law provision in his Stakeholder Agreement with Lockton is void and unenforceable under California Business and Professions Code section 16600 and California's fundamental, unwaivable public policy in favor of workplace mobility and competition.

94. Despite the fact that the restrictive covenant provisions and clauses described above are void and unenforceable, Plaintiff is informed and believes that Lockton has attempted to enforce the provisions and clauses, including by informing Lockton producers, members, associates, employees, customers, and insurance carriers that Lockton has parted ways with Plaintiff and stated that Plaintiff was purportedly "shopping" around his book of business. Lockton made those statements in order to cause irreparable harm and damage his reputation and personal goodwill and thereby thwart fair and open competition. Plaintiff is informed and believes, and based thereon alleges, that Lockton has also sought to enforce such covenants through court proceedings against people who have left Lockton to pursue better opportunities with a competitive insurance brokerage firm.

95. California Business and Professions Code section 16600.5(d) provides that

an employer who . . . attempts to enforce a contract that is void under this chapter commits a civil violation."

96. California Business and Professions Code section 16600.5(e) provides that an employee, former employee, or prospective employee may bring a private action to enforce this chapter for injunctive relief or the recovery of actual damages, or both. Additionally, a prevailing employee, former employee, or prospective employee in an action based on a violation of Section 16600.5 is entitled to recover reasonable attorney's fees and costs.

97. As a direct and proximate result of Lockton's violations of § 16600.5, Plaintiff has suffered an injury in fact, has been forced to incur unnecessary attorneys' fees and costs, and has suffered and will continue to suffer damages and immediate and irreparable harm, including damage to his reputation and goodwill he has developed with his clients and other business contacts. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Plaintiff will be without an adequate remedy at law, and therefore, is entitled to injunctive relief to enjoin and restrain Lockton from attempting to enforce the unlawful restrictive covenants.

## THIRD CAUSE OF ACTION FOR VIOLATION OF BUSINESS & PROFESSIONS CODE §§ 17200, et seq.

## (By Plaintiff against Defendant)

98. Plaintiff re-alleges and incorporates by reference all of the preceding allegations as if fully set forth here.

99. California Business and Professions Code sections 17200 *et seq*. prohibit acts of unfair competition, which include any "unlawful, unfair or fraudulent business act or practice."

100. The confidentiality clause and post-employment restrictive covenants in Plaintiff's Stakeholder Agreement, Deferred Compensation Agreement, and Award Plan Agreement are void and unenforceable under California Business & Professions Code

section 16600 and California's fundamental, unwaivable public policy in favor of employee mobility and open competition.

101. Plaintiff further contends the Missouri forum and governing law provision in his Stakeholder Agreement with Lockton is void and unenforceable under California Business and Professions Code section 16600 and California's fundamental, unwaivable public policy in favor of workplace mobility and competition.

102. Lockton's performance of the above-described activities and attempts to enforce the void and unenforceable restrictive covenants constitutes violations of California public policy and law. Lockton has therefore violated California Business & Professions Code Section 17200's proscription against engaging in any unfair, unlawful and/or fraudulent business practice.

103. If Lockton is not enjoined from the conduct set forth in the Complaint, it will continue to engage in acts of evading California public policy and law involving restrictive noncompete covenants, and favoring free and open competition and employee mobility.

104. In addition to seeking all recoverable relief pursuant to this cause of action, including injunctive relief and restitution, Plaintiff also seeks an award of attorneys' fees in pursuing a cause of action that vindicates the protection and affirmation of fundamental public policies with respect to the enforcement of restrictive noncompete covenants, and favoring free and open competition and employee mobility, including pursuant to California Code of Civil Procedure section 1021.5.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff prays for judgment against Lockton as follows:

1. For a judicial declaration that (i) the enforcement of the Missouri choice-of-law and Missouri forum-selection provision would violate California's fundamental, unwaivable public policy in favor of workplace mobility and competition; and (ii) the post-employment restrictive covenants in the agreements are void and unenforceable under California Business and Professions Code section 16600 and the fundamental, unwaivable

public policy of this state, and that the confidentiality restrictive covenants are also superseded by the California Uniform Trade Secrets Act, especially to the extent they cover confidential and proprietary information not qualifying as trade secrets under CUTSA.

2. For injunctive relief designed to preclude Lockton's enforcement of the combined Missouri "Governing Law and Forum Selection" provision and the confidentiality clause (other than with respect to statutorily defined and protected "trade secrets" within the meaning of the California Uniform Trade Secrets Act or Defend Trade Secrets Act) and post-employment restrictive covenants described herein against Plaintiff, and to preclude Lockton's acts antagonistic to free and open competition and job mobility.

3. Compensatory damages according to proof.

4. Consequential damages according to proof.

5. For reasonable attorneys' fees and costs according to any applicable contractual provision, statute, or other law, including California Business and Professions Code § 16600.5 and California Code of Civil Procedure § 1021.5.

6. Pre-judgment and post-judgment interest at the maximum rate allowed by law.

7. Restitution.

8. For such other and further relief that is deemed to be just and proper.

Respectfully submitted,

Dated: May 8, 2024

MORGAN LEWIS & BOCKIUS LLP

Seth M. Gerber

Attorneys for Plaintiff

# EXHIBIT 1

Mark K. Pastorius/Southern California Series

**SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC
STAKEHOLDER AWARD PLAN AGREEMENT**

In consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Southern California Series of Lockton Companies, LLC (the "Series"), a series established by Lockton Companies, LLC (the "Company"), an Illinois series limited liability company, and the undersigned stakeholder ("Stakeholder") hereby agree as follows[1]:

1. <u>Award</u>.

(a) <u>Initial Balance</u>. In conformity with the Plan, the Executive Committee of the Series hereby grants to Stakeholder an Award evidenced by an Account with an initial balance of Twenty-Four Thousand Eight Hundred Thirty-Four and 40/100 Dollars ($24,834.40) in accordance with and subject to the terms, conditions and limitations set forth in the Plan.

(b) <u>Adjustments</u>. The amount of the Award shall increase/decrease based on the following adjustments reflected in Stakeholder's Account, which adjustments shall take place in the following sequence:

(i) First, commencing on April 30, 2007 and on April 30 of each year thereafter, the Account balance shall be increased or decreased by an amount equal to the then current balance of the Account multiplied by such year's Revenue Growth. "Revenue Growth" means, for a given fiscal year, a ratio, expressed as a percentage, the numerator of which is equal to the Revenues as of April 30 of the current fiscal year minus the Revenues as of April 30 of the prior fiscal year, and the denominator of which is equal to the Revenues as of April 30 of the prior fiscal year. "Revenues" means, for any fiscal year ending April 30, all revenues of the Series recognized by such Series, as accounted for in accordance with standard accounting procedures of the Series, consistently applied, including Securities Revenue but excluding (A) revenues attributable to an acquisition of an insurance or financial services intermediary by purchasing its assets or securities, or (B) the proceeds of a Major Capital Event. "Securities Revenue" means that portion of the revenues of Lockton Financial Advisors, LLC and/or Lockton Investment Advisors, LLC (collectively, "Lockton-Securities") which is attributable (1) to business produced for Lockton-Securities by those producers who are Producer Members (as such term is defined in the Operating Agreement of Lockton Companies, LLC and each of its Series, dated January 1, 2007) of the Series and also affiliated with Lockton-Securities, or (2) to business produced for third-party broker-dealers by those producers who are Producer Members of the Series and also registered representatives of such third-party broker-dealers. "Major Capital Event" with respect to a Series means any sale, exchange, or other disposition of all or a substantial part of the property of the Series not in the ordinary course of business.

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms as set forth in the Southern California Series of Lockton Companies, LLC Stakeholder Award Plan (the "Plan").

(ii) Second, commencing on April 30, 2007 and on April 30 of each year thereafter, the Account balance shall be increased by an amount equal to Stakeholder's then current base salary multiplied by four and one-half percent (4.5%).

2. Acknowledgment of Award. Stakeholder acknowledges and agrees that the Award and Account (and any Award which may be granted to Stakeholder in the future) is subject to the Plan (the terms and conditions of the Plan are incorporated herein by this reference) and by execution of this Stakeholder Award Plan Agreement ("Agreement") and acceptance of the Award and the Account evidencing the Award Stakeholder agrees to be bound by all of the terms and conditions of the Plan and the restrictive covenants set forth in Section 3 of this Agreement. Stakeholder acknowledges that an Account represents the unsecured, unfunded promise of the Series to pay the amount specified in the Plan in the future to Stakeholder, but Stakeholder is not an actual member of the Series and, as a result, among other things, the Award and Account do not convey to Stakeholder a right to vote on any matter relating to the Series or evidence an ownership interest in the Series. As provided in the Plan, the Award and the Account evidencing the Award are not transferable. However, Stakeholder may name a Designated Beneficiary to receive payment of his Award upon Stakeholder's death.

3. Restrictive Covenants. Unless otherwise agreed to in writing by the Series, Stakeholder agrees that by accepting an Award, Stakeholder will, for the period commencing as of a Triggering Event, or upon termination of employment, if later, and ending after the number of years specified in each of the following Sections, refrain from engaging directly or indirectly in any of the activities specified below.

(a) Definitions. The following definitions are established for the purposes of this Agreement:

(i) "Confidential Information" means information of the Series and Company and information of the other Series of Lockton Companies, LLC ("Other Series") disclosed to Stakeholder (whether or not in writing), whether original, duplicated, electronic, memorialized, handwritten or in any other form, that is related to the business of the Series, the Company, or the Other Series, and as to which the Series, the Company, or the Other Series take reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; methods or policies, prices or price formulas; procedures; the identity of and information concerning former, current or prospective customers of the Series, the Company and/or the Other Series; financial information; computer software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation); business strategies; customer needs and preferences; terms of engagement and transactions between the Series, the Company or the Other Series and its/their customers; Stakeholder and personnel information including without limitation Stakeholder or employee compensation information and the internal operational structure of the Series, the Company, or the Other Series; customer levels of satisfaction; and all other information of any kind or character relating to the development, improvement, manufacture, sale or delivery of products or services by the Series, the Company or the Other Series. Notwithstanding the foregoing, Confidential Information does not include

information that (A) is or becomes generally available or known to (or is readily ascertainable by) the public or competitors other than by reason of the fault of Stakeholder or (B) becomes available to Stakeholder on a non-confidential basis from a source other than the Series, the Company or any Other Series, provided that the source is not prohibited from disclosing such information to Stakeholder by any contractual or other obligation to the Series, the Company or the Other Series, which obligation is known to Stakeholder at the time Stakeholder makes any further disclosure of such information;

(ii) "Customer Accounts" means the accounts of all Customers of the Series and the Other Series, and shall also include prospective Customers of the Series and Other Series (but only if a proposal has been made by such Series to, or an invitation to propose has been received by such Series from, such prospective Customer and such proposal or invitation is pending). "Customer" as used in the definition "Customer Accounts," shall include any individuals affiliated with a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm with whom any Stakeholder has a relationship and from which a Series sources or receives referrals of potential Customers of insurance or insurance-related products or services.

(b) Acknowledgments. Stakeholder acknowledges (i) the business of the Series, the Company and the Other Series is highly specialized and competitive, and (ii) documents and information regarding the customers, services, methods of operation, sales and specialized business needs of the customers of the Series, the Company or the Other Series, and other information as described above in Section 3(a), constitute highly Confidential Information that is not generally known to, or readily ascertainable by, the public or the competitors of the Series, the Company or the Other Series. During Stakeholder's employment with the Series, the Series agrees to provide Stakeholder with Confidential Information belonging to the Series, the Company and/or the Other Series. Stakeholder agrees that Confidential Information shall remain the exclusive property of the Series, the Company and/or the Other Series, and understands the unauthorized disclosure or use, or other misappropriation of such information at any time is prohibited and can cause irreparable injury to the Series, the Company and/or the Other Series. In addition, Stakeholder acknowledges that the Series and the Other Series are all parties to the Shared Services Agreement and License Agreement executed pursuant thereto and that by virtue of the Shared Services Agreement and License Agreement executed pursuant thereto the Series and the Other Series each have a shared interest in certain assets of and services provided by Lockton Management, LLC and that the contractual rights under this Section 3 of the Series and/or the Other Series may be enforced by the Series or the Other Series, *provided, however,* that the enforcement rights of any Other Series are limited to enforcement of Stakeholder's obligations under this Agreement with respect to (x) Confidential Information of such Other Series and (y) non-solicitation of Customer Accounts or employees (and other applicable persons) of such Other Series as set forth in Sections 3(h) and 3(i) and must be brought in a single action in which the Series and all Other Series that then have any claim against Stakeholder are parties.

(c) Non-Disclosure. While Stakeholder is a Stakeholder of the Series and at all times thereafter, and except with the prior written consent of the Series or to the extent required for Stakeholder to discharge Stakeholder's duties to the Series, Stakeholder shall not (i)

disclose or attempt to disclose Confidential Information to anyone other than Stakeholders, officers or authorized employees, attorneys or other agents and fiduciaries of the Series, the Company or the Other Series, or (ii) use or attempt to use such information for any unauthorized purpose. Further, if Stakeholder anticipates or should reasonably anticipate a judicial, administrative or arbitration process that will require Stakeholder to disclose Confidential Information, then Stakeholder shall immediately notify the Series and the Company in writing to allow it/them as much time as possible to object to such disclosure, and Stakeholder shall inform such judicial, administrative or arbitration forum of Stakeholder's non-disclosure obligations under this Agreement. Further, Stakeholder shall promptly notify the Series and the Company in writing to the extent Stakeholder knows that any unauthorized person is (x) using, disclosing, or attempting to use or disclose Confidential Information, without the prior written consent of the Series, other than for an authorized purpose or (y) copying, duplicating, reverse engineering, reverse compiling, recording, or otherwise reproducing, analyzing, or attempting any such reproduction or analysis of any of the Confidential Information, without the prior written consent of the Series, for an unauthorized purpose.

(d) Non-Removal. Stakeholder shall not, other than in the ordinary course of business, directly, or indirectly, copy, take, or remove from the premises of the Series, the Company, or the Other Series, any of the books, Confidential Information, or other property of the Series, the Company, or the Other Series.

(e) Return of Documents and Property. Stakeholder will, upon the request of the Series, or upon a Triggering Event, immediately return and surrender to the Series, the original and all copies of Confidential Information and any other documents or property belonging to the Series, the Company, or the Other Series, whether created or obtained by Stakeholder as a result of or in the course of Stakeholder's employment with the Series, or otherwise; provided that Stakeholder shall be permitted to retain a single copy of his Stakeholder Award Plan Agreement to use solely in connection with any claim or dispute between or among the Company, any Series, Stakeholder and any third party. Stakeholder acknowledges and agrees that all such materials are the exclusive property of the Series, the Company, and/or the Other Series.

(f) Non-Disclosure of Third Party Confidential Information. Stakeholder represents and warrants that Stakeholder has fully disclosed to the Series, in writing, all contractual or other obligations that restrict Stakeholder from disclosing, using, or attempting to disclose or use, any trade secrets or other confidential information belonging to third parties, including without limitation previous employers. Stakeholder agrees the unauthorized disclosure, use, or attempted disclosure or use of such trade secrets or other confidential information belonging to third parties constitutes a breach of this Agreement by Stakeholder. By signing this Agreement, Stakeholder expressly agrees to abide by all obligations to such third parties.

(g) Protection of Relationships. Stakeholder acknowledges the relationships of the Series, the Company, and the Other Series with its/their Customer Accounts, members and employees, have been developed at great time and expense, are among its/their most important assets, and developing, maintaining, and continuing such relationships are among its/their highest priorities. Stakeholder further understands Stakeholder will be relied upon to develop

and to maintain such relationships on behalf of the Series throughout the course of Stakeholder's affiliation with the Series. Stakeholder acknowledges that these relationships generally carry the prospect of future economic benefit to the Series, the Company, and the Other Series; that once established, these relationships generally are likely to continue, and to continue to generate economic benefit for the Series, the Company, and the Other Series, unless the relationships are disrupted or interfered with by events outside of the normal course of business; that a sudden or unexpected change in Stakeholder's maintenance of the relationships may cause the relationships to be disrupted; and that the Series therefore has a strong interest in avoiding any such disruption and any such sudden or unexpected changes, and in planning for a smooth transition and uninterrupted service to the Customer Accounts in the event that Stakeholder's involvement appears likely to change or terminate.

(h) Non-Solicitation of Employees. While Stakeholder is affiliated with the Series, and for a period of two (2) years following the Triggering Event or termination of Stakeholder's employment, if later, Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any employee, member, producer or consultant (if substantially all of the services performed by such consultant are on behalf of the Series) to terminate his/its employment, membership, producer or consultant relationship with, or to render services for any competitor of, the Series, the Company or the Other Series.

(i) Non-Solicitation of Customer Accounts. While Stakeholder is affiliated with the Series and for a period of two (2) years following the Triggering Event or termination of Stakeholder's employment, if later, Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage the Customer Accounts described below, that qualified as Customer Accounts within the two (2) years immediately preceding the Triggering Event, to reduce or terminate any of their business with the Series or the Other Series, or to transfer any of their business with the Series or the Other Series or otherwise to do business with a competitor of, the Series, the Company or the Other Series. Stakeholder shall not, directly or indirectly, for himself or on behalf of any other person, accept, service or in any way do business with any of the Customer Accounts that he may not solicit. The Customer Accounts to which this restriction applies are:

(i) any of the Customer Accounts of the Series (A) serviced by Stakeholder, (B) serviced by employees of the Series who are supervised by Stakeholder, or (C) with which Stakeholder had business contact,

(ii) any of the other Customer Accounts of the Series, and

(iii) any of the Customer Accounts of the Other Series.

(j) Reasonableness of Restrictions. Stakeholder acknowledges and agrees that the restrictions imposed on Stakeholder's activities by this Agreement are not greater than reasonably necessary for the protection of the Confidential Information, goodwill and legitimate business interests of the Series, the Company and the Other Series. Among other things, Stakeholder acknowledges that the nature of the business of the Series, the Company, and the

Other Series, as well as the business of their customers, is such that it could be conducted anywhere in the world, and therefore it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities could be conducted. Stakeholder represents and warrants that the restrictions imposed on Stakeholder's activities by this Agreement are sufficiently limited in time and scope that they will not prevent Stakeholder from engaging in Stakeholder's chosen work or profession and will not create undue hardship for Stakeholder. Stakeholder acknowledges and agrees that the prohibited activities would necessarily involve Stakeholder's use of trade secrets and other Confidential Information, for example, in attempting to persuade Customer Accounts to transfer business from the Series or an Other Series to a competitor, Stakeholder would be highly likely to exploit Confidential Information about those Customer Accounts.

(k) Assignment of Inventions. Stakeholder hereby assigns to the Company all right, title, and interest Stakeholder may have in any invention, writing, idea, discovery, or improvement (including any copyrights) made or conceived by Stakeholder relating to, arising out of, emanating from, or discovered in connection with the work performed by Stakeholder as an employee of the Series or through utilization of equipment or property owned by the Series, the Company or any Other Series. Stakeholder further agrees to cooperate with the Company in obtaining U.S. and Foreign Letters Patent or other appropriate intellectual property protections for any such invention, discovery, or improvement at the Company's expense, and will execute any appropriate instruments of assignment, patent or copyright registration applications, or other documents at the request of the Company. Stakeholder will report in writing the details of every such invention, writing, idea, discovery, or improvement (whether patentable or not).

4. **General Provisions.**

(a) Injunctive Relief. Stakeholder acknowledges and agrees that strict compliance with this Agreement is necessary to protect the business and goodwill of the Series; that a breach of this Agreement will result in irreparable harm and continuing damage to the Series; and that, in the event of a breach of this Agreement by Stakeholder, damages would be difficult or impossible to ascertain fully for purposes of remedying the harm that would be caused by such breach. Accordingly, in the event of Stakeholder's breach, attempted breach, or threatened breach of this Agreement, the Series, the Company, or the Other Series, upon application to any court of competent jurisdiction, shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement.

(b) Money Damages. Stakeholder acknowledges and agrees that strict compliance with this Agreement is necessary to protect the business and goodwill of the Series, and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the Series, for which money damages may not provide adequate relief. Nonetheless, it is agreed that in the event of a breach, attempted breach or threatened breach of this Agreement, then in addition to injunctive relief and any other remedies set forth in this Agreement or otherwise available at law or equity, the Series, the Company and the Other Series shall also be entitled to recover from Stakeholder any money damages that can be determined.

5. **Governing Law**. This Agreement and all disputes relating hereto shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to conflict of laws principles, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action to enforce the provisions of this Agreement shall be brought in any Federal Court in Kansas City, Missouri, or in the Circuit Court in Jackson County, Missouri. Such courts shall have exclusive jurisdiction over these matters and Stakeholder hereby consents and agrees to the personal jurisdiction of and venue in such courts.

6. **Tolling**. Stakeholder agrees that if the enforceability of any of the terms of Section 3 of this Agreement is challenged by Stakeholder or by a third party acting in concert with Stakeholder in any court or other forum, and the Series, Company and/or the Other Series seeks but fails to obtain a temporary restraining order or preliminary injunction against Stakeholder's breach, attempted breach, or threatened breach of any such term, and a court or other forum of competent jurisdiction ultimately finds that the challenged term is enforceable or finds against the challenge to enforceability, then the time period restrictions specified in this Agreement with respect to such term shall be deemed tolled during any period of time during which Stakeholder violated any provisions of Section 3.

7. **Modification and Reformation**. If, and to the extent, any term or provision of this Agreement shall be determined to be invalid, illegal, or unenforceable, the parties agree that the court shall be empowered to and the parties hereby request that the court modify such term(s) and/or provision(s) so that such term(s) or provision(s) shall be enforceable to the maximum extent under applicable law.

8. **Attorneys' Fees, Costs and Interest**. If the Series, Company, Other Series or Stakeholder engages counsel in connection with a dispute relating to, or an interpretation of, this Agreement, the prevailing party in any proceeding shall be entitled, in addition to any other remedies set forth in this Agreement or otherwise available at law or equity, to recover any and all costs (including attorneys' fees and expenses) in connection with such proceeding, through all appeals, and interest on the amount of any judgment at the highest applicable statutory rate.

*Remainder of page intentionally left blank*

Please acknowledge your acceptance of the above-specified Award and the Account evidencing the Award and your agreement to be bound by the terms and conditions set forth in the Plan and this Agreement by signing below.

Dated: 2/19/08

SOUTHERN CALIFORNIA SERIES
OF LOCKTON COMPANIES, LLC

By: [signature]
Name: William Humphrey
Title: Secretary

ACKNOWLEDGED AND ACCEPTED:

[signature]
Mark K. Pastorius

# EXHIBIT 2

Stakeholder

**FIRST AMENDMENT**
**TO**
**SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC**
**STAKEHOLDER AWARD PLAN**

THIS FIRST AMENDMENT TO SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC STAKEHOLDER AWARD PLAN (this "Amendment") is made and entered into effective as of the 1st day of December, 2018.

WHEREAS, Lockton Companies, LLC – Pacific Series (f/k/a the Southern California Series of Lockton Companies, LLC) ("Series") established the Southern California Series of Lockton Companies, LLC Stakeholder Award Plan (a/k/a the Lockton Companies, LLC – Pacific Series Stakeholder Award Plan), dated January 1, 2007 (the "Existing Plan");

WHEREAS, the Series desires to amend the Existing Plan to formally change the name of the Plan to the "Lockton Companies, LLC – Pacific Series Stakeholder Award Plan" and to revise Section 12.3(e) to update the determination of benefits claims procedure with respect to disability determinations to comply with new Department of Labor rules; and

WHEREAS, capitalized terms not otherwise defined herein shall have the meanings set forth in the Existing Plan.

In consideration of the premises of the Existing Plan, the Series hereby amends the Plan as follows:

1. <u>Amendment 1 to Existing Agreement</u>. The Existing Plan shall be renamed "Lockton Companies, LLC – Pacific Series Stakeholder Award Plan".

2. <u>Amendment 2 to Existing Agreement</u>. Section 12.3(e) of the Existing Plan shall be deleted in its entirety and the following shall be inserted in lieu thereof:

(e) <u>Special Disability Provisions</u>.

(i) Notwithstanding anything herein, if a Claimant is denied a benefit because he or she is determined not to be disabled and he or she makes a claim pursuant to such denial, the provisions of this subsection shall apply. Upon receipt of a claim, the reply period shall be forty-five (45) days. If, prior to the end of such forty-five (45) day period, the claims reviewer determines that, due to matters beyond the control of Series, a decision cannot be rendered, the period for making the determination may be extended for up to thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of such forty-five (45) day period, of the circumstances requiring an extension and the date by which Series expects to render a decision. If, prior to the end of the first thirty (30) day extension period, the claims reviewer determines that, due to matters beyond the control of Series, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional thirty (30) days, and the claims reviewer shall notify the Claimant,

prior to the expiration of the first thirty (30) day extension period, of the circumstances requiring the extension and the date by which Series expects to render a decision. In the case of any extension described in this paragraph, the notice of extension shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim and the additional information needed to resolve those issues, and the Claimant shall be afforded forty-five (45) days within which to provide the specified information. If information is requested, the period for making the benefit determination shall be tolled from the date on which notification of an extension is sent to the Claimant until the date on which the Claimant responds to the request for information.

(ii) If an adverse benefit determination is made (in whole or in part), a written opinion will be rendered in a culturally and linguistically appropriate manner that will include, in addition to the information set out above for a claim denial, the following information:

(1) either the specific internal rules, guidelines, protocols, standards or other similar criteria of the Plan that were used as a basis for making the adverse benefit determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Plan do not exist;

(2) if the denial is based on a medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request;

(3) a discussion of the decision, including an explanation of the basis for disagreeing with or not following: (A) the views presented by the Claimant to the Plan of health care professionals treating the Claimant or vocational professionals who evaluated the Claimant; (B) the views of medical or vocational experts whose advise was obtained on behalf of the Plan, without regard to whether the advice was relied upon in making the benefit determination; and (C) a disability determination by the Social Security Administration presented by the Claimant to the Plan; and

(4) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits.

(iii) Within one hundred eighty (180) days after receiving the written notice of an adverse disposition of the claim, the Claimant may request, and shall be entitled to, a review of the benefit determination by submitting a written appeal to the Second Level Reviewer ("Appeals Administrator"). The

review will be conducted by a person who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual. To the extent required by law, the Claimant may submit written comments, documents, records, and other information relating to the claim for benefits (regardless of whether such information was considered in the initial claim for benefits) for the Appeals Administrator's review and consideration and will be entitled to receive, upon request and free of charge, access to and copies of all documents, records, and other information that is relevant to his or her appeal. No deference shall be afforded to the initial claim denial. In the case of a claim denied on the grounds of a medical judgment, the Appeals Administrator will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, as required under applicable law. The health care professional who is consulted will be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor a subordinate of that individual. The name of the health care professional whose advice was obtained in connection with the adverse benefit determination will be provided to the Claimant, upon request, without regard to whether the advice was relied upon in making the benefit determination. To the extent required by law, any new or additional evidence or rationale being considered, relied upon, or generated by (or at the direction of) the Appeals Administrator in determining the appeal will be provided to the Claimant sufficiently in advance of the Appeals Administrator's final determination to afford the Claimant with a reasonable opportunity to respond to such evidence or rationale. If the Claimant does not request a review within one hundred eighty (180) days after receiving written notice of the original disposition of the claim, the Claimant shall be deemed to have accepted the original written disposition.

The Executive Committee will ensure that all internal appeals for disability benefits are handled impartially. The Executive Committee shall ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical expert) must not be made based upon the likelihood that the individual will support an adverse benefit determination of benefits. The Executive Committee shall ensure that health care professionals consulted are not chosen based on the expert's reputation for outcomes in contested cases, rather than based on the professional's qualifications.

(iv) A decision on review shall be rendered in writing by Series within a reasonable period of time, but ordinarily not later than forty-five (45) days after receipt of the Claimant's request for review by Series, unless Series determines that special circumstances require an extension of time for processing the claim. If Series determines that an extension of time for processing is required, written notice of the extension shall be furnished to the Claimant prior to the termination of the initial forty-five (45) day period. In no event shall such extension exceed a period of forty-five (45) days from the end of the initial

period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which Series expects to render the determination on review. In the event the extension is due to a Claimant's failure to submit information necessary to decide the claim, the Claimant shall be afforded forty-five (45) days within which to provide the specified information, and the period for making the benefit determination on review shall be tolled from the date on which notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information.

(v) If the disability claim is denied (in whole or in part) on review, the notice of the adverse benefit determination will be provided in a culturally and linguistically appropriate manner and will also include, in addition to the information set out above for a claim denial, the following information:

(1) either the specific internal rules, guidelines, protocols, standards or other similar criteria of the Plan that were used as a basis for in making the adverse benefit determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Plan do not exist;

(2) if the denial is based on a medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request;

(3) a discussion of the decision, including an explanation of the basis for disagreeing with or not following: (A) the views presented to the Appeals Administrator of health care professionals treating the Claimant or vocational professionals who evaluated the Claimant; (B) the views of medical or vocational experts whose advice was obtained on behalf of the Plan, without regard to whether the advice was relied upon in making the benefit determination; and (C) a disability determination by the Social Security Administration presented to the Appeals Administrator by the Claimant; and

(4) a statement of the Claimant's right to bring an action under Section 502(a) of ERISA following the adverse benefit determination on such review and a description of any applicable contractual limitations period that applies to the Claimant's right to bring such an action, including the calendar date on which the contractual limitations period expires for the claim.

(vi) If the Plan fails to strictly adhere to all the requirements of the claims and appeals process with respect to the claim for disability benefits, the Claimant is deemed to have exhausted the administrative remedies under the Plan. However, the administrative remedies under the Plan shall not be deemed to be exhausted if the error was de minimis, does not cause and is not likely to cause

prejudice or harm to the Claimant, the Plan demonstrates that the error was due to good cause or to matters beyond the Plan's control, that the error occurred in the context of a good faith exchange of information between the Plan and the Claimant, and that the error does not reflect a pattern or practice of violations by the Plan.

2. Ratification. Except as specifically set forth in this Amendment, all provisions of the Existing Plan shall be unmodified and shall remain in full force and effect. The Existing Plan, as amended by this Amendment, is hereby ratified and confirmed.

IN WITNESS WHEREOF, the Series has caused this Amendment to be executed and made effective as of the date first above written.

LOCKTON COMPANIES, LLC –
PACIFIC SERIES

By: Wm Humphrey
Name: William Humphrey
Title: Secretary

# EXHIBIT 3

whole life policy

Mark Pastorius

**SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC**
**DEFERRED COMPENSATION AGREEMENT**

THIS AGREEMENT, made and entered into and effective as of December 31, 2008, by and between Southern California Series of Lockton Companies, LLC, ("Series"), a series established by Lockton Companies, LLC, an Illinois series limited liability company ("LLC"), and Mark Pastorius ("Grantee").

## RECITALS

A. Lockton Management, LLC, a Delaware limited liability company ("Management"), performs certain services for Series. The services and related compensation for those services are governed by the terms of that certain Operating Agreement of LLC and Each of its Series dated January 1, 2007 ("Operating Agreement") and Shared Services Agreement dated January 1, 2007, among Management, LLC, Series and other series of LLC ("SSA").

B. In addition to the services provided by Management to Series in accordance with the Operating Agreement and SSA, Series and Management desire to have Grantee serve, and Grantee desires to serve, as an officer of the Series.

C. Series desires to provide incentive compensation for Grantee to serve as an officer of the Series.

## AGREEMENT

In consideration of the mutual promises contained herein, the parties agree as follows:

**1. Definitions.**

(a) "Affiliate" of a specified Person (the "Specified Person") means any Person (i) who directly or indirectly controls, is controlled by, or is under common control with the Specified Person; (ii) who owns or controls ten percent (10%) or more of the Specified Person's outstanding voting securities or equity interests; (iii) of whom such Specified Person owns or controls ten percent (10%) or more of the outstanding voting securities or equity interests; (iv) who is a director, partner, manager, executive officer or trustee of the Specified Person; (v) in whom the Specified Person is a director, partner, manager, executive officer or trustee; or (vi) who has any relationship with the Specified Person by blood, marriage or adoption, not more remote than first cousin.

(b) "Cause" means (i) Grantee's fraud against Series or any affiliate of Series, misappropriation of Series' or any affiliate of Series' assets, embezzlement, theft, willful misconduct, or the conviction of a crime involving drug abuse, violence, dishonesty or theft, or (ii) Grantee's material breach of this Agreement, material failure to follow Series or any affiliate of Series' rules and regulations of general applicability to all employees, or neglect of material duties Grantee is required to perform, which material

KC01DOCS\936679.3

breach, material failure or neglect continues for more than thirty (30) days following Series' written notice to Grantee describing in reasonable detail the material breach, material failure or neglect and the requirements to cure such material breach, material failure or neglect.

(c) "Code" means the Internal Revenue Code of 1986, as amended.

(d) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(e) "Insurance Policy" means that certain $2 million variable annuity life insurance policy Series holds on the life of Grantee, policy number 32 001 418 with Massachusetts Mutual Life Insurance Company.

(f) "LLC" means Lockton Companies, LLC, an Illinois limited liability company or any successor thereto.

(g) "Management" means Lockton Management, LLC, a Delaware limited liability company or any successor thereto.

(h) "Person" means any natural person, partnership (whether general or limited), trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity, in each case, whether domestic or foreign, or a limited liability company or foreign limited liability company or series of a domestic or foreign limited liability company.

(i) "Series" means the Southern California Series of LLC.

(j) "Triggering Event" means the first to occur of the events set forth in Section 4.

**2. <u>Grant of Compensation Rights</u>.** Series hereby grants to Grantee the right to receive, following a Triggering Event, in accordance with the payment terms of Section 8, an amount of deferred compensation (the "Grant") as follows: (a) if a Triggering Event occurs pursuant to Section 4(a) hereof, the Grant shall equal the amount of the death benefit under the Insurance Policy less the total premiums paid by Series on the Insurance Policy; or (b) if a Triggering Event occurs pursuant to Sections 4(b), 4(c) or 4(d) hereof, the Grant shall equal the then fair market value of the Insurance Policy.

**3. <u>Vesting of Grant</u>.** The Grant portion set forth in Section 2 is fully vested.

**4. <u>Triggering Events</u>.** Grantee shall be paid, pursuant to Section 8, upon the earliest of the occurrence of certain events as provided below.

(a) <u>Death of Grantee</u>. In the event of the death of Grantee.

(b) Permanent and Total Disability. In the event of the permanent and total disability of Grantee and Grantee has been affiliated with Series and/or its predecessors or Affiliates for a consecutive period of at least twenty (20) years. For purposes of this Agreement, Grantee shall be deemed to be "permanently and totally disabled" if (i) Grantee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) Grantee is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Series.

(c) Retirement, Resignation or Termination for Cause. If Grantee retires, resigns or is involuntarily removed by Series for Cause and is not otherwise affiliated with the Series, Management or their respective Affiliates and has been affiliated with Series and/or its predecessors or Affiliates for a consecutive period of at least twenty (20) years. No change in the duties of Grantee, while affiliated with Series, Management or their respective Affiliates, or transfer, if still affiliated after the transfer with Series, Management or their respective affiliates, shall satisfy this Triggering Event, except to the extent determined in accordance with the provisions of Section 409A of the Code.

(d) Termination Without Cause. If Grantee is involuntarily removed by Series without Cause and is not otherwise affiliated with the Series, Management or their respective Affiliates and has been affiliated with Series and/or its predecessors or Affiliates for a consecutive period of at least fifteen (15) years. No change in the duties of Grantee, while affiliated with Series, Management or their respective Affiliates, or transfer, if still affiliated after the transfer with Series, Management or their respective affiliates, shall satisfy this Triggering Event, except to the extent determined in accordance with the provisions of Section 409A of the Code.

5. **Term.** The Grant shall expire on (a) the date of the payment of all amounts due under Section 2, or (b) if a Triggering Event has not occurred, at such time as Grantee is no longer an officer of the Series or otherwise affiliated with Management, LLC or another series of LLC.

6. **Withholding.** Series, at the time any payment is made under this Agreement, may withhold from such payment any amount necessary to satisfy federal and state income tax withholding requirements with respect to such payment.

7. **Non-Transferability.** Neither the Grant nor any rights thereunder or under this Agreement may be assigned, transferred or in any manner encumbered except by will or the laws of descent and distribution, and any attempted assignment, transfer, mortgage, pledge or encumbrance except as herein authorized, shall be void and of no effect; provided, however,

Series will consent to assignment of the Grant to an appropriate trust established by Grantee for the benefit of Grantee or his spouse and/or heirs.

**8. Payment.**

(a) Death Triggering Event. Payment of the Grant due as a result of the Triggering Event set forth in Section 4(a) shall be made in a lump sum on the date that is one hundred eighty (180) days following such Triggering Event

(b) Other Triggering Event. Payment of the Grant due as a result of the Triggering Event set forth in Section 4(b) or 4(c) shall be made by assignment of the Insurance Policy to Grantee on the date that is thirty (30) days following such Triggering Event.

In the event of the death of Grantee, payments shall be made to Grantee's estate, or to any person who acquired the right to receive the Grant by bequest or inheritance or by reason of the death of the Grantee. No payments to Grantee may be accelerated except to the extent permitted by the provisions of Section 409A of the Code. Notwithstanding anything to the contrary set forth herein, in the event of a final "determination" (within the meaning of Section 1313(a) of the Code or any corresponding state or local tax law, as applicable) that Grantee is subject to tax or interest pursuant to Section 409A(a)(1)(B) of the Code with respect to the Grant or any amount payable in respect thereof, then the entire amount of the Grant shall be paid in full within ten (10) days after such final determination (calculating the amount of the Grant, if a Triggering Event has not previously occurred, as of the end of the Fiscal Year most recently ended before the date of such final determination).

**9. Insurance.** Series shall maintain the Insurance Policy until the occurrence of a Triggering Event or the termination of this Agreement. In the event of a Triggering Event set forth in Section 4(b) or 4(c), Series shall continue to pay the premiums due under the Insurance Policy until the time the Insurance Policy is transferred to Grantee. Series shall be the applicant, owner and beneficiary of the Insurance Policy, and Grantee shall have no rights under the Insurance Policy except as otherwise set forth in this Agreement. No insurance company which has issued or shall issue a policy or policies subject to this Agreement shall be under any obligation with respect to the performance of the terms and conditions of this Agreement. Any such company shall be bound only by the terms of the policy or policies which it has issued or shall hereafter issue and shall have no liability except as set forth in its policies.

**10. Restrictive Covenants.** Unless otherwise agreed to in writing by Series, Grantee agrees by accepting the Grant, that Grantee shall, for the periods specified below, not engage directly or indirectly, in any of the activities specified below.

(a) Definitions. The following definitions are established for the purposes of this Section 10:

(i) "Confidential Information" means information of the Series and information of the other series of LLC ("Other Series") disclosed to Grantee (whether or not in writing), whether original, duplicated, electronic,

memorialized, handwritten or in any other form, that is related to the business of the Series, LLC, or the Other Series, and as to which the Series, LLC, or the Other Series take reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; methods or policies, prices or price formulas; procedures; the identity of and information concerning former, current or prospective customers of the Series, LLC and/or the Other Series; financial information; computer software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation); business strategies; customer needs and preferences; terms of engagement and transactions between the Series, LLC or the Other Series and its/their customers; member and personnel information including without limitation member or employee compensation information and the internal operational structure of the Series, LLC, or the Other Series; customer levels of satisfaction; and all other information of any kind or character relating to the development, improvement, manufacture, sale or delivery of products or services by the Series, LLC or the Other Series. Notwithstanding the foregoing, Confidential Information does not include information that (A) is or becomes generally available or known to (or is readily ascertainable by) the public or competitors other than by reason of the fault of Grantee or (B) becomes available to Grantee on a non-confidential basis from a source other than the Series, LLC or any Other Series, provided that the source is not prohibited from disclosing such information to Grantee by any contractual or other obligation to the Series, LLC or the Other Series, which obligation is known to Grantee at the time Grantee makes any further disclosure of such information;

(ii) "Customer Accounts" means the accounts of all customers of the Series and the Other Series, and shall also include prospective customers of such Series (but only if a proposal has been made by such Series to, or an invitation to propose has been received by such Series from, such prospective customer and such proposal or invitation is pending). "Customer" as used in the definition "Customer Accounts," shall include any individuals affiliated with a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm with whom any Series member has a relationship and from which a Series sources or receives referrals of potential customers of insurance or insurance-related products or services.

(b) Acknowledgments. Grantee acknowledges (i) the business of the Series, LLC and the Other Series is highly specialized and competitive, and (ii) documents and information regarding the customers, services, methods of operation, sales and specialized business needs of the customers of the Series, LLC or the Other Series, and other information as described above, constitute highly Confidential Information that is not generally known to, or readily ascertainable by, the public or the competitors of the Series, LLC or the Other Series. During the term of this Agreement and Grantee's employment with Series, the Series may provide Grantee with Confidential Information belonging to the Series, LLC and/or the Other Series. Grantee agrees that Confidential

Information shall remain the exclusive property of the Series, LLC and/or the Other Series, and understands the unauthorized disclosure or use, or other misappropriation of such information at any time is prohibited and can cause irreparable injury to the Series, LLC and/or the Other Series. In addition, Grantee acknowledges that the Series and the Other Series are all parties to a Shared Services Agreement and License Agreement executed pursuant thereto and that by virtue of the Shared Services Agreement and License Agreement executed pursuant thereto the Series and the Other Series each have a shared interest in certain assets of and services provided by Management and that the rights of the Series and/or the Other Series may be enforced by the Series or the Other Series, *provided, however,* that the enforcement rights of any Other Series are limited to enforcement of Grantee's obligations under this Agreement with respect to (i) Confidential Information of such Other Series and (ii) non-solicitation of Customer Accounts or employees (and other applicable persons) of such Other Series as set forth in Sections 10(h) and 10(i) and must be brought in a single action in which the Series and all Other Series that then have any claim against the Grantee are parties.

(c) Non-Disclosure. During the Term of this Agreement and for a period of two (2) years following Grantee's termination as an officer of the Series, Grantee shall not (i) disclose or attempt to disclose Confidential Information to anyone other than the members, officers or authorized employees, attorneys or other agents and fiduciaries of the Series, LLC or the Other Series, or (ii) use or attempt to use such information for any unauthorized purpose. Further, if Grantee anticipates or should reasonably anticipate a judicial, administrative or arbitration process that will require Grantee to disclose Confidential Information, then Grantee shall immediately notify the Series and LLC in writing to allow it/them as much time as possible to object to such disclosure, and Grantee shall inform such judicial, administrative or arbitration forum of Grantee's non-disclosure obligations under this Agreement. Further, Grantee shall promptly notify the Series and LLC in writing to the extent Grantee knows that any unauthorized person is (i) using, disclosing, or attempting to use or disclose Confidential Information other than for an authorized purpose without the prior written consent of the Series or (ii) copying, duplicating, reverse engineering, reverse compiling, recording, or otherwise reproducing, analyzing, or attempting any such reproduction or analysis of any of the Confidential Information for an unauthorized purpose without the prior written consent of the Series.

(d) Non-Removal. Grantee shall not, other than in the ordinary course of business, directly or indirectly, copy, take, or remove from the premises of the Series, LLC, or the Other Series, any of the books, Confidential Information, or other property of the Series, LLC, or the Other Series.

(e) Return of Documents and Property. Grantee will, upon the request of the Series, or upon Grantee's termination as an officer of the Series, immediately return and surrender to the Series, the original and all copies of Confidential Information and any other documents or property belonging to the Series, LLC, or the Other Series, whether created or obtained by Grantee as a result of or in the course of Grantee's employment with the Series, or otherwise; provided that Grantee shall be permitted to

retain a single copy of this Agreement to use solely in connection with any claim or dispute between or among LLC, any Series, the Grantee and any third party. Grantee acknowledges and agrees that all such materials are the exclusive property of the Series, LLC, and/or the Other Series.

(f) Non-Disclosure of Third Party Confidential Information. Grantee represents and warrants that Grantee has fully disclosed to the Series, in writing, all contractual or other obligations that restrict Grantee from disclosing, using, or attempting to disclose or use, any trade secrets or other confidential information belonging to third parties, including without limitation previous employers. Grantee agrees the unauthorized disclosure, use, or attempted disclosure or use of such trade secrets or other confidential information belonging to third parties constitutes a breach of this Agreement by Grantee. By signing this Agreement, Grantee expressly agrees to abide by all obligations to such third parties.

(g) Protection of Relationships. Grantee acknowledges the relationships of the Series, LLC, and the Other Series with its/their Customer Accounts, members and employees, have been developed at great time and expense, are among its/their most important assets, and developing, maintaining, and continuing such relationships are among its/their highest priorities. Grantee further understands Grantee will be relied upon to develop and to maintain such relationships on behalf of the Series throughout the course of Grantee's employment with the Series. Grantee acknowledges that these relationships generally carry the prospect of future economic benefit to the Series, LLC, and the Other Series; that once established, these relationships generally are likely to continue, and to continue to generate economic benefit for the Series, LLC, and the Other Series, unless the relationships are disrupted or interfered with by events outside of the normal course of business; that a sudden or unexpected change in Grantee's maintenance of the relationships may cause the relationships to be disrupted; and that the Series therefore has a strong interest in avoiding any such disruption and any such sudden or unexpected changes, and in planning for a smooth transition and uninterrupted service to the Customer Accounts in the event that Grantee's involvement appears likely to change or terminate.

(h) Non-Solicitation of Employees. During the Term of this Agreement and for a period of two (2) years following Grantee's termination as an officer of the Series, Grantee shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any employee, member, producer or consultant (if substantially all of the services performed by such consultant are on behalf of the Series) to terminate his/its employment, membership, producer or consultant relationship with, or to render services for any competitor of, the Series, LLC or the Other Series.

(i) Non-Solicitation of Customer Accounts. During the Term of this Agreement and for a period of two (2) years following Grantee's termination as an officer of the Series, Grantee shall not, directly or indirectly, for himself or on behalf of any other person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or

encourage the Customer Accounts described below, that qualified as Customer Accounts within the two (2) years immediately preceding Grantee's termination as an officer of the Series, to reduce or terminate any of their business with the Series or the Other Series, or to transfer any of their business with the Series or the Other Series or otherwise to do business with a competitor of, the Series, LLC or the Other Series. Grantee shall not, directly or indirectly, for himself or on behalf of any other person, accept, service or in any way do business with any of the Customer Accounts that he may not solicit. The Customer Accounts to which this restriction applies are:

(i) any of the Customer Accounts of the Series (A) serviced by Grantee, (B) serviced by employees of the Series who are supervised by Grantee, or (C) with which Grantee had business contact,

(ii) any of the other Customer Accounts of the Series, and

(iii) any of the Customer Accounts of the Other Series.

(j) Reasonableness of Restrictions. Grantee acknowledges and agrees that the restrictions imposed on his activities by this Agreement are not greater than reasonably necessary for the protection of the Confidential Information, goodwill and legitimate business interests of the Series, LLC and the Other Series. Among other things, Grantee acknowledges that the nature of the business of the Series, LLC, and the Other Series, as well as the business of their customers, is such that it could be conducted anywhere in the world, and therefore it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities could be conducted. Grantee represents and warrants that the restrictions imposed on his activities by this Agreement are sufficiently limited in time and scope that they will not prevent him from engaging in his chosen work or profession and will not create undue hardship for him. Grantee acknowledges and agrees that the prohibited activities would necessarily involve Grantee's use of trade secrets and other Confidential Information, for example, in attempting to persuade Customer Accounts to transfer business from the Series or an Other Series to a competitor, Grantee would necessarily exploit Confidential Information about those Customer Accounts.

(k) Injunctive Relief. Grantee acknowledges and agrees that strict compliance with this Agreement is necessary to protect the business and goodwill of the Series; that a breach of this Agreement will result in irreparable harm and continuing damage to the Series; and that, in the event of a breach of this Agreement by Grantee, damages would be difficult or impossible to ascertain. Accordingly, in the event of Grantee's breach, attempted breach, or threatened breach of this Agreement, the Series, upon application to any court of competent jurisdiction, shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement. In the event that any court shall finally hold that the time restriction or any other provision stated in the Agreement constitutes an unreasonable restriction against Grantee, then the provisions of this Agreement shall not be rendered void, but shall apply as to such time or to such other

extent as such court may determine or indicate; or, if such a court does not so determine or indicate, to the extent that any pertinent statute or judicial decision in the jurisdiction of any such court may indicate constitutes a reasonable restriction under the circumstances.

(l) Money Damages. Grantee acknowledges and agrees that strict compliance with this Agreement is necessary to protect the business and goodwill of the Series, and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the Series, for which money damages may not provide adequate relief. Nonetheless, it is agreed that in the event of a breach, attempted breach or threatened breach of this Agreement, then in addition to injunctive relief and any other remedies set forth in this Agreement or otherwise available at law or equity, the Series shall also be entitled to recover from Grantee any money damages that can be determined.

**11. Miscellaneous Provisions.**

(a) Entire Agreement. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to the subject matter of this Agreement, and contains all the covenants and agreements between the parties with respect to said matter.

(b) Amendments. The terms and conditions applicable to the Grant may be amended or modified by mutual agreement between Series and Grantee or such other persons as may then have an interest therein. However, no such amendment or substitution shall be effective if, as a result thereof the Agreement would cease to comply with Section 409A of the Code.

(c) Construction. Throughout this Agreement, the masculine, feminine or neuter genders shall be deemed to include the masculine, feminine and neuter and the singular, the plural and vice versa. The headings of the Sections of this Agreement are for reference only and do not limit, expand or otherwise affect the contents of the Agreement.

(d) Notices. All notices or other communications required hereunder to be in writing shall be deemed to have been duly given if delivered or mailed, certified or registered mail, postage prepaid to Grantee at his or her business or residence address as contained in the records of Series or, in the case of Series, as follows:

Southern California Series of Lockton Companies, LLC.
725 S. Figueroa, 35th Floor
Los Angeles, CA 90017
Attn: General Counsel

The foregoing addresses may be changed by written notice to the other party.

(e) Burden and Benefit. This Agreement shall be binding upon, and shall inure to the benefit of, Series and Grantee, and their respective heirs, personal and legal representatives, successors and permitted assigns; and the parties hereby agree for themselves and their heirs, legal representatives, executors, administrators, successors or assigns to execute any instruments and to perform any acts which may be necessary or proper to carry out the purposes of this Agreement.

(f) Governing Law. It is understood and agreed that the construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the State of California without regard to the choice of law doctrine of such state.

(g) No Waiver. No termination, change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intended to be bound. No waiver of any provision of this Agreement shall be valid unless the same is in writing and signed by the party against whom such waiver is sought to be enforced; moreover, no valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement at such time or will be deemed a valid waiver of such provision at any other time.

(h) Waiver of Breach. The waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

(i) Severability. Whenever possible, each provision, or subpart thereof, of this Agreement shall be interpreted so as to be valid and enforceable under applicable law. If any provisions, or any subparts thereof, of this Agreement shall be prohibited or invalid under applicable law, including without limitation Section 409A of the Code, they shall be modified and, to the maximum extent permissible under applicable law, enforced.

(j) Further Assurances. Each party shall execute and cause to be delivered to the other party such instruments and other documents, and shall act in good faith to take such other actions for the purpose of carrying out or evidencing the transactions contemplated by this Agreement, including, without limitation, such actions as may be required by Section 409A of the Code.

(k) Determination of Benefits.

(i) Claim. The Grantee, a beneficiary or other person who believes that he or she is being denied a benefit to which he or she is entitled (hereinafter referred to as "Claimant"), or his or her duly authorized representative, may file a written request for such benefit with the First Level Reviewer setting forth his or her claim. The request must be addressed to the President of Series at its then principal place of business ("First Level Reviewer").

(ii) Claim Decision. Upon receipt of a claim, the First Level Reviewer shall advise the Claimant that a reply will be forthcoming within a reasonable period of time, but ordinarily not later than ninety (90) days, and shall, in fact, deliver such reply within such period. However, the First Level Reviewer may extend the reply period for an additional ninety (90) days for reasonable cause. If the reply period will be extended, the First Level Reviewer shall advise the Claimant in writing during the initial ninety (90) day period indicating the special circumstances requiring an extension and the date by which the First Level Reviewer expects to render the benefit determination.

If the claim is denied in whole or in part, the First Level Reviewer will render a written opinion, using language calculated to be understood by the Claimant, setting forth:

1. the specific reason or reasons for the denial;

2. the specific references to pertinent provisions on which the denial is based;

3. a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation as to why such material or such information is necessary;

4. appropriate information as to the steps to be taken if the Claimant wishes to submit the claim for review, including a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review; and

5. the time limits for requesting a review of the denial and for the actual review of the denial.

(iii) Request for Review. Within sixty (60) days after the receipt by the Claimant of the written opinion described above, the Claimant may request in writing that the Second Level Reviewer review the First Level Reviewer's prior determination. Such request must be addressed to the Chief Executive Officer of the owner of the Corporate Units of Series at its then current address ("Second Level Reviewer"). The Claimant or his or her duly authorized representative may submit written comments, documents, records or other information relating to the denied claim, which such information shall be considered in the review under this subsection without regard to whether such information was submitted or considered in the initial benefit determination.

The Claimant or his or her duly authorized representative shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information which (1) was relied upon by the First Level Reviewer in making its initial claims decision, (2) was submitted, considered or

generated in the course of the First Level Reviewer making its initial claims decision, without regard to whether such instrument was actually relied upon by the First Level Reviewer in making its decision or (3) demonstrates compliance by the First Level Reviewer with its administrative processes and safeguards designed to ensure and to verify that benefit claims determinations are made in accordance with governing documents and that, where appropriate, the provisions have been applied consistently with respect to similarly situated claimants, if any. If the Claimant does not request a review of the First Level Reviewer's determination within such sixty (60) day period, he or she shall be barred and estopped from challenging such determination.

(iv) Review of Decision. Within a reasonable period of time, ordinarily not later than sixty (60) days, after the Second Level Reviewer's receipt of a request for review, it will review the First Level Reviewer's prior determination. If special circumstances require that the sixty day time period be extended, the Second Level Reviewer will so notify the Claimant within the initial sixty (60) day period indicating the special circumstances requiring an extension and the date by which the Second Level Reviewer expects to render its decision on review, which shall be as soon as possible but not later than one hundred twenty (120) days after receipt of the request for review. In the event that the Second Level Reviewer extends the determination period on review due to a Claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination on review shall not take into account the period beginning on the date on which notification of extension is sent to the Claimant and ending on the date on which the Claimant responds to the request for additional information.

The Second Level Reviewer has discretionary authority to determine a Claimant's eligibility for benefits and to interpret the terms of the Agreement. Benefits under the Agreement will be paid only if the Second Level Reviewer decides in its discretion that the Claimant is entitled to such benefits. The decision of the Second Level Reviewer shall be final and non-reviewable, unless found to be arbitrary and capricious by a court of competent review. Such decision will be binding upon Series and the Claimant.

If the Second Level Reviewer makes an adverse benefit determination on review, the Second Level Reviewer will render a written opinion, using language calculated to be understood by the Claimant, setting forth:

1. the specific reason or reasons for the denial;

2. the specific references to pertinent provisions on which the denial is based;

3. a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all

documents, records and other information which (i) was relied upon by the Second Level Reviewer in making its decision, (ii) was submitted, considered or generated in the course of the Second Level Reviewer making its decision, without regard to whether such instrument was actually relied upon by the Second Level Reviewer in making its decision or (iii) demonstrates compliance by the Second Level Reviewer with its administrative processes and safeguards designed to ensure and to verify that benefit claims determinations are made in accordance with governing documents, and that, where appropriate, the applicable provisions have been applied consistently with respect to similarly situated claimants; and

4. a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following the adverse benefit determination on such review.

(v) Special Disability Provisions. Notwithstanding anything herein, if a Claimant is denied a benefit because he or she is determined not to be disabled and he or she makes a claim pursuant to such denial, the provisions of this subsection shall apply. Upon receipt of a claim, the reply period shall be forty-five (45) days. If, prior to the end of such forty-five (45) day period, the claims reviewer determines that, due to matters beyond the control of Series, a decision cannot be rendered, the period for making the determination may be extended for up to thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of such forty-five (45) day period, of the circumstances requiring an extension and the date by which Series expects to render a decision. If, prior to the end of the first thirty (30) day extension period, the claims reviewer determines that, due to matters beyond the control of Series, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of the first thirty (30) day extension period, of the circumstances requiring the extension and the date by which Series expects to render a decision. In the case of any extension described in this paragraph, the notice of extension shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim and the additional information needed to resolve those issues, and the Claimant shall be afforded forty-five (45) days within which to provide the specified information. If information is requested, the period for making the benefit determination shall be tolled from the date on which notification of an extension is sent to the Claimant until the date on which the Claimant responds to the request for information.

Within one hundred eighty (180) days after receiving the written notice of an adverse disposition of the claim, the Claimant may request in writing, and shall be entitled to, a review of the benefit determination. In deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, Series shall consult with a health care professional who has appropriate

training and experience in the field of medicine involved in the medical judgment. Such health care professional shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal nor the subordinate of any such individual. The medical or vocational experts whose advice was obtained on behalf of Series in connection with the Claimant's adverse benefit determination will be identified to the Claimant. If the Claimant does not request a review within one hundred eighty (180) days after receiving written notice of the original's disposition of the claim, the Claimant shall be deemed to have accepted the original written disposition.

A decision on review shall be rendered in writing by Series within a reasonable period of time, but ordinarily not later than forty-five (45) days after receipt of the Claimant's request for review by Series, unless Series determines that special circumstances require an extension of time for processing the claim. If Series determines that an extension of time for processing is required, written notice of the extension shall be furnished to the Claimant prior to the termination of the initial forty-five (45) period. In no event shall such extension exceed a period of forty-five (45) days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which Series expects to render the determination on review. In the event the extension is due to a Claimant's failure to submit information necessary to decide the claim, the Claimant shall be afforded forty-five (45) days within which to provide the specified information, and the period for making the benefit determination on review shall be tolled from the date on which notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information.

*Remainder of page intentionally left blank.*

IN WITNESS WHEREOF, Series has caused this Agreement to be executed on its behalf by its manager and Grantee has signed this Agreement to evidence Grantee's acceptance of the Grant and of the terms hereof, all as of the date hereof.

**SOUTHERN CALIFORNIA SERIES OF LOCKTON COMPANIES, LLC**

By: Lockton Management, LLC, its sole manager

William W. Humphrey, III, Secretary

**GRANTEE:**

Mark Pastorius



KC01DOCS\936679.3

# Exhibit 4

Mark Pastorius

**FIRST AMENDMENT TO DEFERRED COMPENSATION AGREEMENT**

This First Amendment to Deferred Compensation Agreement ("Amendment") is made and entered into effective the 31st day of December, 2018, by and between Lockton Companies, LLC – Pacific Series (f/k/a Southern California Series of Lockton Companies, LLC) ("Series") and Mark Pastorius ("Grantee").

WHEREAS, Grantee and Series entered into a Deferred Compensation Agreement dated December 31, 2008 (the "Agreement");

WHEREAS, the parties desire to amend the Agreement to revise Section 11(k)(v) to update the determination of benefits claims procedure with respect to disability determinations to comply with new Department of Labor rules; and

WHEREAS, capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

NOW, THEREFORE, in consideration of the foregoing and the premises and mutual agreements set forth herein and therein, the parties agree as follows:

1. Amendment to the Agreement. Section 11(k)(v) of the Agreement shall be deleted in its entirety and the following shall be inserted in lieu thereof:

(v) Special Disability Provisions.

(1) Notwithstanding anything herein, if a Claimant is denied a benefit because he or she is determined not to be disabled and he or she makes a claim pursuant to such denial, the provisions of this subsection shall apply. Upon receipt of a claim, the reply period shall be forty-five (45) days. If, prior to the end of such forty-five (45) day period, the claims reviewer determines that, due to matters beyond the control of the Series, a decision cannot be rendered, the period for making the determination may be extended for up to thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of such forty-five (45) day period, of the circumstances requiring an extension and the date by which the Series expects to render a decision. If, prior to the end of the first thirty (30) day extension period, the claims reviewer determines that, due to matters beyond the control of the Series, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of the first thirty (30) day extension period, of the circumstances requiring the extension and the date by which the Series expects to render a decision. In the case of any extension described in this paragraph, the notice of extension shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim and the additional information needed to resolve those issues, and the Claimant shall be afforded forty-five (45) days within which to provide the specified information. If information is requested, the period for

making the benefit determination shall be tolled from the date on which notification of an extension is sent to the Claimant until the date on which the Claimant responds to the request for information.

(2) If an adverse benefit determination is made (in whole or in part), a written opinion will be rendered in a culturally and linguistically appropriate manner that will include, in addition to the information set out above for a claim denial, the following information:

(A) either the specific internal rules, guidelines, protocols, standards or other similar criteria of the Agreement that were used as a basis for making the adverse benefit determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Agreement do not exist;

(B) if the denial is based on a medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Agreement to the Claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request;

(C) a discussion of the decision, including an explanation of the basis for disagreeing with or not following: (i) the views presented by the Claimant to the Agreement of health care professionals treating the Claimant or vocational professionals who evaluated the Claimant; (ii) the views of medical or vocational experts whose advise was obtained on behalf of the Agreement, without regard to whether the advice was relied upon in making the benefit determination; and (iii) a disability determination by the Social Security Administration presented by the Claimant to the Agreement; and

(D) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits.

(3) Within one hundred eighty (180) days after receiving the written notice of an adverse disposition of the claim, the Claimant may request, and shall be entitled to, a review of the benefit determination by submitting a written appeal to the Second Level Reviewer ("Appeals Administrator"). The review will be conducted by a person who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual. To the extent required by law, the Claimant may submit written comments, documents, records, and other information relating to the claim for benefits (regardless of whether such information was considered in the initial claim for benefits) for the Appeals Administrator's review and consideration and will be entitled to receive, upon request and free of charge, access to and copies of all documents, records, and other information that is relevant to his or her appeal.

No deference shall be afforded to the initial claim denial. In the case of a claim denied on the grounds of a medical judgment, the Appeals Administrator will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, as required under applicable law. The health care professional who is consulted will be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor a subordinate of that individual. The name of the health care professional whose advice was obtained in connection with the adverse benefit determination will be provided to the Claimant, upon request, without regard to whether the advice was relied upon in making the benefit determination. To the extent required by law, any new or additional evidence or rationale being considered, relied upon, or generated by (or at the direction of) the Appeals Administrator in determining the appeal will be provided to the Claimant sufficiently in advance of the Appeals Administrator's final determination to afford the Claimant with a reasonable opportunity to respond to such evidence or rationale. If the Claimant does not request a review within one hundred eighty (180) days after receiving written notice of the original disposition of the claim, the Claimant shall be deemed to have accepted the original written disposition.

The Executive Committee of the Series will ensure that all internal appeals for disability benefits are handled impartially. The Executive Committee of the Series shall ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical expert) must not be made based upon the likelihood that the individual will support an adverse benefit determination of benefits. The Executive Committee of the Series shall ensure that health care professionals consulted are not chosen based on the expert's reputation for outcomes in contested cases, rather than based on the professional's qualifications.

(4) A decision on review shall be rendered in writing by the Series within a reasonable period of time, but ordinarily not later than forty-five (45) days after receipt of the Claimant's request for review by the Series, unless the Series determines that special circumstances require an extension of time for processing the claim. If the Series determines that an extension of time for processing is required, written notice of the extension shall be furnished to the Claimant prior to the termination of the initial forty-five (45) day period. In no event shall such extension exceed a period of forty-five (45) days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Series expects to render the determination on review. In the event the extension is due to a Claimant's failure to submit information necessary to decide the claim, the Claimant shall be afforded forty-five (45) days within which to provide the specified information, and the period for making the benefit determination on review shall be tolled from

the date on which notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information.

(5) If the disability claim is denied (in whole or in part) on review, the notice of the adverse benefit determination will be provided in a culturally and linguistically appropriate manner and will also include, in addition to the information set out above for a claim denial, the following information:

(A) either the specific internal rules, guidelines, protocols, standards or other similar criteria of the Agreement that were used as a basis for in making the adverse benefit determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Agreement do not exist;

(B) if the denial is based on a medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Agreement to the Claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request;

(C) a discussion of the decision, including an explanation of the basis for disagreeing with or not following: (i) the views presented to the Appeals Administrator of health care professionals treating the Claimant or vocational professionals who evaluated the Claimant; (ii) the views of medical or vocational experts whose advice was obtained on behalf of the Agreement, without regard to whether the advice was relied upon in making the benefit determination; and (iii) a disability determination by the Social Security Administration presented to the Appeals Administrator by the Claimant; and

(D) a statement of the Claimant's right to bring an action under Section 502(a) of ERISA following the adverse benefit determination on such review and a description of any applicable contractual limitations period that applies to the Claimant's right to bring such an action, including the calendar date on which the contractual limitations period expires for the claim.

(6) If the Agreement fails to strictly adhere to all the requirements of the claims and appeals process with respect to the claim for disability benefits, the Claimant is deemed to have exhausted the administrative remedies under the Agreement. However, the administrative remedies under the Agreement shall not be deemed to be exhausted if the error was de minimis, does not cause and is not likely to cause prejudice or harm to the Claimant, the Agreement demonstrates that the error was due to good cause or to matters beyond the Agreement's control, that the error occurred in the context of a good faith exchange of information between the Agreement and the Claimant, and that the error does not reflect a pattern or practice of violations by the Agreement.

2. Ratification. Except as specifically set forth in this Amendment, all provisions of the Agreement shall be unmodified and remain in full force and effect. The Agreement, as amended by this Amendment, is hereby ratified and confirmed, including with respect to all prior amendments thereto.

3. Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and together shall constitute one and the same Amendment, with one counterpart being delivered to each party hereto.

*Remainder of page intentionally left blank.*

**IN WITNESS WHEREOF,** Series and Grantee have executed this Amendment effective as of the date set forth above.

**SERIES:**

**Lockton Companies, LLC – Pacific Series**

William W. Humphrey III, Secretary

**GRANTEE:**

Mark Pastorius

# Exhibit 5

Deferred
% NB

Mark Pastorius

## KEY EXECUTIVE AWARD PLAN PARTICIPATION AGREEMENT

THIS AGREEMENT is entered into effective as of May 1, 2016, by and between Lockton Companies, LLC — Pacific Series ("Company"), a series established by Lockton Companies, LLC, a Missouri series limited liability company, and Mark Pastorius ("Participant").

### RECITALS

A. Participant is an employee of the Company.

B. The Company desires to provide incentive compensation for Participant to continue to serve the Company as an employee.

C. The parties intend that this Agreement be considered an unfunded arrangement, maintained primarily to provide deferred compensation benefits for Participant, a member of a select group of management or highly compensated employees of the Company, for purposes of the Employee Retirement Income Security Act of 1974, as amended.

### AGREEMENT

In consideration of the mutual promises contained herein, the parties agree as follows:

1. **Definitions.**

(a) "Affiliates" means, collectively, Lockton Financial Advisors, LLC, Lockton Investment Advisors, LLC, Lockton Affinity, LLC, any series of Lockton Affinity, LLC, and any entity in which Lockton Insurance Agency, LLC owns or controls ten percent (10%) or more of the outstanding voting securities or equity interests. "Affiliate" means any one of the Affiliates, singularly.

(b) "Business" means providing retail insurance or reinsurance intermediary and risk management consulting services; providing consulting services to clients, including investment advice; buying and selling securities as a registered broker-dealer; and other services related or incidental thereto.

(c) "Change of Control" means the occurrence of any of the following events, provided that in no case shall any such event be considered a Change of Control if it would not be a "change in control event" as defined in Treasury Regulation § 1.409A-3(i)(5):

(i) any acquisition of beneficial ownership of the corporate units of the Company (or the acquisition of any equity interest in any Person, other than a natural person, that, immediately before such acquisition, directly or indirectly had beneficial ownership of any corporate units of the Company) if, immediately after such acquisition, corporate units representing more than fifty percent (50%) of the total voting power of all outstanding corporate units of the Company is not beneficially owned or controlled, directly or indirectly, by David M. Lockton or his relatives;

(ii) any merger, consolidation or similar transaction involving the Company (or any Person, other than a natural person, that, immediately before such merger, consolidation or similar transaction, directly or indirectly had beneficial ownership of any corporate units of Company), if, immediately after such merger, consolidation or similar transaction, corporate units representing more than fifty percent (50%) of the total voting power of all outstanding corporate units of the Company is not beneficially owned or controlled, directly or indirectly, by David M. Lockton or his relatives; or

(iii) any acquisition (whether by assignment, conveyance, issuance, merger or other transaction or otherwise) by any one Person, or more than one Person acting as a group, of beneficial ownership of equity interests in the Company that, together with equity interests beneficially owned by such Person or group immediately before such acquisition, constitutes more than fifty percent (50%) of the total voting power of all corporate units of the Company outstanding immediately after such acquisition (unless such Person or group beneficially owned more than fifty percent (50%) of the total voting power of all corporate units of the Company outstanding immediately before such acquisition); or

(iv) any acquisition (whether by assignment, conveyance, issuance, merger or other transaction or otherwise, including one or more such acquisitions during any twelve (12)-month period ending on the date of the most recent such acquisition) by any one Person, or more than one Person acting as a group, of assets from the Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of the Company immediately before such acquisition or acquisitions (determining such gross fair market values without regard to any liabilities associated with any such assets).

(d) "Code" means the Internal Revenue Code of 1986, as amended.

(e) "Company" means Lockton Companies, LLC — Pacific Series, a series established by Lockton Companies, LLC, a Missouri series limited liability company or any successor thereto.

(f) "Company Credits Account" has the meaning set forth in Section 2(b).

(g) "Confidential Information" means information, of or pertaining to any Lockton Entity, disclosed to Participant or to which Participant has or had access (whether or not in writing and whether original, duplicated, electronic, memorialized, handwritten or in any other form), that is related to the Business of any of the Lockton Entities, and as to which the applicable Lockton Entity has taken reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, trade secrets, non-public proprietary information, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; sales and other business methods or policies; prices or price formulas; procedures; the identity of and information concerning former or current Customer Accounts of the Company, the Other Series and/or any Affiliate, including but not limited to Customer Account needs and preferences, levels of satisfaction and the terms of engagement and transactions between the Company, the

Other Series or Affiliates and/or its or their Customer Accounts; revenues, expenses, budgeting, finances and other financial information; computer systems, programs and software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation) and other technology; business, marketing and development strategies and plans; Company, Other Series and Affiliate member and/or Lockton Entity personnel information, including without limitation, compensation and benefit information; internal operational information related to the structure of any of the Lockton Entities, including without limitation, the Operating Agreement; inventions; and all other confidential information of any kind or character relating to the development, improvement, sale or delivery of products or services by the Company, the Other Series or Affiliates. Confidential Information also includes, without limitation, medical and health information, electronic or otherwise, that is protected by law, including but not limited to state or local privacy laws and/or the federal Health Information Portability and Accountability Act of 1996, as amended, and the regulations enacted pursuant to it and its amendments, including but not limited to 45 C.F.R. § 160.103; personal private information, electronic or otherwise, that is protected by law, including but not limited to federal, state or local privacy laws; and all trade secrets, non-public proprietary information and other confidential information belonging to Customer Accounts of the Company, the Other Series or Affiliates. Notwithstanding the foregoing, Confidential Information does not include information that (i) is or becomes generally available or known to (or is readily ascertainable by use of proper means by) members of the public, competitors or other Person(s) other than by reason of the fault of Participant, or (ii) becomes available to Participant on a non-confidential basis from a source other than any Lockton Entity, provided that the source is not prohibited from disclosing such information to Participant by any contractual or other obligation to such Lockton Entity, which obligation is known, or should reasonably be known, to Participant at the time Participant makes any further disclosure of such information.

(h) "Customer Accounts" means:

(i) the accounts of all customers of one or more of the Company, the Other Series or any Affiliate, including, but not limited to, a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm in its capacity as a buyer or when it has engaged the Company, the Other Series or any Affiliate to perform due diligence or other prospecting activities with respect to a potential investment in or the acquisition of another entity; and

(ii) prospective customers of either one or more of the Company, the Other Series or any Affiliate in the event:

(1) a proposal has been made by the Company, the Other Series or any Affiliate and such proposal is pending or was pending within the six (6) month period before the last day of Participant's employment with the Company; or

(2) the Company, the Other Series or any Affiliate has been engaged by a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm to perform due diligence or other prospecting activities

with respect to potential investment in or acquisition of another entity (the "target entity"), at any time during the six (6) month period preceding the last day of Participant's employment with the Company, in which case such target entity shall be considered a prospective customer.

(i) "Deemed Investment Elections" has the meaning set forth in Section 2(c).

(j) "Deemed Investment Options" has the meaning set forth in Section 2(c).

(k) "Earnings" means the actual or notional gains or losses (realized or unrealized) credited or debited to Participant's Company Credits Account in accordance with Section 2(c).

(l) "Executive Committee" means the executive committee of the Company.

(m) "Fiscal Year" means the twelve (12)-month period ending April 30.

(n) "FY Contribution" for a given Fiscal Year shall be an amount equal to seven and one-half percent (7.5%) of Tim Noonan's Producer Profit Return on new business written during such Fiscal Year as reflected on the Series' balance sheet.

(o) "Grant" has the meaning set forth in Section 2.

(p) "Lockton Entities" means, collectively, the Company, the Other Series, the Affiliates, Lockton Management, LLC, Lockton Insurance Agency, LLC, Lockton Partners, LLC, LPCM, LLC, Lockton Operating Companies, LLC, Lockton, Inc. and its/their direct and indirect subsidiaries. "Lockton Entity" means any one of the Lockton Entities, singularly.

(q) "Operating Agreement" means the Second Amended and Restated Operating Agreement of Lockton Companies, LLC and each of its Series, dated May 1, 2016, as may be amended from time to time.

(r) "Other Series" means any series of Lockton Companies, LLC other than the Company.

(s) "Person" means any natural person, partnership (whether general or limited), trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity, in each case, whether domestic or foreign, or a limited liability company or foreign limited liability company or series of a domestic or foreign limited liability company.

(t) "Property" means any property of any type whatsoever belonging to any Lockton Entity, including without limitation any property created or obtained by Participant as a result, or in the course, of Participant's employment with the Company.

(u) "Shared Services Agreement" means that certain Amended and Restated Shared Services Agreement, dated as of September 1, 2015, by and among the Company, the

Other Series, Affiliates and other Lockton Entities, as it may have been or may be amended from time to time.

(v) "Triggering Event" means the occurrence of an event set forth in Section 4.

2. **<u>Grant of Compensation Rights.</u>**

(a) <u>Grant.</u> The Company hereby grants to Participant the right to receive, following a Triggering Event, in accordance with the payment terms in Section 8, an amount of deferred compensation (the "Grant") equal to the Company Credits Account *multiplied by* the vested percentage as determined pursuant to Section 3 herein.

(b) <u>Grant - Company Credits Account.</u> For purposes of this Agreement, the term "Company Credits Account" shall mean book entries maintained by the Company reflecting amounts credited or debited thereto by the Company as follows:

(i) <u>Initial Contribution.</u> On May 1, 2016 Participant shall receive an initial contribution to Participant's Company Credits Account in an amount equal to Eighty Thousand Eighty-Six Dollars ($80,086.00).

(ii) <u>Adjustments.</u> The Company Credits Account shall increase and/or decrease based on the following adjustments:

(1) The Company Credits Account shall be increased or decreased each business day by an amount equal to the Earnings attributable to the Company Credits Account for such business day.

(2) Commencing on April 30, 2017 and on April 30 of each Fiscal Year thereafter, provided Participant is then an employee of the Company, this Agreement has not otherwise been terminated pursuant to its terms hereunder, and/or a Triggering Event has not yet occurred, the Company Credits Account shall be increased by an amount equal to the FY Contribution for such Fiscal Year. If Participant is terminated as an employee of the Company at any time, Participant shall be entitled to a FY Contribution in an amount equal to seven and one-half percent (7.5%) of Tim Noonan's Producer Profit Return on new business written during such Fiscal Year through the final day of Participant's employment with the Company.

(c) <u>Earnings.</u> The Company shall select from time to time certain mutual funds, insurance company separate accounts, indexed rates, or other methods (the "Deemed Investment Options") for purposes of crediting Earnings to Participant's Company Credits Account. The Company may discontinue, substitute, or add Deemed Investment Options in its sole discretion. Any discontinuance, substitution, or addition of a Deemed Investment Option will take effect as soon as administratively practicable. The Deemed Investment Options are to be used for measurement purposes only, and Participant's election of any such Deemed Investment Option, the allocation of such Deemed Investment Options to Participant's Company Credits Account, the calculation of additional amounts, and the crediting or debiting of such amounts to Participant's Accounts shall not be considered or construed in any manner as an

actual investment of Participant's Company Credits Account. Participant's Company Credits Account shall reflect all gains or losses (realized or unrealized), reduced by any expenses as determined by the Company. In the event that the Company, in its own discretion, decides to invest funds in any or all of the investments on which any of the Deemed Investment Options are based, Participant shall not have any rights in or to such investments themselves. Participant shall have the right to direct the Company as to how Participant's Accounts shall be deemed to be invested ("Deemed Investment Elections"), subject to any operating rules and procedures imposed by the Company. As of the close of each business day, as established and amended from time to time by guidelines and procedures of the Company at its sole and absolute discretion, Participant's Company Credits Account will be credited or debited to reflect the performance of the Deemed Investment Options elected by Participant. Participant's Deemed Investment Elections for his Participant's Company Credits Account shall be subject to the following rules:

(i) Any initial or subsequent Deemed Investment Election shall be in writing or electronic format, supplied by and filed with the Company (or made in any other manner specified by the Company), and shall be effective on such date as specified by the Company. The Company is not required to provide multiple methods of making Deemed Investment Elections.

(ii) All Deemed Investment Elections shall continue indefinitely until changed by Participant in the manner permitted by the Company.

(iii) If the Company receives an initial or revised Deemed Investment Election which it determines to be incomplete, unclear, or improper, Participant's Deemed Investment Election then in effect shall remain in effect (or, in the case of a deficiency in an initial Deemed Investment Election, Participant shall be deemed to have filed no Deemed Investment Election) until a date so designated by the Company, unless the Company provides for, and permits the application of, corrective action prior to that date. Notwithstanding the foregoing, Participant's election must total one hundred percent (100%). If the Company possesses (or is deemed to possess, as provided above) at any time Deemed Investment Elections of less than one hundred percent (100%) of Participant's Company Credits Account, Participant shall be deemed to have directed that the undesignated portion of the said Accounts be deemed to be invested in a money market or similar fund made available under this Agreement as determined by the Company.

(d) Classification of Company Credits Account. Without limiting the foregoing, Participant's Company Credits Account shall at all times be a bookkeeping entry only and shall not represent any investment made on Participant's behalf by the Company. Participant and Participant's beneficiaries shall at all times remain an unsecured creditor of the Company and any liability or obligation of the Company to Participant, or Participant's beneficiaries with respect to a right to payment shall be based solely upon contractual obligations created by this Agreement.

3. **Vesting of Grant.** The Grant is fully vested.

4. **Triggering Events.** Participant shall be paid, pursuant to Section 8, upon the earliest of the occurrence of the events set forth in subsections (a)-(d) below.

(a) Death of Participant. In the event of the death of Participant.

(b) Permanent and Total Disability. In the event of the permanent and total disability of Participant. For purposes of this Agreement, Participant shall be deemed to be "permanently and totally disabled" if (i) Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) Participant is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of the Company.

(c) Separation from Service — Retirement, Resignation or Removal. If (i) Participant retires, resigns or is removed from the Company or its Affiliates which would be treated as a single employer for such purpose within the meaning of Section 409A of the Code and (ii) Participant has attained age sixty (60).

(d) Age 65. Participant has attained age sixty-five (65).

For purposes of this Agreement, the terms "termination of employment", "resignation", "removal" and similar concepts shall mean a "separation from service" as such term is defined under Section 409A of the Internal Revenue Code. No change in the duties of Participant, while affiliated with the Company or its affiliates, or transfer, if still affiliated after the transfer with the Company or its affiliates, shall constitute separation from service, except to the extent determined in accordance with the provisions of Section 409A of the Internal Revenue Code of 1986, as amended.

5. **Term.** The Grant shall expire on the earlier of (a) the date of the payment of all amounts due under Section 2, or (b) if a Triggering Event set forth in Section 4(a)-(d) has not occurred, at such time as Participant is no longer an employee of the Company, or otherwise affiliated with the Company or its Affiliates, or in the event of a Change of Control, its successors.

6. **Withholding.** Company, at the time any payment is made under this Agreement, may withhold from such payment any amount necessary to satisfy federal and state income tax withholding requirements with respect to such payment.

7. **Non-Transferability.** Neither the Grant nor any rights thereunder or under this Agreement may be assigned, transferred or in any manner encumbered except by will or the laws of descent and distribution, and any attempted assignment, transfer, mortgage, pledge or encumbrance except as herein authorized, shall be void and of no effect; provided, however, Company will consent to assignment of the Grant to an appropriate trust established by Participant for the benefit of Participant or Participant's spouse and/or heirs.

8. **Payment.** Payment shall be made as follows:

(a) Death of Participant. Upon the occurrence of a Triggering Event set forth in Section 4(a), payment of an amount equal to Participant's Company Credits Account shall be made in a lump sum on the last day of the month that includes the date that is sixty (60) days after occurrence of the Section 4(a) Triggering Event.

(b) Permanent and Total Disability. Upon the occurrence of a Triggering Event set forth in Section 4(b), payment of an amount equal to Participant's Company Credits Account shall be made in eleven (11) installments. The initial installment payment shall be paid on the last day of the month that includes the date that is sixty (60) days after occurrence of the Section 4(b) Triggering Event and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining. Each additional installment payment shall be due on the anniversary date of the first installment payment and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining.

(c) Separation from Service — Retirement, Resignation or Removal. Upon the occurrence of a Triggering Event set forth in Section 4(c), payment of an amount equal to Participant's Company Credits Account shall be made in eleven (11) installments. The initial installment payment shall be paid on the last day of the month that includes the date that is sixty (60) days after occurrence of the Section 4(c) Triggering Event and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining. Each additional installment payment shall be due on the anniversary date of the first installment payment and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining.

(d) Age 65. Upon the occurrence of a Triggering Event set forth in Section 4(d), payment of an amount equal to Participant's Company Credits Account shall be made in eleven (11) installments. The initial installment payment shall be paid on the last day of the month that includes the date that is sixty (60) days after occurrence of the Section 4(d) Triggering Event and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining. Each additional installment payment shall be due on the anniversary date of the first installment payment and shall equal the then current balance of Participant's Company Credits Account, divided by the number of payments remaining.

In the event of the death of Participant, payments shall be made to Participant's estate, or to any person who acquired the right to receive the Grant by bequest or inheritance or by reason of the death of the Participant. No payments to Participant may be accelerated except to the extent permitted by the provisions of Section 409A of the Code. Notwithstanding anything to the contrary set forth herein, in the event of a final "determination" (within the meaning of Section 1313(a) of the Code or any corresponding state or local tax law, as applicable) that Participant is subject to tax or interest pursuant to Section 409A(a)(1)(B) of the Code with respect to the Grant or any amount payable in respect thereof, then the entire amount of the Grant shall be paid in full within ten (10) days after such final determination (calculating the amount of the Grant, if a Triggering Event has not previously occurred, as of the end of the Fiscal Year most recently ended before the date of such final determination).

Notwithstanding Sections 8(a)-(d), payment of Participant's Company Credits Account will be distributed in a single lump sum payment if, at the time of the Triggering Event, the balance does not exceed the limit in Section 402(g)(1)(B) of the Code and results in the termination of the Participant's entire interest in this Agreement as provided under Section 409A of the Code. Such payment shall be made on or before the later of (i) December 31 of the calendar year in which the Triggering Event occurs, or (ii) the date that is 2-1/2 months after the Triggering Event occurs.

9. **Benefits Payable Only from General Assets; Unsecured General Creditor Status of Participant.**

(a) Payments Not Secured. The payments to Participant, Participant's designated beneficiary or any other beneficiary hereunder shall be made from assets which shall continue, for all purposes, to be a part of the general, unrestricted assets of the Company and no person shall have nor acquire any interest in any such assets by virtue of the provisions of this Agreement. The Company's obligation hereunder shall be an unfunded and unsecured promise to pay money in the future. To the extent that Participant or any person acquires a right to receive payments from the Company under the provisions hereof, such right shall be no greater than the right of any unsecured general creditor of Company; no such person shall have nor acquire any legal or equitable right, interest or claim in or to any property or assets of the Company.

(b) Insurance Policy. Company shall have the right to purchase insurance on Participant to finance the payment of the Grant pursuant to this Agreement. The purchaser of such insurance policies shall be the applicant, owner and beneficiary of the policies so purchased, and Participant shall have no rights under any such policies. No insurance company which has issued or shall issue a policy or policies subject to this Agreement shall be under any obligation with respect to the performance of the terms and conditions of this Agreement. Any such company shall be bound only by the terms of the policy or policies which it has issued or shall hereafter issue and shall have no liability except as set forth in its policies.

10. **Obligation to Abide By Restrictive Covenants.** Unless otherwise agreed to in writing by the Company, Participant agrees that by accepting a Grant, Participant will, for the period specified in each of the following Sections, refrain from engaging directly or indirectly in any of the activities specified below.

(a) Acknowledgments. Participant acknowledges and agrees that: (i) the business of the Lockton Entities is highly specialized and competitive; (ii) the Confidential Information is unique and a valuable part of the Lockton Entities' assets; (iii) each Lockton Entity's Confidential Information (1) derives independent economic value, actual or potential, from not being generally known to members of the public, competitors, or other Persons who can obtain economic value from its disclosure, use, access, duplication, removal, transmission or other appropriation, and (2) is the subject of internal procedures, safeguards or other efforts that are reasonable under the circumstances to maintain its secrecy; (iv) Participant will be provided or continue to be provided with introduction or access to Confidential Information belonging to Lockton Entities; (v) all Confidential Information shall remain the exclusive property of the applicable Lockton Entity or Lockton Entities; (vi) the unauthorized disclosure, use, acquisition,

access, duplication, removal, transmission or other appropriation of such Confidential Information at any time is prohibited and, whether actual or threatened, will cause irreparable injury to the Lockton Entity or Lockton Entities whose Confidential Information is at issue; (vii) Participant will engage in efforts that are reasonable under the circumstances to maintain the confidentiality of the Confidential Information to which Participant has access, including, without limitation, following all policies and procedures applicable to Participant which relate to that access; (viii) the Lockton Entities are parties to the Shared Services Agreement pursuant to which they have a shared interest in, and benefit from, certain assets of, and resources and services provided by, Lockton Management, LLC, as well as the expense sharing and other efficiencies flowing from the Shared Services Agreement; and (ix) to efficiently effectuate that shared interest as well as the shared interests reflected in the Operating Agreement, the Shared Services Agreement and this Agreement, respectively, provide for the Company and other Lockton Entities to assign certain rights, including without limitation, enforcement rights relating to Confidential Information and restrictive covenants and any and all other available rights and remedies. Participant consents to all such assignments.

(b) Nondisclosure of Confidential Information. While Participant is an employee of the Company and at all times thereafter, and except with the prior written consent of the applicable Lockton Entity or as is reasonably necessary for Participant to perform Participant's responsibilities as an employee of the Company, Participant shall not, directly or indirectly, (i) disclose, or attempt to disclose, Confidential Information to anyone other than the members, officers or authorized employees, attorneys or other agents and fiduciaries of the applicable Lockton Entity, (ii) use, or attempt to use, Confidential Information for any unauthorized purpose, or (iii) acquire, access, duplicate, copy, remove, download, upload, save, email, transmit or otherwise take, or attempt to do any of the foregoing with respect to, Confidential Information for any unauthorized purpose. Further, if Participant anticipates or should reasonably anticipate a judicial, administrative or arbitration process that will require Participant to disclose Confidential Information, then Participant shall immediately notify (to the extent such notification is permitted by law) the Lockton Entity or Lockton Entities whose Confidential Information is at issue, in writing, pursuant to Section 12(d) below, to allow it/them as much time as possible to object to such disclosure, and Participant shall inform such judicial, administrative or arbitration tribunal of Participant's non-disclosure obligations under this Agreement. Further, in the event Participant knows that any Person is (x) using, disclosing, or attempting to use or disclose Confidential Information or (y) copying, duplicating, reverse engineering, reverse compiling, recording, or otherwise reproducing, or analyzing, Confidential Information, or attempting to do any of the foregoing, for an unauthorized purpose, without the prior written consent of the Lockton Entity or Lockton Entities whose Confidential Information is at issue, Participant shall immediately notify such Lockton Entity or Lockton Entities in writing pursuant to Section 12(d) below.

(c) Non-Removal of Confidential Information and Property. Participant shall not, other than for proper, authorized, and lawful purposes, directly or indirectly, copy, duplicate, take, save, transmit, email, upload, download or remove in any manner whatsoever from the premises of the Company or of any other Lockton Entity, or destroy or render unusable, in whole or in part, in any manner whatsoever any of the Confidential Information or Property of the Company or any other Lockton Entity.

(d) Return of Confidential Information and Property. Participant shall, upon the request of any Lockton Entity whose Confidential Information or Property is at issue, or upon the last day of Participant's employment with the Company, immediately return and surrender to the Company or other applicable Lockton Entity, the Property and the original and all copies of Confidential Information belonging to such Lockton Entity that Participant has in Participant's possession, custody or control; provided that Participant shall be permitted to retain one copy of this Agreement. The obligation to return and surrender set forth in this Section 10(d) shall apply to Property and Confidential Information in whatever form, electronic or otherwise, and shall include any electronic device containing any such Confidential Information.

(e) Non-Disclosure of Third-Party Confidential Information. Participant represents and warrants that Participant has fully disclosed to the Company, in writing, all contractual or other obligations that restrict Participant from disclosing, using, or attempting to disclose or use, any trade secrets or other confidential information belonging to third parties, including without limitation previous employers. Participant agrees that the unauthorized, unlawful, improper or otherwise harmful or damaging disclosure, use, acquisition, access, copying, duplication, upload, download, removal, transmission, taking or other misappropriation of such trade secrets or other confidential information belonging to third parties, or any attempts or threats to do any of the foregoing, constitutes a breach of this Agreement by Participant.

(f) Protection of Relationships and Other Legitimate Business Interests.

(i) In addition to the acknowledgements and agreements set forth in Section 10(a) of this Agreement, Participant further acknowledges and agrees that: the relationships (including without limitation the related goodwill and loyalty) of the Company, the Other Series and any Affiliate with and between its/their Customer Accounts, employees, members, producers and consultants, have been developed at great time and expense, and are among its/their most important assets, and developing, maintaining, and continuing such relationships are among its/their highest priorities; Participant will be provided with introduction or access to, and/or continued introduction or access to, such relationships, will use resources and staff of the Lockton Entities to develop and maintain such relationships, and will be relied upon to develop and to maintain such relationships on behalf of the Company and, if applicable, the Other Series and the Affiliates, throughout the course of Participant's employment with the Company; these relationships generally carry the prospect of future economic benefit to the Lockton Entities; and, that once established, these relationships generally are likely to continue, and to continue to generate economic benefit for the Lockton Entities, unless the relationships are disrupted or interfered with by events outside of the normal course of business; a sudden or unexpected change in Participant's maintenance of the relationships may cause the relationships to be disrupted, interfered with or to become unstable and that any such actual or threatened disruption, interference or instability may jeopardize or harm the Business of the Lockton Entities; and the Lockton Entities, therefore, have a strong interest in avoiding any such disruption, interference or instability and any such sudden or unexpected changes, and in planning for a smooth transition and uninterrupted service to the Customer Accounts in the event that Participant's involvement appears likely to change or terminate.

(ii) Participant further acknowledges and agrees that: the Company, the Other Series and the Affiliates have legitimate protectable business interests, including, without limitation, in its/their customer contacts and goodwill, in its/their relationships with Customer Accounts, employees, members, producers and consultants and in the stability of its/their ownership and workforce, as well as in maintaining the confidentiality of its/their Confidential Information; and, any one of these legitimate protectable business interests is sufficient and reasonably necessary to support and warrant the enforcement of the restrictions, duties, and obligations set forth in Section 10 of this Agreement.

(g) Nonsolicitation of Producer Members, Employees and Others. While Participant is employed by the Company, and, in the event Participant's employment is terminated by Participant or the Company for any reason, Participant shall not, for a period of two (2) years following the last day of Participant's employment with the Company, directly or indirectly, for himself or on behalf of any other Person, solicit, recruit, induce, persuade, or encourage, or attempt to solicit, recruit, induce, persuade or encourage, any employee, member or consultant of the Company, or any Other Series or Affiliate (if, with respect to a consultant, substantially all of the services performed by such consultant are on behalf of the Company, or the Other Series or Affiliate) to terminate his/its employment, membership or consultant relationship with, or to render services for any competitor of the Company, or any Other Series or Affiliate, as applicable, and shall not otherwise take any action to interfere with, or attempt to interfere with, any employee's, member's or consultant's relationship with the Company, or any Other Series or Affiliate, as applicable. This nonsolicitation restriction will apply to any employee, consultant or member (i) with whom Participant was personally acquainted or worked; or (ii) whom Participant supervised directly or indirectly.

(h) Non-Solicitation of Customer Accounts. While Participant is employed by the Company and, in the event Participant's employment is terminated by Participant or the Company for any reason, Participant shall not, for a period of two (2) years following the last day of Participant's employment with the Company,(is this the same amount of time in our non-compete – if yes, ok, if not it should mirror such?) directly or indirectly, for himself or on behalf of any other Person, utilize any trade secrets of the Company or any Lockton Entity in order to solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the last day of Participant's employment with the Company, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Company, the Other Series or any Affiliate. Participant shall not, directly or indirectly, for himself or on behalf of any other Person, (i) accept, service, or work on, or attempt or threaten to accept, service or work on, any such competitive business from any of the Customer Accounts that Participant may not solicit, or (ii) in any way do business with any of the Customer Accounts that Participant may not solicit to the extent such business is the same or substantially similar to that provided by the Company, the Other Series or any Affiliate. The Customer Accounts to which this restriction applies are:

(i) any of the Customer Accounts of the Company (1) serviced or worked on by Participant, (2) serviced or worked on by associates who were supervised

by Participant, (3) for or about which Participant acquired or had access to Confidential Information, or (4) with which Participant has or had business contact; and

(ii) any of the Customer Accounts of the Other Series (1) serviced or worked on by Participant, (2) serviced or worked on by associates who were supervised by Participant, (3) for or about which Participant acquired or had access to Confidential Information, or (4) with which Participant has or had business contact; and

(iii) any of the Customer Accounts of any Affiliate (1) serviced or worked on by Participant, (2) serviced or worked on by associates who were supervised by Participant, (3) for or about which Participant acquired or had access to Confidential Information, or (4) with which Participant has or had business contact.

(i) Reasonableness of Restrictions. Participant acknowledges and agrees that the restrictions imposed on Participant's activities by this Agreement are not greater than reasonably necessary for the protection of the Confidential Information, goodwill and the other legitimate protectable business interests of the Company, and, as applicable, the Other Series, the Affiliates and Lockton Entities, which legitimate protectable business interests include, without limitation, customer contacts and goodwill, relationships with Customer Accounts, employees, members, producers and consultants, maintaining the confidentiality of Confidential Information, ownership and workforce stability and other interests described in Section 10 of this Agreement. Among other things, Participant acknowledges and agrees that the nature of the business of the Company, the Other Series and the Affiliates, as well as the business of Company, Other Series and Affiliate customers, is carried on wherever a Customer Account is located such that the restrictions imposed by this Agreement cannot be limited to a geographic location or region, and, therefore, it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted. Participant represents and warrants that the restrictions imposed on Participant's activities by this Agreement are sufficiently limited in time and scope that they will not prevent Participant from engaging in Participant's chosen work or profession and will not create undue hardship for Participant, and are designed to protect the goodwill of the Company, and, as applicable, the Other Series, the Affiliates and Lockton Entities.

(j) Assignment of Inventions. Participant hereby assigns to Lockton, Inc. all right, title, and interest Participant may have in any invention, writing, idea, discovery, or improvement (including any copyrights): (i) made, conceived or developed by Participant while working to any extent of time for the Company (rather than while entirely working on Participant's own time) or through utilization of any equipment, supplies, facilities or trade secret information owned by any of the Lockton Entities; (ii) that relates at the time of conception or reduction to practice of the invention to the business of, or demonstrably anticipated research or development of, any Lockton Entity; or (iii) resulting from any work performed for the Company by Participant. Participant further agrees to cooperate with Lockton, Inc. in obtaining U.S. and Foreign Letters Patent or other appropriate intellectual property protections for any such invention, discovery, or improvement at Lockton, Inc.'s expense, and will execute any appropriate instruments of assignment, patent or copyright registration applications, or other documents at the request of Lockton, Inc. Participant will report in writing

the details of every such invention, writing, idea, discovery, or improvement (whether patentable or not).

11. **Injunctive Relief & Money Damages.**

(a) Participant acknowledges and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Company and, as applicable, the Other Series, the Affiliates and other Lockton Entities; that a breach of this Agreement will result in irreparable harm and continuing damage to the Company and, where applicable, any one or more Other Series Affiliate or other Lockton Entity; and that, in the event of a breach of this Agreement by Participant, damages would be difficult or impossible to ascertain. Accordingly, in the event of Participant's breach, attempted breach, or threatened breach of this Agreement, the Company and, if applicable, any of the Other Series, any Affiliate and/or another Lockton Entity, upon application to any court of competent jurisdiction pursuant to Section 12(f), shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement.

(b) Participant acknowledges, and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Company and, as applicable, the Other Series, the Affiliates and other Lockton Entities, and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the Company and, if applicable, any of the Other Series, any Affiliate and/or another Lockton Entity, for which money damages may not provide adequate relief. Nonetheless, it is agreed that in the event of a breach, attempted breach or threatened breach of this Agreement, then in addition to injunctive relief and any other remedies set forth in this Agreement or otherwise available at law or equity, the Company and, if applicable, any of the Other Series, any Affiliate and/or another Lockton Entity, shall also be entitled to recover from Participant any money damages that can be determined

12. **Miscellaneous Provisions.**

(a) Entire Agreement. This Agreement, the Nonsolicitation, Nondisclosure and Invention Ownership Agreement, the Stakeholder Award Plan Agreement and the Deferred Compensation Agreement between Participant and the Company contain the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, the Nonsolicitation, Nondisclosure and Invention Ownership Agreement, the Stakeholder Award Plan Agreement and the Deferred Compensation Agreement and no representations, promises, agreements or understandings, written or oral, not herein contained or contained in the Nonsolicitation, Nondisclosure and Invention Ownership Agreement, the Stakeholder Award Plan Agreement or the Deferred Compensation Agreement shall be of any force or effect.

(b) Amendments. The terms and conditions applicable to the Grant may be amended or modified by mutual agreement between Company and Participant or such other persons as may then have an interest therein. However, no such amendment or substitution shall be effective if, as a result thereof the Agreement would cease to comply with Section 409A of the Code.

(c) Construction. Throughout this Agreement, the masculine, feminine or neuter genders shall be deemed to include the masculine, feminine and neuter and the singular, the plural and vice versa. The headings of the Sections of this Agreement are for reference only and do not limit, expand or otherwise affect the contents of the Agreement.

(d) Notices. All notices or other communications required hereunder to be in writing shall be deemed to have been duly given if delivered or mailed, certified or registered mail, postage prepaid to Participant at Participant's business or residence address as contained in the records of Company or, in the case of Company, as follows:

Lockton Companies, LLC — Pacific Series
444 West 47th Street, Suite 900
Kansas City, MO 64112
Attn: General Counsel
Telephone: (816) 960-9000
Facsimile: (816) 960-9099

The foregoing addresses may be changed by written notice to the other party.

(e) Burden and Benefit. This Agreement shall be binding upon, and shall inure to the benefit of, Company and Participant, and their respective heirs, personal and legal representatives, successors and permitted assigns; and the parties hereby agree for themselves and their heirs, legal representatives, executors, administrators, successors or assigns to execute any instruments and to perform any acts which may be necessary or proper to carry out the purposes of this Agreement.

(f) Governing Law and Forum Selection. This Agreement and all disputes relating to Participant's employment with the Company shall be subject to, governed by, and construed in accordance with the laws of the State of California without reference to conflict of law principles, even if one or both of the parties now is or may become a resident of a different state. Any action to enforce the provisions of this Agreement shall be brought in any state or federal court in Los Angeles, California. Such courts shall have exclusive jurisdiction over this Agreement and all disputes relating to Participant's employment with the Company and Participant hereby agrees to be subject to the personal jurisdiction of and venue in such courts.

(g) Third-Party Beneficiaries. This Agreement is for the benefit of the parties hereto and any other Lockton Entity that has rights referenced herein. Participant agrees that each other Lockton Entity, jointly and severally, is an intended third-party beneficiary of Participant's covenants set forth in Section 10 of this Agreement, in each case as applicable with respect to the interests of such other Lockton Entity in respect of Confidential Information, Customer Accounts, goodwill, relationships with Customer Accounts, customer contacts, employees, member, producers and consultants, and other legitimate protectable business interests. Accordingly, and for the avoidance of doubt, the parties hereto agree that, to the extent permitted by applicable law, the Company and, as applicable, each of such other Lockton Entities shall have the right, power and authority (but not the obligation), to enforce each and every right and remedy relating to or arising under or as a result of any breach of, any of Participant's covenants set forth in Section 10 of this Agreement that affects any such interest of

such other Lockton Entity, without the need for joinder or participation as a party plaintiff or otherwise on the part of the Company or any other Lockton Entity, and thereby to pursue any and all available remedies, including but not limited to enforcing any and all provisions of this Agreement, including, without limitation, those contained in Section 10, with regard to their respective rights referenced herein.

(h) Attorneys' Fees, Costs and Interest. If Participant or any Lockton Entity engages counsel in connection with any action involving or seeking to resolve any dispute, claim or issue that in any way pertains to the breach, interpretation, validity or enforceability of, or that otherwise arises out of, or relates to this Agreement and/or Participant's employment with the Company, including, without limitation, any action involving or seeking to resolve any dispute, claim or issue arising out of the rights and interests of the Company, the Other Series, the Affiliates and/or the other Lockton Entities as set forth herein, the prevailing party in any such action shall be entitled, in addition to any other remedies set forth in this Agreement or otherwise available at law or equity, to recover any and all reasonable costs and expenses incurred in connection with such action, through all appeals, including reasonable attorneys' fees, reasonable out-of-pocket costs of travel to attend proceedings, reasonable expert witness fees and expenses, reasonable deposition transcript and transcription services costs, court costs, and interest on the amount of any judgment at the highest applicable statutory rate. The fact that a party or third-party beneficiary to this Agreement ultimately is granted or otherwise is awarded less than the full scope of any injunctive relief that the party or third-party beneficiary may have sought, or that a court reforms or modifies this Agreement and enforces the Agreement as reformed or modified in the given action at issue, shall not prevent that party or the third-party beneficiary from being deemed a "prevailing party" for purpose of this Section 12(h).

(i) No Waiver. No termination, change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intended to be bound. No waiver of any provision of this Agreement shall be valid unless the same is in writing and signed by the party against whom such waiver is sought to be enforced; moreover, no valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement at such time or will be deemed a valid waiver of such provision at any other time.

(j) Waiver of Breach. The waiver of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

(k) Severability. Whenever possible, each provision, or subpart thereof, of this Agreement shall be interpreted so as to be valid and enforceable under applicable law. If any provisions, or any subparts thereof, of this Agreement shall be prohibited or invalid under applicable law, including without limitation Section 409A of the Code, they shall be modified and, to the maximum extent permissible under applicable law, enforced.

(l) Further Assurances. Each party shall execute and cause to be delivered to the other party such instruments and other documents, and shall act in good faith to take such other actions for the purpose of carrying out or evidencing the transactions contemplated by this Agreement, including, without limitation, such actions as may be required by Section 409A of the Code.

(m) Determination of Benefits.

(i) Claim. The Participant, a beneficiary or other person who believes that he or she is being denied a benefit to which he or she is entitled (hereinafter referred to as "Claimant"), or Participant's duly authorized representative, may file a written request for such benefit with the First Level Reviewer setting forth his or her claim. The request must be addressed to the President of Company at its then principal place of business ("First Level Reviewer").

(ii) Claim Decision. Upon receipt of a claim, the First Level Reviewer shall advise the Claimant that a reply will be forthcoming within a reasonable period of time, but ordinarily not later than ninety (90) days, and shall, in fact, deliver such reply within such period. However, the First Level Reviewer may extend the reply period for an additional ninety (90) days for reasonable cause. If the reply period will be extended, the First Level Reviewer shall advise the Claimant in writing during the initial ninety (90) day period indicating the special circumstances requiring an extension and the date by which the First Level Reviewer expects to render the benefit determination.

If the claim is denied in whole or in part, the First Level Reviewer will render a written opinion, using language calculated to be understood by the Claimant, setting forth:

(1) the specific reason or reasons for the denial;

(2) the specific references to pertinent provisions on which the denial is based;

(3) a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation as to why such material or such information is necessary;

(4) appropriate information as to the steps to be taken if the Claimant wishes to submit the claim for review, including a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review; and

(5) the time limits for requesting a review of the denial and for the actual review of the denial.

(iii) Request for Review. Within sixty (60) days after the receipt by the Claimant of the written opinion described above, the Claimant may request in writing that the Second Level Reviewer review the First Level Reviewer's prior determination. Such request must be addressed to the Chief Executive Officer of the owner of the corporate units of Company at its then current address ("Second Level Reviewer"). The Claimant or his or her duly authorized representative may submit written comments, documents, records or other information relating to the denied claim, which such information shall be considered in the review under this subsection without regard to whether such information was submitted or considered in the initial benefit determination.

The Claimant or his or her duly authorized representative shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information which (1) was relied upon by the First Level Reviewer in making its initial claims decision, (2) was submitted, considered or generated in the course of the First Level Reviewer making its initial claims decision, without regard to whether such instrument was actually relied upon by the First Level Reviewer in making its decision or (3) demonstrates compliance by the First Level Reviewer with its administrative processes and safeguards designed to ensure and to verify that benefit claims determinations are made in accordance with governing documents and that, where appropriate, the provisions have been applied consistently with respect to similarly situated claimants, if any. If the Claimant does not request a review of the First Level Reviewer's determination within such sixty (60) day period, he or she shall be barred and estopped from challenging such determination.

(iv) Review of Decision. Within a reasonable period of time, ordinarily not later than sixty (60) days, after the Second Level Reviewer's receipt of a request for review, it will review the First Level Reviewer's prior determination. If special circumstances require that the sixty day time period be extended, the Second Level Reviewer will so notify the Claimant within the initial sixty (60) day period indicating the special circumstances requiring an extension and the date by which the Second Level Reviewer expects to render its decision on review, which shall be as soon as possible but not later than one hundred twenty (120) days after receipt of the request for review. In the event that the Second Level Reviewer extends the determination period on review due to a Claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination on review shall not take into account the period beginning on the date on which notification of extension is sent to the Claimant and ending on the date on which the Claimant responds to the request for additional information.

The Second Level Reviewer has discretionary authority to determine a Claimant's eligibility for benefits and to interpret the terms of the Agreement. Benefits under the Agreement will be paid only if the Second Level Reviewer decides in its discretion that the Claimant is entitled to such benefits. The decision of the Second Level Reviewer shall be final and non-reviewable, unless found to be arbitrary and capricious by a court of competent review. Such decision will be binding upon Company and the Claimant.

If the Second Level Reviewer makes an adverse benefit determination on review, the Second Level Reviewer will render a written opinion, using language calculated to be understood by the Claimant, setting forth:

(1) the specific reason or reasons for the denial;

(2) the specific references to pertinent provisions on which the denial is based;

(3) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information which (A) was relied upon by the Second Level Reviewer in making its decision, (B) was submitted, considered or generated in the course of the Second Level Reviewer making its decision, without regard to whether such instrument was actually relied upon by the Second Level Reviewer in making its decision or (C) demonstrates compliance by the Second Level Reviewer with its administrative processes and safeguards designed to ensure and to verify that benefit claims determinations are made in accordance with governing documents, and that, where appropriate, the applicable provisions have been applied consistently with respect to similarly situated claimants; and

(4) a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following the adverse benefit determination on such review.

(v) Special Disability Provisions. Notwithstanding anything herein, if a Claimant is denied a benefit because he or she is determined not to be disabled and he or she makes a claim pursuant to such denial, the provisions of this subsection shall apply. Upon receipt of a claim, the reply period shall be forty-five (45) days. If, prior to the end of such forty-five (45) day period, the claims reviewer determines that, due to matters beyond the control of Company, a decision cannot be rendered, the period for making the determination may be extended for up to thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of such forty-five (45) day period, of the circumstances requiring an extension and the date by which Company expects to render a decision. If, prior to the end of the first thirty (30) day extension period, the claims reviewer determines that, due to matters beyond the control of Company, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional thirty (30) days, and the claims reviewer shall notify the Claimant, prior to the expiration of the first thirty (30) day extension period, of the circumstances requiring the extension and the date by which Company expects to render a decision. In the case of any extension described in this paragraph, the notice of extension shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim and the additional information needed to resolve those issues, and the Claimant shall be afforded forty-five (45) days within which to provide the specified information. If information is requested, the period for making the benefit determination shall be tolled from the date on which notification of an extension is sent to the Claimant until the date on which the Claimant responds to the request for information.

Within one hundred eighty (180) days after receiving the written notice of an adverse disposition of the claim, the Claimant may request in writing, and shall be entitled to, a review of the benefit determination. In deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, Company shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. Such health care professional shall be an individual who is neither an individual who was consulted in connection with

the adverse benefit determination that is the subject of the appeal nor the subordinate of any such individual. The medical or vocational experts whose advice was obtained on behalf of Company in connection with the Claimant's adverse benefit determination will be identified to the Claimant. If the Claimant does not request a review within one hundred eighty (180) days after receiving written notice of the original's disposition of the claim, the Claimant shall be deemed to have accepted the original written disposition.

A decision on review shall be rendered in writing by Company within a reasonable period of time, but ordinarily not later than forty-five (45) days after receipt of the Claimant's request for review by Company, unless Company determines that special circumstances require an extension of time for processing the claim. If Company determines that an extension of time for processing is required, written notice of the extension shall be furnished to the Claimant prior to the termination of the initial forty-five (45) period. In no event shall such extension exceed a period of forty-five (45) days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which Company expects to render the determination on review. In the event the extension is due to a Claimant's failure to submit information necessary to decide the claim, the Claimant shall be afforded forty-five (45) days within which to provide the specified information, and the period for making the benefit determination on review shall be tolled from the date on which notification of the extension is sent to the Claimant until the date on which the Claimant responds to the request for additional information.

*Remainder of page intentionally left blank.*

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed and Participant has signed this Agreement to evidence Participant's acceptance of the Grant and of the terms hereof, all as of the date hereof.

Dated: 10/14/16

LOCKTON COMPANIES, LLC - PACIFIC SERIES

William W. Humphrey III, Secretary

PARTICIPANT:

Mark Pastorius

# Exhibit 6

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 29 2023

David W. Slayton, Executive Officer/Clerk of Court

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DISTRICT

DEPARTMENT 53

| | |
|---|---|
| SALLIE GIBLIN;<br>Plaintiff,<br>vs.<br>LOCKTON COMPANIES, LLC—PACIFIC SERIES, et al.;<br>Defendants. | Case No.: 22STCV39876<br>Hearing Date: March 29, 2023<br>Time: 10:00 a.m.<br>~~[TENTATIVE]~~ **ORDER RE:**<br>DEFENDANTS' MOTION TO DISMISS COMPLAINT AND/OR STAY ACTION ON GROUNDS OF FORUM NON CONVENIENS |

MOVING PARTIES: Defendants Lockton Companies, LLC—Pacific Series, Lockton Investment Advisors, LLC, Lockton Investment Securities, LLC f/k/a Lockton Financial Advisors, and Lockton Partners, LLC

RESPONDING PARTY: Plaintiff Sallie Giblin

**Motion to Dismiss Complaint and/or Stay Action on Grounds of Forum Non Conveniens**

The court considered the moving, opposition, and reply papers filed in connection with this motion.

**REQUEST FOR JUDICIAL NOTICE**

The court grants plaintiff Sallie Giblin's request for judicial notice. (Evid. Code, § 452, subd. (d).)

**DISCUSSION**

Defendants Lockton Companies, LLC—Pacific Series ("Pacific Series"), Lockton Investment Advisors, LLC ("LIA"), Lockton Investment Securities, LLC f/k/a Lockton Financial Advisors, LLC ("LIS"), and Lockton Partners, LLC ("Lockton Partners") (collectively,

"Defendants") move the court for an order dismissing this action filed by plaintiff Sallie Giblin ("Plaintiff") or, in the alternative, staying this action pursuant to the doctrine of forum non conveniens.

If a court "finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (Code Civ. Proc., § 410.30, subd. (a).) "A defendant may enforce a forum-selection clause by bringing a motion pursuant to sections 410.30 and 418.10, the statutes governing forum non conveniens motions, because they are the ones which generally authorize a trial court to decline jurisdiction when unreasonably invoked and provide a procedure for the motion." (*Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1680.) "'Section 410.30 is a codification of the doctrine of forum non conveniens [citation], but the principles governing enforcement of a forum selection clause are not the same as those applicable to motions based on forum non conveniens. [¶] In California, "forum selection clauses are valid and may be given effect, in the court's discretion and in the absence of a showing that enforcement of such a clause would be unreasonable." [Citation.] [¶] The burden of proof is on the plaintiff, and the factors involved in traditional forum non conveniens analysis do not control. [Citation.] "Instead, the forum selection clause is presumed valid and will be enforced unless the plaintiff shows that enforcement of the clause would be unreasonable under the circumstances of the case."'" (*Korman v. Princess Cruise Lines, Ltd.* (2019) 32 Cal.App.5th 206, 213.)

1. The Agreements Contain Mandatory Forum Selection Clauses

The court finds that Defendants have presented evidence of agreements containing forum selection clauses between Defendants and Plaintiff. The court further finds that the forum selection clauses are mandatory.

Defendants present evidence establishing that (1) Plaintiff was a Producer Member of defendant Pacific Series and she entered into Member Agreements with Pacific Series based on her status as a member; (2) Plaintiff was a Producer Member of defendant LIA and she entered into Member Agreements with LIA based on her status as a member; (3) Plaintiff was a Producer

Member of LIS, and she entered into the LIS Member Agreement based on her status as a member; and (4) Plaintiff became a Producer Partner of defendant Lockton Partners, and she entered into the May 1, 2017 Producer Partner Agreement with Lockton Partners based on her position. (Mundy Decl., ¶¶ 2-5; Mundy Decl., Ex. A [May 1, 2016 Amended and Restated Pacific Series Member Agreement], Ex. B [May 1, 2017 First Amendment to Amended and Restated Pacific Series Member Agreement], Ex. C [May 1, 2016 Amended and Restated LIA Member Agreement]; Ex. D [May 1, 2017 First Amendment to Amended and Restated LIA Member Agreement], Ex. E [November 17, 2021 Solicitation of Vote by Producer Members to Amend and Restate the Operating Agreement of LIA], Ex. F [November 6, 2017 LIS Member Agreement], Ex. G [May 1, 2017 Producer Partner Agreement with Lockton Partners].)

Each of the agreements entered into by and between Plaintiff and Defendants includes a forum selection clause.

The agreements with Pacific Series, LIA, and LIS include the following provision: "Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in [Pacific Series, LIA, LIS], including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of [the Other Series,] Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; *provided, however,* [Pacific Series, LIA, and LIS] shall pay promptly, upon demand from time-to-time by Member, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 7.7 are fair and reasonable." (Mundy Decl., Ex. A, § 7.7, subd. (a), Ex. C, § 7.7., subd. (a), Ex. F, § 7.7, subd. (a).)

The Producer Partner Agreement with Lockton Partners similarly states as follows: "Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating

Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; *provided, however*, the Company shall pay promptly, upon demand from time-to-time by Producer Partner, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Producer Partner hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 5.9 are fair and reasonable." (Mundy Decl., Ex. G, § 5.9, subd. (a).)

"In a contract dispute in which the parties' agreement contains a forum selection clause, a threshold issue in a forum non conveniens motion is whether the forum selection clause is mandatory or permissive." (*Animal Film, LLC v. D.E.J. Productions, Inc.* (2011) 193 Cal.App.4th 466, 471.) "A clause is mandatory if it requires the parties to litigate their disputes exclusively in the designated forum, and it is permissive if it merely requires the parties to submit to jurisdiction in the designated forum." (*Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147, fn. 2.) Courts will analyze the applicability of a forum selection clause differently based on whether the clause is mandatory or permissive. (*Ibid*; *Animal Film, LLC*, *supra*, 193 Cal.App.4th at p. 471.)

The court finds that the forum selection clauses in each of the agreements are mandatory because each provides that (1) covered claims "*shall* be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri" and (2) "[s]uch courts *shall have exclusive jurisdiction* over these matters…." (Mundy Decl., Ex. A, § 7.7, subd. (a), Ex. C, § 7.7., subd. (a), Ex. F, § 7.7, subd. (a), Ex. G, § 5.9, subd. (a) [emphasis added].) Thus, the forum selection clauses require covered disputes and claims to be brought in the designated courts, which the parties have agreed will have exclusive jurisdiction over such disputes and claims.

2. <u>The Forum Selection Clauses Apply to All of Plaintiff's Causes of Action</u>

The court finds that the forum selection clauses apply to all of the claims and causes of action asserted by Plaintiff in her Complaint.

Plaintiff contends that the forum selection clauses do not apply to her causes of action under California's Fair Employment and Housing Act ("FEHA") (Gov. Code, § 12900 *et seq.*) because (1) the clauses apply only to claims that pertain to the interpretation, validity, or enforceability of the agreements, the operating agreement, and/or Plaintiff's membership in the companies, and (2) Plaintiff has asserted claims under FEHA concerning the environment Plaintiff was subjected to and therefore "do not turn on any substantive provisions of her member agreements" and, accordingly, do not pertain to or arise out of the member agreements. (Opp., p. 3:19-21.) Defendants contend that Plaintiff's action arises out of her membership with Defendants and therefore is governed by the forum selection clauses.

As set forth above, the forum selection clauses provide that "[a]ny action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, *or otherwise arise out of or relate to this Agreement, the Operating Agreement*[,]" and Plaintiff's membership in the defendant companies "shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri…." (Mundy Decl., Ex. A, § 7.7, subd. (a), Ex. C, § 7.7., subd. (a), Ex. F, § 7.7, subd. (a), Ex. G, § 5.9, subd. (a) [emphasis added].)

The court finds that Plaintiff's causes of action under FEHA arise from Plaintiff's membership with Defendants. In her Complaint, Plaintiff alleges (1) facts establishing her history with Defendants, and (2) that, during the course of her relationship with Defendants, she was subjected to gender discrimination, retaliation, and harassment, including the existence of a hostile work environment. (Compl., ¶¶ 20-23, 88, 94-95, 102, 104.) Thus, the court finds that Plaintiff's FEHA causes of action relate to her positions and legal relationship with Defendants, and therefore are encompassed by the parties' Member Agreements and Producer Partner Agreement. (Mundy Decl., Exs. A, C, F, G.)

Plaintiff does not appear to dispute the applicability of the agreements to her fourth and fifth causes of action for declaratory relief and unfair competition, respectively. The court finds that those causes of action are encompassed by the Member Agreements and Producer Partner Agreement because Plaintiff (1) requests judicial declarations regarding her agreements with Defendants, and (2) alleges that Defendants have engaged in unfair competition by attempting to enforce restrictive noncompete covenants as set forth in those agreements. (Compl., ¶¶ 171, 179-182, 189.)

3. <u>Labor Code Section 925 Does Not Apply</u>

The court finds that Plaintiff has not met her burden to prove that the forum selection clauses should not be enforced pursuant to Labor Code section 925. (*Korman*, *supra*, 32 Cal.App.5th at p. 216 [burden is placed on the party seeking to overturn the forum selection clause].)

Labor Code section 925 provides that "[a]n employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following: [¶] (1) Require the employee to adjudicate outside of California a claim arising in California[,] [¶] (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California." (Lab. Code, § 925, subd. (a).) This statute applies to contracts entered into, modified, or extended on or after January 1, 2017. (Lab. Code, § 925, subd. (f).) This statute does not apply to contracts "with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied." (Lab. Code, § 925, subd. (e).) Thus, section 925 "provides that a mandatory choice of law or forum selection clause in an employment contract is voidable at the option of the 'employee' when enforcement of the provision would require the employee to litigate a claim arising in California in an out-of-state forum, or deprive the employee of the substantive protection of California law with respect to a controversy arising in California." (*Grove v. Juul Labs, Inc.* (2022) 77 Cal.App.5th 1081, 1094.)

The parties dispute whether Plaintiff was an employee or an owner of Defendants. Plaintiff and Defendants cite different standards to determine Plaintiff's employment status, both of which appear to be inapplicable to the circumstances presented here. Plaintiff cites authority setting forth the common law employment test primarily used by courts to determine whether an individual is an employee or independent contractor. (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530-531.) However, Defendants do not contend that Plaintiff was misclassified as an independent contractor and instead contend that Plaintiff was not an employee, but rather, an owner. In reply, Defendants cite Labor Code section 1132.4, which provides that an "'[e]mployee' means any person who performs services for wages or salary under a contract of employment, express or implied, for an employer." This definition is in Chapter 8 of the Labor Code, entitled "Professional Strikebreakers." Defendants have not cited any authority that establishes that this provision governs the employment relationship test here.

The court finds that the evidence shows that Plaintiff was not an employee within the meaning of Labor Code section 925, but was an owner of Defendants. The court therefore finds that Labor Code section 925 does not operate as a bar to this motion. The parties have presented the following evidence.

Defendants first cite to the agreements between Plaintiff and Defendants, which do not identify Plaintiff as an employee. First, the Amended and Restated Member Agreement with Pacific Series (1) defines Plaintiff to be a "Member" of Pacific Series; (2) provides that Plaintiff made a capital contribution to the Pacific Series in exchange for one Producer Unit in the Pacific Series; (3) states that the parties agree that, "for all purposes, [Plaintiff], as an owner of a Producer Unit in the [Pacific] Series, has and holds an ownership interest in the [Pacific] Series and all rights, benefits, duties, promises, opportunities and mutual agreements commensurate therewith, which employees of the [Pacific] Series do not have or hold." (Mundy Decl., Ex. A, pp. 1-2, § 1.) Second, the Amended and Restated Member Agreement with LIA (1) similarly defines Plaintiff to be a "Member" of LIA; (2) provides that she made a capital contribution to the capital of LIA; and (3) provides an agreement that Plaintiff, "as an owner of a Producer Unit in the Company [i.e., LIA] has and holds an ownership interest in the Company and all rights,

benefits, duties, promises, opportunities and mutual agreements commensurate therewith, which employees of the Company do not have or hold." (Mundy Decl., Ex. C, pp. 1-2, § 1.)

Third, the Member Agreement with LIS also (1) defines Plaintiff to be a "Member;" (2) provides that she has made a capital contribution; and (3) includes an agreement between the parties that Plaintiff, "as an owner of a Producer Unit in the Company, has and holds an ownership interest in the Company and all rights, benefits, duties, promises, opportunities and mutual agreements commensurate therewith, which employees of the Company do not have or hold." (Mundy Decl., Ex. F, pp. 1-2, § 1.) Finally, the Producer Partner Agreement with Lockton Partners defines Plaintiff to be a "Producer Partner" of Lockton Partners and provides that she shall "own an Interest comprising one Partner Unit of and in the Company," and to share in the income "as an owner of" Lockton Partners. (Mundy Decl., Ex. G, pp. 1-2.) Further, Defendants present evidence that, "[a]s a Producer Member, [Plaintiff] received a Form K-1 and took advantage of expense and qualified income deductions[,]" and that Plaintiff was paid "in connection with her ownership interests" and "equity interests" in Defendants. (Mundy Decl., ¶¶ 17, 18, 20.)

In reply, Defendants present responsive evidence showing that (1) Plaintiff was not compensated by Defendants as an employee; (2) Plaintiff did not perform services for wages or a salary and instead was entitled to share in the profits as an owner; (3) Plaintiff was not treated as an employee for tax purposes in connection with her work for Defendants, and she (i) did not file taxes reporting W-2 income, (ii) did not pay payroll taxes, and (iii) filed state and federal taxes as a business owner and received a Form K-1; and (4) Plaintiff did not have an employment agreement with Defendants, and instead entered into the Member Agreements and Partner Agreement, and Defendants' employees "are not party to these kinds of agreements." (Supp. Mundy Decl., ¶¶ 14, 17-18.)

In her declaration, Plaintiff states that (1) "it is [her] understanding that [she] never held an ownership interest in any Lockton entity, including in the Pacific Series within which [she] worked[;]" (2) "the only interest [she] received under [the] agreements were entitlements to profit-sharing[;]" (3) she did not receive any power or control over Lockton operations as a result

of her membership in Lockton Partners or any of the other Lockton entitles; (4) although she is a member of Pacific Series, LIA, and LIS, she has "never attended any membership meetings" and has "never acted like or conducted [herself] as an equity owner in those entities[;]" (5) she did not own any shares of stock that she could sell for cash or exchange for other assets; (6) she "always considered [herself] an employee and feel[s] [she] was treated as an employee" despite the titles she was given, which Plaintiff maintains "were not indicative of any ownership or power" with the Lockton entities; and (7) she had no power to hire or fire employees, control the service teams that supported her clients, and was personally subject to demotion or firing. (Giblin Decl., ¶¶ 24, 27-28, 30, 32.)

In opposition, Plaintiff does not meaningfully dispute the language in the agreements that identify her as an owner instead of an employee. The court also finds significant that the Member Agreements distinguish her position from that of its employees. Those agreements expressly state that Plaintiff, as a member of defendants Pacific Series, LIA, and LIS, "holds an ownership interest" therein, along with the rights, benefits, duties, and promises commensurate therewith, "*which employees of* [Pacific Series, LIA, and LIS] *do not have or hold.*" (Mundy Decl., Ex. A, § 1 [Amended and Restated Member Agreement with Pacific Series], Ex. C, § 1 [Amended and Restated Member Agreement with LIA], Ex. F, § 1 [Member Agreement with LIS] [emphasis added].)

Plaintiff also does not dispute that she received a Form K-1, took advantage of other tax benefits, and was compensated based on her equity interests. (Mundy Decl., ¶¶ 17-18.) Further, the court notes that the forum selection clauses are contained in the Member Agreements and Producer Partner Agreement, and not any employment contract between Plaintiff and Defendants. (*Grove*, *supra*, 77 Cal.App.5th at p. 1094 [finding that Section 925 did not apply to shareholder derivative claims and noting that the forum selection clause was not part of an employment contract and was instead contained in the corporate charter].)

The court therefore finds that Plaintiff has not met her burden of showing that she is an employee within the meaning of Labor Code section 925 and therefore finds that the forum selection clauses are not voidable pursuant to that statute for purposes of this motion.[1]

4. Enforcing the Forum Selection Clauses Would Violate California's Public Policy

The court finds that Defendants have not met their burden to show that the forum selection clause should be enforced on the ground that litigating this action in Missouri would not diminish any substantive rights afforded in California.

"'California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy.'" (*Verdugo*, *supra*, 237 Cal.App.4th at p. 147.) While the party opposing enforcement of a forum selection clause ordinarily has the burden of proving why it should not be enforced, the burden "is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum 'will not diminish in any way the substantive rights afforded . . . under California law." (*Ibid.*) "By definition, this showing requires the defendant to compare the plaintiff's rights if the clause is not enforced and the plaintiff's rights if the clause is enforced. Indeed, a defendant can meet its burden only by showing the foreign forum provides the same or greater rights than California, or the foreign forum will apply California law on the claims at issue." (*Id.* at p. 157.)

Plaintiff contends that enforcement of the forum selection clause and dismissal of her action would be contrary to California's fundamental public policy because (1) this action concerns a California resident and California activities, and (2) noncompete covenants are unenforceable under California law, and the covenants in Defendants' agreements are part of an illegal scheme to evade Business and Professions Code section 16600. The court notes that Plaintiff presents evidence showing that she (1) is a California resident, (2) received all agreements in California; (3) reported to California leadership at all times during her relationship

[1] The court expresses no view and makes no finding as to whether Plaintiff is an individual covered under the FEHA in connection with ruling on this motion.

with Defendants; (4) worked on almost exclusively California-based client accounts; and (5) interacted with Defendants' Missouri-based executives in California more often than in Missouri. (Giblin Decl., ¶¶ 8, 10-11, 15-16.)

Plaintiff argues that her action concerns statutory rights under Business and Professions Code section 16600, and that enforcement of the forum selection clause has the potential to contravene this statute. The parties appear to agree that the rights pursuant to this statute are nonwaivable. (Mot., p. 12:15-16 ["even where rights are deemed *non-waivable* (such as rights under *Section 16600*"] [emphasis added]; Opp., p. 11:20-21 [Plaintiff's claims "are based on *unwaivable* statutory rights"].) The court also finds that the rights under this statute are nonwaivable. (*Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659 ["We are mindful of the admonition of the provision of Civil Code section 3513 that '… a law established for a public reason cannot be contravened by a private agreement.' Also, we do not quarrel with the assertion that Business and Professions Code section 16600 was adopted for a public reason. It follows that [the defendant] could not by agreement waive the benefit afforded under California law."]; *SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 622 (citing *Weber, Lipshie & Co., supra,* 52 Cal.App.4th at pp. 659-660) ["At least one court has indicated that [section 16600] is an unwaivable right"].) Thus, Defendants have the burden of showing that litigating this action in the contractually-designated forum will not diminish substantive rights afforded under California law. (*Verdugo*, *supra*, 237 Cal.App.4th at p. 147.)

Each of the agreements includes restrictive covenants.

First, the agreements with Pacific Series, LIA, and LIS provide that, when an individual is a Producer Member of those companies, and for a period of two years following the sale of the Producer Unit, the member shall not: (1) "render services for any competitor of [Pacific Series, LIA, and LIS]" or any other series or Affiliate, "and shall not otherwise take any action to interfere with, or attempt to interfere with, any employee's, member's, or consultant's relationship with" Pacific Series, LIA, and LIS; (2) "directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer

Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate, or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products provided by" Pacific Series, LIA, and LIS; or (3) accept, service, or work on, or attempt to accept, service, or work on any such competitive business from any Customer Accounts that a member may not solicit or in any way do business with any of the Customer Accounts that a member may not solicit to the extent that the business is the same or substantially similar to that provided by Pacific Series, LIA, and LIS. (Mundy Decl., Ex. A, §§ 5.3, 5.4 [Amended and Restated Member Agreement with Pacific Series]; Mundy Decl., Ex. C, §§ 5.3, 5.4 [Amended and Restated Member Agreement with LIA]; Mundy Decl., Ex. F, §§ 5.3, 5.4 [Member Agreement with LIS].) The two-year period set forth in the agreements between Plaintiff and Pacific Series and Plaintiff and LIA appears to have been extended to four years by subsequent amended agreements. (Mundy Decl., Ex. B § 4, subd. (a) [First Amendment to Amended and Restated Member Agreement]; Mundy Decl., Ex. D, § 4, subd. (a) [First Amendment to Amended and Restated Member Agreement with LIA.) The two-year period set forth in the agreement between Plaintiff and LIS appears to have been extended pursuant to the terms set forth in "Exhibit A" to the agreement. (Mundy Decl., Ex. F, Exhibit A, § 4, subd. (a) [Member Agreement with LIS].)

Second, the Producer Partner Agreement with Lockton Partners provides that the restrictive covenants included in the Member Agreements "remain in full force and effect without amendment or modification and that, in addition and as separate and independent covenants of Producer Partner pursuant to this Agreement, Sections 5.3 and 5.4 of each such Member Agreement shall apply (disregarding for purposes of this Section 5.1 the two (2) year periods referenced therein) for a period of four (4) years following the sale of the Producer Unit . . . of the Producer Partner . . . ." (Mundy Decl., Ex. G, § 5.1 [Producer Partner Agreement with Lockton Partners].)

In their motion, Defendants contend that both California law and Missouri law would permit enforcement of the restrictive covenants set forth above.

"Under the common law, as is still true in many states today, contractual restraints on the practice of a profession, business, or trade, were considered valid, as long as they were reasonably imposed. [Citation.] This was true even in California. [Citations.] However, in 1872 California settled public policy in favor of open competition, and rejected the common law 'rule of reasonableness,' when the Legislature enacted the Civil Code. [Citations.] Today in California, covenants not to compete are void, subject to several exceptions" set forth by statute. (*Edwards v. Arthur Anderson LLP* (2008) 44 Cal.4th 937, 945; Bus. & Prof. Code, § 16600 [except as otherwise provided by statute, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void"].) "Thus, unless a contractual restraint falls into one of section 16600's three statutory exceptions (§§ 16601 [sale of goodwill or interest in a business], 16602 [dissolution of partnership], or 16602.5 [dissolution or sale of limited liability company]), it ostensibly is void." (*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 935.)

Here, Defendants assert that all three of the statutory exceptions permit enforcement of the restrictive covenants in the agreements between Plaintiff and Defendants.

Section 16601 provides that "any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographical area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein." (Bus. & Prof. Code, § 16601.) This "exception is limited: '[I]n order to uphold a covenant not to compete pursuant to Section 16601, the contract for sale of the corporate shares may not circumvent California's deeply rooted public policy favoring open competition. The transaction must clearly establish that it falls within this limited exception.'" (*Blue Mountain Enterprises, LLC v. Owen* (2022) 74 Cal.App.5th 537, 551.)

Section 16602 provides that a partner, upon or in anticipation of dissociation from the partnership, may "agree that he or she will not carry on a similar business within a specified geographic area where the partnership business has been transacted, so long as any other member

of the partnership, or any person deriving title to the business or its goodwill from any such other member of the partnership, carries on a like business therein." (Bus. & Prof. Code, § 16602, subds. (a), (b)(2).)

Section 16602.5 provides that "[a]ny member may, upon or in anticipation of a dissolution of, or the termination of his or her interest in, a limited liability company (including a series of a limited liability company formed under the laws of a jurisdiction recognizing such a series), agree that he or she or it will not carry on a similar business within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein." (Bus. & Prof. Code, § 16602.5.)

Defendants contend that these provisions apply because (1) Plaintiff "sold back, and was compensated for, her Producer Units and Partner Unit" upon termination of her membership in Defendants; (2) Plaintiff dissociated from Lockton Partners; (3) Plaintiff had agreed, in her respective agreements with Defendants, to refrain from soliciting clients and engaging in other acts as set forth above. (Mundy Decl., ¶ 21.)

The court finds that Defendants have not met their burden of showing that the foreign forum (i.e., the Missouri courts) provides the same or greater rights than California because it appears that the restrictive covenants would not be enforceable under California law. (*Verdugo*, *supra*, 237 Cal.App.4th at p. 157.)

The court notes that Defendants have produced evidence showing that Plaintiff, as a member in Defendants, sold her interest in Defendants and agreed not to render services for any competitor or solicit any customer accounts. This evidence may support Defendants' position that the statutory exceptions set forth in Business and Professions Code sections 16601, 16602, and 16602.5 apply. However, as noted by Plaintiff, the restrictive covenants in the agreements are not limited to "a specified geographic area" which is required by language of each statute. (Bus. & Prof. Code, §§ 16601, 16602, 16602.5.) Instead, the agreements expressly state that they are not limited to any geographical scope or region. The agreements specifically provide

that, due to the nature of Defendants' businesses, "such that the restrictions imposed by this Agreement cannot be limited to a geographic location or region . . . it is reasonable that the restricted activities *are not limited to a geographical scope or region*; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted." (Mundy Decl., Ex. A, § 5.5 [Amended and Restated Member Agreement with Pacific Series], Ex. C, § 5.5 [Amended and Restated Member Agreement with LIA], Ex. F, § 5.5 [Member Agreement with LIS], Ex. G, § 5.2 [Producer Partner Agreement with Lockton Partners] [emphasis added].)

This language does not appear to satisfy the requirements of Sections 16601, 16602, or 16602.5. As to Section 16601, a restrictive covenant is enforceable if it prohibits activity "within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on . . . ." (Bus. & Prof. Code, § 16601.) Similarly, Section 16602 permits a restrictive covenant "within a specified area where the partnership business has been transacted, so long as any other member of the partnership, or any person deriving title to the business or its goodwill from any such other member of the partnership, carries on a like business therein." (Bus. & Prof. Code, § 16602, subd. (a).) Section 16602.5 permits a restrictive covenant "within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein." (Bus. & Prof. Code, § 16602.5.) But the language of the agreements does not limit their applicability to locations where business has been transacted, and also includes those areas where the restricted activities "*reasonably could be conducted*." (Mundy Decl., Ex. A, § 5.5 [Member Agreement with Pacific Series], Ex. C, § 5.5 [Amended and Restated Member Agreement with LIA], Ex. F, § 5.5 [Member Agreement with LIS], Ex. G, § 5.2 [Producer Partner Agreement with Lockton Partners] [emphasis added].) Thus, it appears that the restrictive covenants would not be enforceable under these statutory exceptions.

The court notes that Defendants cite and rely on *Tivoli LLC v. Sankey* (C.D. Cal. 2015) 2015 WL 12683801 at *8, which provides that, "for employee nonsolicitation clauses, an explicit geographic restriction is not needed to define the scope of the covenant. Indeed, the scope will typically be clear based upon the terms of the restriction." The court finds that this authority does not require the court to find that the restrictive covenants are enforceable because (1) the court is not "bound by federal decisions on matters of state law[,]" and (2) the language of the restrictive covenants exceeds the permitted geographic limitation set forth in Sections 16601, 16602, and 16602.5 for the reasons set forth above. (*Haynes v. EMC Mortgage Corp* (2012) 205 Cal.App.4th 329, 335.)

The court therefore finds that the restrictive covenants contained in the agreements between Plaintiff and Defendants appear to be unenforceable restraints on trade pursuant to California law.

As set forth above, Defendants have the burden to show that Missouri law provides for the same or greater rights than California. Missouri appears to employ a different standard when evaluating the enforceability of a restrictive covenant. "Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. [Citation.] 'A non-compete agreement is reasonable if it is no more restrictive than is necessary ….'" (*Whelan Sec. Co. v. Kennebrew* (2012) 379 S.W.3d 835, 841.) Here, the restrictive covenants include provisions seeking to establish that they are reasonable. It appears that a Missouri court may enforce the restrictive covenants at issue here based on Missouri law, which the court notes appears to conflict with California's rejection of the common law rule of reasonableness. (*Ibid.*; *Edwards*, *supra*, 44 Cal.4th at p. 945.)

Finally, Defendants have not presented evidence showing that the foreign forum will apply California law. (*Verdugo*, *supra*, 237 Cal.App.4th at p. 157 [defendant can meet its burden by showing that "the foreign forum will apply California law on the claims at issue"].) Plaintiffs have submitted the Amended Complaint filed by Defendants in the United States District Court for the Western District of Missouri, in which they have alleged that Plaintiff's agreements with Defendants "require litigation of disputes between the parties in Missouri, subject to Missouri

law." (Pl. RJN Ex. 3, ¶ 170.) Thus, it appears that Defendants will argue that Missouri law applies. Defendants do not present evidence establishing that their arguments on that ground are likely to be rejected by a Missouri court in favor of applying California law.

Based on the evidence and argument presented in connection with this motion, the court finds that Defendants have not met their burden of showing that litigating Plaintiff's claims in Missouri will not diminish the substantive rights afforded under California law since it appears that (1) under California law, the restrictive covenants in the Member Agreements and Producer Partner Agreement are unenforceable, but (2) under Missouri law, the restrictive covenants in the Member Agreement and Producer Partner Agreement are enforceable as "demonstratively reasonable." (*Verdugo*, *supra*, 237 Cal.App.4th at pp. 147, 157; *Whelan Sec. Co.*, *supra*, 379 S.W.3d at p. 841.) The court therefore exercises its discretion to deny Defendants' motion to dismiss or stay this action pursuant to the forum selection clauses and the doctrine of forum non conveniens.

**ORDER**

The court denies defendants Lockton Companies, LLC—Pacific Series, Lockton Investment Advisors, LLC, Lockton Investment Securities f/k/a Lockton Financial Advisors, LLC, and Lockton Partners, LLC's motion to dismiss complaint and/or stay action on grounds of forum non conveniens.

The court directs the clerk to give notice of this ruling.

IT IS SO ORDERED.

DATED: March 29, 2023

Robert B. Broadbelt III
Judge of the Superior Court

# Exhibit 7

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

COURT OF APPEAL – SECOND DIST.
FILED
Sep 25, 2023
EVA McCLINTOCK, Clerk
mcastro Deputy Clerk

| | |
|---|---|
| LOCKTON COMPANIES, LLC et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>SALLIE GIBLIN,<br><br>Real Party in Interest. | B328408<br><br>(Super. Ct. No. 22STCV39876)<br><br>**O R D E R** |

THE COURT:

The court has read and considered the petition for a writ of mandate, filed May 3, 2023, the amicus letter filed May 8, 2023, the preliminary opposition, filed May 30, 2023, and petitioner's reply brief, filed June 6, 2023. The request for judicial notice filed in support of the opposition is denied. The petition is denied.

LUI, P. J. CHAVEZ, J. HOFFSTADT, J.

# Exhibit 8

FILED
Superior Court of California
County of Los Angeles

DEC 13 2023

David W. Slayton, Executive Officer/Clerk of Court
By: M. Carino, Deputy

*Eric Kaufman v. Lockton Companies, LLC, et al.*
22STCV23460

The court issues its rulings regarding Defendants' motion to dismiss the first amended complaint and/or stay this action on grounds of forum non conveniens.

I. BACKGROUND

Plaintiff Eric Kaufman brings this action for declaratory relief against Defendants Lockton Investment Advisors, LLC ("LIA"), Lockton Investment Securities, LLC, f/k/a Lockton Financial Advisors, LLC ("LIS"), and Lockton Companies, LLC - Pacific Series ("Pacific Series", collectively "Lockton").

LIA provides investment advisory and related services, LIS buys and sells securities as a registered broker dealer, and Pacific Series provides insurance and risk management services. (FAC, ¶ 10.) Kaufman became a producer member of LIA in approximately July 2007 and a producer member in LIS and Pacific Series in approximately July 2008. (FAC, ¶ 23.) To become a producer member of LIA, LIS, and Pacific Services, Kaufman paid a $200 capital contribution for a single "Producer Unit" in each entity. (FAC, ¶ 23.) As of May 1, 2016, Plaintiff entered into an "Amended and Restated Member Agreement" with Pacific Series and with LIS and, as of May 1, 2016, a "Second Amended and Restated Member Agreement" with LIA (collectively the "Member Agreements"). (FAC, ¶ 16.)

The Member Agreements include nonsolicitation covenants. (FAC, ¶ 20.) The Member Agreements define customer accounts to include "the accounts of all customers" of Defendants and their affiliates and prospective customers to which a proposal was pending within six months prior to Kaufman's termination. (Nix-Hines Decl., Exs. A, B, C, § 4.1(c).) Thus, a prospective customer means that a proposal was pending with a potential client within six months prior to Kaufman's termination. (Nix-Hines Decl., Exs. A, B, C, § 4.1(c)(2)(a).) For two years after his termination, the

covenants preclude Kaufman from soliciting customer accounts if the account qualified as a customer account within six months prior to his termination. (Nix-Hines Decl., Exs. A, B, C, § 5.4.) For the same time period, the covenants also preclude Kaufman from, among other things, soliciting any potential customer with whom Kaufman had business contact. (Nix-Hines Decl., Exs. A, B, C, § 5.4(a).) The prohibitions apply to the customer accounts of Defendants and their affiliates. (Nix-Hines Decl., Exs. A, B, C, §§ 4.1(c), 5.4.) The Member Agreements also provide that for two years after termination Kaufman will not solicit any employees of Defendants or their affiliates. (Nix-Hines Decl., Exs. A, B, C, § 5.3.) On November 17, 2020, LIA transferred certain of its assets to a third party. As part of that transaction, Kaufman's Member Agreement with LIA was amended to prohibit Kaufman from soliciting any customer accounts transferred to the third party for a period beginning on the closing date and ending on the later of (1) the expiration of two years or (2) the earlier of the date of expiration of a strategic alliance agreement or Kaufman's termination. (Nix-Hines Decl., Ex. D, at Ex. B.)

The portions of the non-solicitation covenants relevant to geography provide: "Among other things, Member acknowledges and agrees that the nature of the business of the Series, the Other Series and the Affiliates, as well as the business of Series, Other Series and Affiliate customers, is carried on wherever a Customer Account is located (and each Producer Member of each Series decides where to seek out Customer Accounts and may do so in any geographic location) such that the restrictions imposed by this Agreement cannot be limited to a geographic location or region, and, therefore, it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted. Member represents and warrants that the restrictions imposed on Member's activities by this Agreement are sufficiently limited in time and scope that they will not prevent Member from engaging in Member's chosen work or profession and will not create undue hardship for Member, and are designed to protect the goodwill of the Series, and, as applicable, the Other Series, the Affiliates and Lockton Entities." (Nix-Hines Decl., Exs. A, B, C, § 5.5.)

The Member Agreements include Missouri choice of law and Missouri forum selection clauses. The Member Agreements require Kaufman to adjudicate disputes in the federal court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri. (FAC, ¶ 18.) The forum selection clauses, in relevant parts, read: "Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability

12/15/2023

of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri . . . ." (Nix-Hines Decl., Exs. A, B, C, ¶ 7.7(a).) The Member Agreements for LIA, LIS, and Pacific Series require Plaintiff to provide thirty days written notice of termination. (FAC, ¶ 22.)

Kaufman withdrew from and terminated his membership in LIA, LIS, and Pacific Series on July 18, 2022. (FAC, ¶ 27.) Kaufman subsequently accepted employment with Alliant, a California-based competitor of Lockton. (FAC, ¶ 28.) At Alliant, Kaufman will provide products and services that are directly competitive with the products or services of Lockton. (*Ibid.*)

In the first amended complaint, Kaufman asserts a single cause of action for declaratory relief, seeking a judicial declaration that the nonsolicitation covenants, Missouri choice of law and forum selection clauses, and notice requirements are void and unenforceable as a violation of Business and Professions Code Sections 16600 and California public policy. Kaufman alleges: "Plaintiff desires a judicial declaration that the enforcement of the Missouri Choice of Law and Missouri Forum Section Provisions would violate California's fundamental public policy in favor of workplace mobility and competition. Plaintiff also desires a judicial declaration that the Notice Provision, Member Agreements Non-Competition Covenants and the December 2021 Non-Competition Covenants are facially void under Business and Professions Code Section 16600 and California public policy in favor of workplace mobility and open competition [ ] are thereby unenforceable as to Plaintiff." (FAC, ¶ 40.)

Lockton moves to dismiss Kaufman's complaint and/or stay this action on grounds that the Missouri forum selection clause is mandatory. All litigation involving Kaufman and Defendants therefore must occur in Missouri.

On October 24, 2023, the court issued an order requiring further briefing. The order stated: "Based on *Whelan Security Co. v. Kennebrew* (2012) 379 S.W.3d 835, Defendants now argue that Plaintiff will receive the same or greater rights under Missouri law. In *Whelan,* the Missouri Supreme Court held: "Based on the circumstances of the case, this Court modifies the customer non-solicitation clause to eliminate the provision

prohibiting Mr. Kennebrew and Mr. Morgan from soliciting existing Whelan customers except those customers with whom Mr. Kennebrew and Mr. Morgan dealt, respectively, during their employment. This Court also modifies the customer non-solicitation clause to eliminate the prohibition against solicitation by Mr. Kennebrew and Mr. Morgan of Whelan's prospective customers." (379 S.W.3d at pp. 844-845.) The court in *Whelan* also held: "In balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. *Id.* 'A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer.' *Id.* A non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.' *Id.* The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space. *Id.*" (379 S.W.3d at pp. 841-842.) The pertinent sections of the Business & Professions Code provide that a person "may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold . . . has been carried on . . . so long as the buyer . . . carries on a like business therein." (Bus. & Prof. Code § 16601.) As Defendants point out, courts in California have narrowed overbroad restrictive covenants. (See *Swenson v. File* (1970) 3 Cal.3d 389, 395 ["However, section 16602 does not invalidate that covenant in its entirety, for under section 16600 a contract in restraint of trade is only 'to that extent void.' Thus, the rule of severability may be invoked to uphold defendant's covenant to the extent that it falls within the limits permitted by section 16602."]; Civ. Code § 1599.) Under these circumstances, it would seem that there would be litigation under California law and Missouri law to determine the legitimate scope of the non-solicitation covenants. California applying its Business and Professions Code. Missouri enforcing its common law. Both states have limited non-solicitation covenants. [¶] Does Defendants' argument carry their burden to demonstrate that enforcing the forum selection clause would not diminish Plaintiff's unwaivable rights?"

## II. DISCUSSION

"California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy." (*America Online, supra,* 90 Cal.App.4th at

12/15/2023

p. 12, 108 Cal.Rptr.2d 699; see *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 200, [127 Cal.Rptr.2d 847] (*Intershop Communications* ) ["a forum selection clause will not be enforced if to do so would bring about a result contrary to the public policy of this state"]; *CQL Products, supra,* 39 Cal.App.4th at p. 1354, 46 Cal.Rptr.2d 412; *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 416-418, [197 Cal.Rptr. 757] (*Hall* ).)" (*Verdugo v. Alliantgroup* (2015) 237 Cal.App.4th 141, 147.)

"The party opposing enforcement of a forum selection clause ordinarily "bears the 'substantial' burden of proving why it should *not* be enforced." (*Global Packaging, Inc. v. Superior Court* (2011) 196 Cal.App.4th 1623, 1633, [127 Cal.Rptr.3d 813], original italics; *Intershop Communications, supra*, 104 Cal.App.4th at p. 198, 127 Cal.Rptr.2d 847.) That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum "will not diminish in any way the substantive rights afforded . . . under California law." (*Wimsatt v. Beverly Hills Weight etc. Internat., Inc.* (1995) 32 Cal.App.4th 1511, 1520-1524, [38 Cal.Rptr.2d 612] (*Wimsatt* ); see *America Online, supra,* 90 Cal.App.4th at pp. 10-11, 108 Cal.Rptr.2d 699 [party seeking enforcement must "prove that enforcement of the forum selection clause would not result in a significant diminution of rights"].)" (*Verdugo, supra,* 237 Cal.App.4th at pp. 147-148; see *G Companies Management, LLC v. LREP Arizona, LLC* (2023) 88 Cal.App.5th 342, 350 ["That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually designated forum 'will not diminish in any way the substantive rights afforded . . . under California law.' "].)

In *G Companies Management, LLC v. LREP Arizona, LLC, supra,* 88 Cal.App.5th 342, the court held: "In *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 197 Cal.Rptr. 757 (*Hall*), this court refused to enforce a forum selection clause in a case in which two California investors had exchanged their interests in an oil and gas limited partnership in return for stock in one of their co-investors, a Utah corporation. As in this case, the parties in *Hall* agreed to both forum selection and choice of law provisions, which identified Nevada as the selected forum and chose its laws to govern the transaction. Although the trial court enforced the forum selection clause, this court reversed. [¶] We explained in *Hall* that "[w]hile 'California does not have any public policy against a choice of law provision, where it is otherwise appropriate' [citation] . . . [citation], 'an agreement designating [a



12/15/2023

foreign] law will not be given effect if it would violate a strong California public policy . . . [or] "result in an evasion of . . . a statute of the forum protecting its citizens." ' " (*Hall, supra*, 150 Cal.App.3d at pp. 416-417, 197 Cal.Rptr. 757.) We then reasoned that if the pending litigation were transferred to Nevada where Nevada law would be applied, the investors would lose the benefit of California's Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), which would otherwise govern the exchange. The investors would thus be denied California's unwaivable protections against fraud and deception in securities matters. (*Hall, supra*, 150 Cal.App.3d at p. 417, 197 Cal.Rptr. 757.) Consequently, the trial court erred by enforcing the provision." (88 Cal.App.5th at p. 351.)

Here, the burden is on Lockton because Kaufman's claims are based on unwaivable rights created by California statutes. Kaufman's claims are based on Business and Professions Code section 16600. Section 16600 rights are unwaivable. (See *SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 622 ["Section 16600 . . . protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.' . . . At least one court has indicated this is an unwaivable right."]; *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659 ["we do not quarrel with the assertion that Business and Professions Code section 16600 was adopted for a public reason. It follows that Christian could not by agreement waive the benefit afforded under California law."]; see generally *G Companies Management, LLC v. LREP Arizona, LLC, supra,* 88 Cal.App.5th at p. 353 ["California's public policy is established by the provisions of our Constitution and (where allowed by the Constitution) such laws as our Legislature chooses to enact."].) Thus, the burden is on Lockton to show that litigating this action in Missouri will not diminish in any way the substantive rights afforded to Kaufman under section 16600.[1]

In *G Companies Management, LLC v. LREP Arizona, LLC, supra,* 88 Cal.App.5th 342, the court further held: "We acknowledge the trial court's suggestion that enforcement of the forum selection clause is beside the point because the real issue is which state's *law* would be applied: i.e., the contractual choice of law provision. The court pointed out that '[e]ither court may make a choice-of-law determination: Arizona courts sometimes apply

---

1 As support for its argument that an anti-waiver concerns "are not at issue here," in violation of California Rules of Court, rule 8.1115(a), Lockton cites an unpublished appellate opinion as one of its principal authorities in their opening memorandum: *Troisi v. Cannon Equipment Co.* (2010) 2010 WL 2061989.



12/15/2023

California law; California courts sometimes apply Arizona law. Which law governs this loan is a distinct inquiry from which court should make that decision.' We cannot agree. It is true that states sometimes apply the laws of other states, but they generally do so because the parties have agreed to it. If this cross-complaint were litigated in Arizona, there is no reason to suspect Arizona would apply California's usury law to the dispute." (88 Cal.App.5th at p. 355, fn. 6.)

Business and Professions Code section 16600 provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

Business and Professions Code section 16601 provides: "Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity, or any owner of a business entity that sells (a) all or substantially all of its operating assets together with the goodwill of the business entity, (b) all or substantially all of the operating assets of a division or a subsidiary of the business entity together with the goodwill of that division or subsidiary, or (c) all of the ownership interest of any subsidiary, may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein."

Business and Professions Code section 16602.5 provides: "Any member may, upon or in anticipation of a dissolution of, or the termination of his or her interest in, a limited liability company (including a series of a limited liability company formed under the laws of a jurisdiction recognizing such a series), agree that he or she or it will not carry on a similar business within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein."

12/15/2023

To discharge their burden, Defendants argue that "the covenants are enforceable under California law to the same extent they are enforceable under Missouri law." [2]

Under California law, there is no doubt that the covenants are unlawful. The covenants do not contain the geographic limitation required by sections 16601 and 16602.5. The covenants are not limited to a "specified geographic area." The Member Agreements disavow any geographical limitation ("they extend to any geographical location where restricted activities are or reasonably could be conducted"). Kaufman is restricted from soliciting for two years after his separation not only any of his customers or potential customers with whom he acquired confidential information, but also all of Defendant's customers and prospective customers to whom Defendants or their affiliates a proposal has been made within the last six months of Kaufman's employment. As part of the December 2021 asset sale, Kaufman's agreements with Defendants were amended to provide that for two years Kaufman could not solicit any of the transferred accounts. There are no geographic restrictions. Without geographic limitation, the covenants in the Member Agreements do not comply with California law.

The first question presented is what would a California court do with these unlawful nonsolicitation agreements. (See *Verdugo v. Alliantgroup, L.P., supra,* 237 Cal.App.4th at p. 160 ["First, the question is whether enforcing the forum selection clause would diminish Verdugo's unwaivable rights under the Labor Code, not whether Texas law provides 'adequate' remedies."].) The record here on this motion is undeveloped.[3] There is no

---

[2] The court in *Verdugo v. Alliantgroup, L.P., supra,* 237 Cal.App.4th 141 held: "Alliantgroup could have eliminated any uncertainty on which law a Texas court would apply by stipulating to have a Texas court apply California law in deciding Verdugo's claims, but Alliantgroup did not do so. Instead, Alliantgroup has preserved its ability to argue to a Texas court that it should apply Texas law, and Alliantgroup has hinted at its intention to do so by downplaying the significance of the statutory rights Verdugo seeks to enforce through this action." (237 Cal.App.4th at p. 158.)

[3] For example, although Kaufman alleged in the first amended complaint that the $200 producer unit concept was a "sham" and cited *Bosley Medical Group v. Abramson* (1980) 161 Cal.App.3d 284 (FAC, ¶¶ 23-26), Lockton did not attempt to place in evidence until their reply papers any information about the compensation that Kaufman received at his separation from Lockton. Kaufman argues: "Lockton is relying on sham agreements. Under the Lockton agreements, Kaufman did not acquire a bona fide equity interest

doubt that if Kaufman were treated as an employee, the nonsolicitation covenants as a matter of law would be unenforceable, and the court would not enforce the forum selection clause. Employees not subject to an available exception to section 16600 are given absolute protection. (See *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1158 ["We agreed, holding that 'an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to the rule.' "].) But we have exceptions to section 16600 at issue on this motion. Therefore, Kaufman's citations to *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, *Hill Medical Corp. v. Wycoff* (2001) 86 Cal.App.4th 895; *D'sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, and *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564 are not controlling. These cases all involved employees and section 16600. While the doctor in *Hill Medical Group* owned stock, the court held that section 16601 did not apply because goodwill was not part of the transaction. (86 Cal.App.4th at p. 907.)

Kaufman's reliance on *Strategic, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068 is more pertinent. The court in *Strategic* strongly condemned overbroad unlawful nonsolicitation covenants. Thus, in *Strategix*, the court held: "The nonsolicitation covenants are unenforceable because they are broader than permitted by the statute that authorizes noncompetition covenants reached in connection with the sale of a business, Business and Professions Code section 16601. Section 16601 allows a seller to agree not to compete with the buyer in the geographic location where the seller had carried on business. The permissible scope of the covenant is thus tied to *the sold business*. The nonsolicitation covenants here wrongly barred

---

in a Lockton LLC. While the Lockton agreements–in a transparent effort to impose noncompetes on its California employees–required Kaufman to make a capital contribution in exchange for stock, Kaufman only had to pay $200 and only received a single share. Such a de minimis equity interest does not qualify for the exemptions to Section 16600." In response, Lockton files the supplemental Mundy reply declaration. Mundy sets forth certain payments to Kaufman and values at Kaufman's "termination of his membership." Not much is developed by either side regarding Kaufman's sham argument. The context of Kaufman's $200 payments, the nature and structure of the entities and their related entities, the number of members, overall valuations, what exactly Kaufman sold to Lockton, etc., needs to be developed. Without this information, the court cannot evaluate whether *Bosley Medical Group v. Abramson, supra,* 161 Cal.App.3d 284 is applicable. Accordingly, on this motion, Kaufman does not establish that the agreements are "shams."



12/15/2023

appellants from soliciting *the buyer's* employees and customers, rather than the former employees and customers of the seller, Strategix." (142 Cal.App.4th at p. 1071.) The court in *Strategix* continued: "On the other hand, nonsolicitation covenants barring the seller from soliciting all employees and customers of the buyer, even those who were not former employees or customers of the sold business, extend their anticompetitive reach beyond 'the business so sold.' (§ 16601.) They do more than ensure the buyer receives the full value of the business it bought, whose goodwill does not include " 'the patronage of the general public.' " (*Hill, supra*, 86 Cal.App.4th at p. 902, fn. 6, 103 Cal.Rptr.2d 779.) The covenants would give the buyer broad protection against competition wherever it happens to have employees or customers, at the expense of the seller's fundamental right to compete for employees and customers in the marketplace. (Cf. § 16600.) [¶] In addition, practical concerns militate against barring the seller from soliciting *the buyer's* employees and customers, rather than the sold business's employees and customers. The seller presumably is familiar with *the sold business's* employees and customers as of the date of sale. Thus, the seller has some basis for determining who it may and may not solicit pursuant to the nonsolicitation covenants. But the seller is far less likely to be familiar with the buyer's employees and customers, especially as time passes." (142 Cal.App.4th at pp. 1073-1074.)

The court in *Strategix* concluded: "Courts have 'blue penciled' noncompetition covenants with overbroad or omitted geographic and time restrictions to include reasonable limitations. (See *Swenson v. File* (1970) 3 Cal.3d 389, 395-396, 90 Cal.Rptr. 580, 475 P.2d 852; *Mahlstedt v. Fugit* (1947) 79 Cal.App.2d 562, 566, 180 P.2d 777.) But courts will not strike a new bargain for the parties 'for the purposes of saving an illegal contract.' (*Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 406, 75 Cal.Rptr.2d 257 (*Kolani*).) In *Kolani*, the court declined to 'rewrite the broad covenant not to compete into a narrow bar on theft of confidential information. (*Id.* at p. 408, 75 Cal.Rptr.2d 257.) We decline to rewrite overbroad covenants not to solicit Infocrossing's employees and customers into narrow bars against soliciting Strategix's former employees and customers. Had the parties intended to reach such limited—and enforceable—covenants, they could have negotiated for them. We will not do so for the parties now." (142 Cal.App.4th at p. 1074.)

Lockton relies on California authorities issued beginning in 1894 through 1970. The statutes have been materially amended several times after the dates of Lockton's citations. In Lockton's most recent cited decision for their proposition that California courts rewrite overbroad unlawful



12/15/2023

covenants, *Roberts v. Pfefer* (1970) 13 Cal.App.3d 93, a prior version of section 16602 was at issue. The partnership agreement among the physicians provided: " 'The partners hereby mutually agree, in the event of their withdrawal or expulsion from the partnership, not to enter the private practice of medicine in that portion of Alameda County south of the city limits of Oakland, California, alone or in another partnership, for a period of three (3) years,' and that on violation of this provision, all amounts due would be forfeited." (13 Cal.App.3d at p. 96.) According to the court in *Roberts*, "Section 16602 limits the territory in which a partner, by contract, may restrain himself not to carry on a business similar to that of the dissolving partnership to a city or town." (13 Cal.App.3d at p. 97.) The court in *Roberts* held: "[A]s in *Swenson*, the provisions of section 16602 do not invalidate the covenant not to compete in its entirety, and the rule of severability may be invoked to uphold the covenant to the extent that it falls within the limits permitted by the statute." The court further held: "The trial court is directed to make findings as to the reasonableness of the restriction of the covenant under the circumstances (i.e., the fact that respondent's new office, although beyond the city limits of Hayward, was very close to the partnership office, the population of the areas involved, and whether respondent had in fact enticed a sufficient number of appellants' patients to substantially affect appellants' competitive position." (13 Cal.App.3d at p. 98.) Thus, in *Roberts,* the covenant at issue contained a geographic limitation ("that portion of Alameda County south of the city limits of Oakland, California"), although not the "same city or town . . . where the partnership business [had] been transacted" as that prior version of section 16602 required. It was close geographically.

Both sides discuss the California Supreme Court's decision in *Swenson v. File* (1970) 3 Cal.3d 389. The version of the section 16600 exception at issue provided: "[S]ection 16602 provided that 'Partners may, upon or in anticipation of a dissolution of the partnership, agree that none of them will carry on a similar business within the same city or town or a specified part thereof, where the partnership business has been transacted.' " (3 Cal.3d at p. 392.) The covenants involved stated: " '(1) The retired partner will not render service to a client which is or has been a client of the partnership within the last three years prior to the retirement of the retired partner. [¶] (2) The retired partner will not render service to a client which has its principal office within a radius of twenty miles from any partnership office which existed on the date of his retirement. . . . ' " (3 Cal.3d at pp. 391-392.) The dispute concerned whether the departing partner in the accounting firm partnership carried on business in Pasadena or Azusa after he withdrew. (3 Cal.3d at p. 396.)

12/15/2023

The California Supreme Court held: "[B]oth subsection J(1), pertaining to former clients, and subsection J(2), pertaining to any client having its principal office within a radius of 20 miles from the partnership offices, may be upheld to the extent that serving such clients would also constitute, under former section 16602, 'carrying on' an accounting business within the Cities of Pasadena or Azusa, where the partnership offices are located. But neither subsection may validly be construed as enjoining defendant from serving clients, regardless of the location of their offices, unless defendant 'carries on' business with those clients in Pasadena or Azusa. Therefore, we must determine whether the trial court properly found that defendant did not carry on an accounting business in those cities." (3 Cal.3d at pp. 395-396, fn. omitted.) Thus, in affirming the trial court's judgment that the departing partner "did not breach the legally enforceable portions of his covenant not to complete," the Supreme Court in *Swenson* concluded: "Judged by the foregoing standards, it seems apparent that defendant did not carry on an accounting business in the City of Pasadena within the meaning of former section 16602. The fact that some of defendant's clients had Pasadena addresses would not, of itself, establish that proposition, and plaintiffs offered no evidence that defendant performed in Pasadena any services, substantial or otherwise, for those clients or actively solicited their business. Nor do we think that defendant carried on business in Pasadena merely by performing occasional services in that city for a single client whose plant was moved from Arcadia to Pasadena after it had retained defendant. Aside from the insubstantial and isolated nature of the transaction, we cannot interpret former section 16602 as requiring the covenantor to discontinue serving a client merely because that client has moved its plant to within the proscribed territory." (3 Cal.3d at p. 397.)

In reaching its holding, the Supreme Court in *Swenson* noted: "Having concluded that former section 16602 is applicable herein, it is apparent that the provisions of that section substantially restrict the scope and effect of defendant's covenant not to compete. However, section 16602 does not invalidate that covenant in its entirety, for under section 16600 a contract in restraint of trade is only 'to that extent void.' Thus, the rule of severability may be invoked to uphold defendant's covenant to the extent that it falls within the limits permitted by section 16602." (3 Cal.3d at p. 395.) However, the Court in *Swenson* did not "blue-pencil" any covenants. The court held that the departed accountant could not have violated "the legally enforceable portions of his covenant not to compete" because he did not "carry on" business in Pasadena or Azusa. Some 50 years later, in *Ixchel Pharma, LLC v. Brogen, Inc., supra,* 9 Cal.5th 1130, in summarizing *Swenson,* the



12/15/2023

California Supreme Court held: "Even when we have upheld portions of noncompetition agreements under statutory exceptions to section 16600, we have recognized that any portion of the agreement restraining competition not within an exception is per se invalid. For example, we said in *Swenson* that a noncompetition agreement between a former partner of an accounting firm and his firm would fall outside the section 16602 exception and thus be invalid '[o]n its face' if 'it forb[ade him] from serving former partnership clients without regard to territorial limits.' " (9 Cal.5th at p. 1157.)

Lockton's other citations are also to historical cases involving courts limiting covenants to a particular county or city under prior versions of the statutes. (See e.g., *Mahlstedt v. Fugit* (1947) 79 Cal.App.2d 562, 566-567 ["In the instant case the contract did not specify the territory in which appellant agreed that he would not engage in business. Prior to the sale appellant's business had been carried on in Los Angeles County and after the sale respondent conducted his business in the same county. The court construed the contract to be limited to the territory in which the parties respectively had conducted their businesses and restrained appellant from infringing on respondent's business in Los Angeles County."]; *Stephens v. Bean* (1924) 65 Cal.App. 779, 783-784 ["The case is unlike those of manufacturing concerns and wholesale merchants whose goods are sold and distributed over large territories. The court was justified in concluding that it was the intention of the parties that the restraint imposed upon defendant was applicable only to the city of Fresno."].)

As to what may happen under Missouri law, the Missouri Supreme Court in *Whelan Security Co. v. Kennebrew* (2012) 379 S.W.3d 835 held: "In balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. *Id.* "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* A non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.' *Id.* The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space. *Id.*" (379 S.W.3d at pp. 841-842.)

The Missouri Supreme Court in *Whelan Security Co.* further held: "Based on the circumstances of the case, this Court modifies the customer

non-solicitation clause to eliminate the provision prohibiting Mr. Kennebrew and Mr. Morgan from soliciting existing Whelan customers except those customers with whom Mr. Kennebrew and Mr. Morgan dealt, respectively, during their employment. This Court also modifies the customer non-solicitation cause to eliminate the prohibition against solicitation by Mr. Kennebrew and Mr. Morgan of Whelan's prospective customers. Because the customer non-solicitation clauses are enforceable as modified, this Court must determine enforceability of the remaining non-compete agreements." (379 S.W.3d at pp. 844-845.)

Based on the record now before the court, the court finds that a California court would not rewrite the covenants in the Member Agreements to make them lawful. The covenants would remain unlawful and would be nullified. Given the rejection of any geographic limitation, Lockton made no attempt to comply with California law. California law on these issues is long-standing and well-known. In light of the density of the language and complex structure of the Member Agreements, on this motion, it appears that Lockton had a well thought out plan to attempt to create locked-down iron-clad covenants with Kaufman. However, although Kaufman has been a long-time California resident who has always worked in California, Lockton made no provision for California law. Instead, Lockton specifically repudiated California law in the Member Agreements (e.g., "restricted activities are not limited to a geographic location or region"). The covenants also broadly extend to all customers and prospective customers of Defendants and their affiliates; not just Kaufman's accounts. The covenants thus are not tied to any acquired business. The covenants extend beyond Kaufman's business. Lockton made no effort to create lawful covenants. There is no overbroad geographic limitation to "blue-pencil" because the Member Agreements repudiate any such restrictions (e.g., "extend . . . reasonably could be conducted"). The covenants extend to *anywhere* Lockton could reasonably conduct business.

To date, Lockton has not explained how the covenants could be made lawful. The closest Lockton comes is in its reply memorandum at page nine where it argues: "Here, an explicit geographic restriction is not needed to define the scope of the non-solicitation covenants because it is necessarily circumscribed by the location and customer base of the owners and Producer Members subject to those covenants." As stated, there is nothing in the covenants necessarily circumscribing them. Lockton's position on this motion seems to be that they can create the broadest covenants possible and, even if the covenants reject any geographic limitation, request that the court conduct a trial so that a proper geographic scope can be ascertained and created.



12/15/2023

Lockton would then ask the court to write a proper lawful covenant. The *Strategix* court could have " 'blue penciled' " the covenant at issue by simply replacing "Infocrossing's employees and customers" with "Strategix's former employees and customers." (*Strategix v. Infocrossing West, Inc., supra,* 142 Cal.App.4th at p. 1074.) But it did not do so. The situation here does not involve whether a withdrawing physician in 1966 impermissibly opened his new practice too close to the City of Hayward as in *Roberts v. Pfefer, supra,* 13 Cal.App.3d 93 or an inquiry into whether a withdrawing accountant beginning in 1961 carried on business in Pasadena because some of his clients had a Pasadena address as in *Swenson v. File, supra,* 3 Cal.3d 389. Here, in contrast, the scope is not so limited. For example, Lockton alleges in its Missouri complaint that it operates nationwide ("LIA operates an investment advisory service for its clients across the United States.").

The modern California authorities are against rewriting unlawful covenants. In *Kolani v. Gluska, supra,* 64 Cal.App.4th 402, the court held: "Generally, courts reform contracts only where the parties have made a mistake (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 382, p. 347), and not for the purpose of saving an illegal contract. (*Id.*, § 386, p. 350). Illegal contracts are void. (*Id.*, § 441, p. 396). Several decisions 'saved' covenants not to compete by narrowly construing them, but these covenants were contained in agreements to sell goodwill, where such covenants are permitted under Business and Professions Code section 16601. (*General Paint Corp. v. Seymour* (1932) 124 Cal.App. 611, 614, [12 P.2d 990]; *John F. Matull & Associates, Inc. v. Cloutier* (1987) 194 Cal.App.3d 1049 [240 Cal.Rptr. 211]; see 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 571, p. 512, and additional cases cited there.) [¶] The trial court here properly concluded that it should not rewrite the broad covenant not to compete into a narrow bar on theft of confidential information. There was no allegation of any mistake justifying reformation. The 'savings' clause in the agreement authorizes a court to revise the noncompete covenant if it is 'unfair' or 'commercially unreasonable,' not if it is illegal. No case we have found approves of the rewriting of an illegal covenant not to compete in the manner proposed here. [¶] Further, as the trial court recognized, the policy of Business and Professions Code section 16600 would be undermined by doing so. Employers could insert broad, facially illegal covenants not to compete in their employment contracts. Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation." (64 Cal.App.4th at pp. 406-407.)



12/15/2023

As stated, in *Strategix, Ltd. v. Infocrossing West, Inc., supra,* 142 Cal.App.4th 1068, the court held: "We decline to rewrite overbroad covenants not to solicit Infocrossing's employees and customers into narrow bars against soliciting Strategix's former employees and customers. Had the parties intended to reach such limited—and enforceable—covenants, they could have negotiated for them. We will not do so for the parties now." (142 Cal.App.4th at p. 618.) Under these circumstances, based on the present record, the court concludes that a California court would declare the covenants void and not rewrite them. (See *Ixchel Pharma, LLC v. Biogen, Inc., supra,* 9 Cal.5th at p. 1159 ["Finally, the holding and language in Edwards simply confirmed our long line of decisions interpreting section 16600 strictly in the context of noncompetition agreements following the termination of employment or the sale of interest in a business."].)

In Missouri, the courts will enforce reasonable covenants and presumably not render an unreasonable covenant void. According to Kaufman, "Missouri courts will modify the [unreasonable] agreement to make it reasonable in the eyes of the court." Lockton states that "courts [in Missouri] apply the common law rule of reasonableness to a non-solicitation covenant and that if a Missouri court found a covenant overbroad, it would have discretion to modify, or 'blue pencil,' the covenant to be geographically reasonable and enforce it only within that reasonable geographic limit." Thus, there is a significant difference in California law versus Missouri's law. A California court would likely render the covenants void and unenforceable. In Missouri, there would be an effort to create reasonable limitations for the covenants. Accordingly, Lockton has not carried its burden on this motion. Lockton has not shown that Kaufman's substantive rights will not be diminished in any way under California law by litigation in Missouri. (See *Verdugo v. Alliantgroup, L.P., supra,* 237 Cal.App.4th at p. 158 ["Alliantgroup must show enforcing the forum selection clause '*will not diminish in any way*' Verdugo's statutory rights."].)

The rulings herein pertain to this motion on the present record. The court is not intending to make any final rulings. Rather, because of Lockton's present argument based on the California law versus Missouri law, the court is called to make a determination as to what a California court would do in light of California law and the present limited record. (See *Verdugo v. Alliantgroup, L.P., supra,* 237 Cal.App.4th at p. 157 ["Simply stated, a comparison is necessary to determine whether enforcing a forum selection and choice-of-law clause would violate California's public policy embodied in its governing statutes. As explained above, a defendant seeking to enforce a



1 2 1 5 2 0 2 3

mandatory forum selection clause bears the burden to show enforcement will not in any way diminish the plaintiff's unwaivable statutory rights. By definition, this showing requires the defendant to compare the plaintiff's rights if the clause is not enforced and the plaintiff's rights if the clause is enforced. Indeed, a defendant can meet its burden only by showing the foreign forum provides the same or greater rights than California, or the foreign forum will apply California law on the claims at issue."].)

## III. DISPOSITION

Lockton's motion to dismiss is denied. Lockton is ordered to give notice of this order.

IT IS SO ORDERED.

Dated: December 13, 2023

Timothy Patrick Dillon
Judge of the Superior Court

# Exhibit 9

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 32

**23STCV24107**
**SCOTT CANALES, AN INDIVIDUAL vs LOCKTON COMPANIES, LLC - PACIFIC SERIES, A MISSOURI SERIES LIMITED LIABILITY COMPANY, et al.**

December 6, 2023
10:07 AM

Judge: Honorable Daniel S. Murphy
Judicial Assistant: S. Luqueno
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 12/04/2023 for Hearing on Motion to Dismiss, now rules as follows:

BACKGROUND

On October 3, 2023, Plaintiff Scott Canales filed this action for declaratory relief against Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC.

Plaintiff filed this action to establish that he may freely compete against Defendants by soliciting clients from his former employment for Defendants, despite restrictive covenants contained in agreements between the parties. Plaintiff alleges that the covenants are void and unenforceable under California law. Plaintiff also alleges that the forum selection provisions are unenforceable because they violate California's public policy.

On November 6, 2023, Defendants filed the instant motion to dismiss based on forum selection clauses within the applicable contracts. Plaintiff filed his opposition on November 17, 2023. Defendants filed their reply on November 27, 2023.

LEGAL STANDARD

"When a court . . . finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (Id., § 410.30, subd. (a).) "The court may dismiss without prejudice the complaint in whole, or as to that defendant, when dismissal is made pursuant to Section

418.10." (Id., § 581, subd. (h).)

"[C]ourts possess discretion to decline to exercise jurisdiction in recognition of the parties' free and voluntary choice of a different forum." (Smith, Valentino & Smith, Inc. v. Superior Court of Los Angeles County (1976) 17 Cal.3d 491, 495.) Where "a plaintiff has freely and voluntarily negotiated away his right to a California forum," the forum selection clause may be given effect "in the absence of a showing that enforcement of such a clause would be unreasonable." (Id. at pp. 495-96.)

DISCUSSION

I. The Law on Forum Selection Clauses

Courts generally enforce forum selection clauses unless "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . ." (Nedlloyd Lines B.V. v. Superior Court (1992) 3 Cal.4th 459, 465.) "The party opposing enforcement of a forum selection clause ordinarily bears the substantial burden of proving why it should not be enforced." (Verdugo v. Alliantgroup, L.P. (2015) 237 Cal.App.4th 141, 147.) "That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually designated forum will not diminish in any way the substantive rights afforded under California law." (Ibid.)

Here, the agreements at issue contain choice-of-law provisions stating that any dispute is to be resolved in Missouri court. Missouri has a reasonable relationship to the case because Defendants are Missouri companies. The primary issue is whether applying Missouri law would contravene fundamental California policy.

II. Application to the Instant Case

a. Burden Shifting

Under California law, "every contract by which anyone is restrained from engaging in a lawful

profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600.) This is a nonwaivable statutory right. (Weber, Lipshie & Co. v. Christian (1997) 52 Cal.App.4th 645, 659.) Therefore, Defendants bear the burden of showing that litigation in Missouri "will not diminish in any way the substantive rights afforded under California law." (Verdugo, supra, 237 Cal.App.4th at p. 147.)

Defendants argue that the burden does not shift to them under Verdugo because that case involved a statute with an express anti-waiver provision. (Verdugo, supra, 237 Cal.App.4th at p. 150, citing Lab. Code, §§ 219(a), 1194(a).) Defendants point out that under Verdugo, the burden only shifts when the claims at issue "are based on statutory rights the Legislature has declared unwaivable." (Id. at p. 151.) The forum selection clause in Verdugo was not enforced because it had "the potential to contravene an antiwaiver statute designed to protect California residents." (Ibid.)

While Business and Professions Code section 16600 does not include its own anti-waiver provision like the one found in the Labor Code, Civil Code section 3513 provides that "a law established for a public reason cannot be contravened by a private agreement." This is an express anti-waiver provision that applies to any law established for a public reason, including Business and Professions Code section 16600. (Weber, supra, 52 Cal.App.4th at p. 659.) In that sense, Section 16600 is a "statute[] the Legislature enacted and specifically made unwaivable to protect California residents." (See Verdugo, supra, 237 Cal.App.4th at p. 151.) The claims at issue "are based on statutory rights the Legislature has declared unwaivable." (Ibid.) That the legislative declaration comes from the Civil Code rather than the Business and Professions Code does not change the conclusion. Civil Code section 3513 is as much an express legislative declaration as any other.

Neither Verdugo nor any of the cases cited by Defendants stand for the proposition that the burden only shifts when the statute being litigated itself contains an anti-waiver provision. (See Olinick v. BMG Entertainment (2006) 138 Cal.App.4th 1286; Ryze Claim Solutions LLC v. Superior Court (2019) 33 Cal.App.5th 1066.) "A court's opinion is not authority for a proposition not considered in it." (People v. Anderson (2015) 232 Cal.App.4th 1259, 1275.) Olinick and Ryze "do[] not affect our analysis because [they] do[] not address the issue of who carries the burden of proof in determining whether to enforce a mandatory forum selection clause." (Verdugo, supra, 237 Cal.App.4th at p. 153.) Ultimately, Business and Professions Code section 16600 is indisputably a nonwaivable statute. Therefore, "the claims at issue are based on unwaivable rights created by California statutes." (Id. at p. 147.) "Enforcement of the contractual

forum selection and choice of law clauses would be the functional equivalent of a contractual waiver" of these unwaivable rights. (See America Online, Inc. v. Superior Court (2001) 90 Cal.App.4th 1, 5.) Accordingly, Defendants "bear[] the burden to show litigating the claims in the contractually designated forum will not diminish in any way the substantive rights afforded under California law." (Verdugo, supra, 237 Cal.App.4th at p. 147.)

b. Satisfying the Burden

"[A] defendant can meet its burden only by showing the foreign forum provides the same or greater rights than California, or the foreign forum will apply California law on the claims at issue." (Verdugo, supra, 237 Cal.App.4th at p. 157.)

Unlike California law, Missouri law favors noncompete clauses. (See, e.g., Schott v. Beussink (Mo. Ct. App. 1997) 950 S.W.2d 621, 625 ["Missouri courts recognize that public policy approves employment contracts containing restrictive covenants"].) Defendants do not point to any Missouri statutory provision similar to Business and Professions Code section 16600. Therefore, Defendants have not satisfied their burden of showing that Missouri law provides the same or greater rights than California law.

Defendants have also not proven that a Missouri court would apply California law. Defendants argue that it is possible a Missouri court will apply California law because the court would have to conduct an analysis before deciding which law to apply. This does not satisfy Defendants' burden of showing that a Missouri court "will" apply California law. (See Verdugo, supra, 237 Cal.App.4th at p. 157.) Defendants' position in the case depends largely on the application of Missouri law over California law. The contracts at issue contain choice-of-law provisions selecting Missouri law. There is no indication that Defendants intend on stipulating to California law, or that a Missouri court would apply California law after conducting an analysis. It is insufficient to merely speculate on what a Missouri court "is 'likely' to do," while avoiding "any specific and definitive argument that [Missouri] courts either have applied or will apply California" law in similar circumstances. (Id. at p. 158.)

Lastly, Defendant Lockton Companies LLC – Pacific Series has itself argued that a similar forum selection clause would violate nonwaivable rights under Section 16600. (Compl., Ex. 6 ¶¶ 59, 90, 97, 104.) Pacific Series previously filed a substantially similar lawsuit (Aon case) making the same arguments that Plaintiff makes here. (Ibid.) Defendants cannot make one argument when they want to freely compete, and make the opposite argument when someone else wants to

compete against them.

In sum, Defendants have not satisfied their burden of demonstrating that "litigating the claims in the contractually designated forum will not diminish in any way the substantive rights afforded under California law." (Verdugo, supra, 237 Cal.App.4th at p. 147.)

III. Exception Under Section 16602.5

Defendants also argue that Section 16600 has no bearing at all because this case falls under Section 16602.5. Section 16602.5 is an exception to the general rule enumerated in Section 16600. Section 16602.5 provides that "[a]ny member may, upon or in anticipation of a dissolution of, or the termination of his or her interest in, a limited liability company . . . agree that he or she or it will not carry on a similar business within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein."

Defendants have produced evidence that arguably supports the application of the exception under Section 16602.5. Defendants are limited liability companies organized under Missouri law, and Plaintiff signed a member agreement with the Defendants, in which Plaintiff became a member the LLCs. However, the restrictive covenants in the agreements are not limited to "a specified geographical area" which is required by the language of Section 16602.5. Instead, the agreements expressly provide that they are not limited to any geographic scope or region. (See, Mundy's Decl., Ex. A through F ["restrictions imposed by this Agreement cannot be limited to a geographic location or region … it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographic location where the restricted activities are or reasonably could be conducted."].) As such, this language does not appear to satisfy the requirements of Section 16602.5.

The application of exceptions such as Section 16602.5 is a substantive matter to be resolved at trial. Also, whether a restrictive covenant with no geographic limitation can be "blue penciled" is a substantive matter to be resolved at trial. It does not affect the procedural determination of where the case should be litigated. The case clearly implicates the nonwaivable statutory right to be free from restrictive covenants even if an exception may apply.

Assuming for argument's sake that the court should consider Section 16602.5 and consider if the

geographic limitation may be "blue penciled," There is no evidence that a Missouri court would "blue pencil" any geographic limitation. It appears that a Missouri court may enforce the restrictive covenants based on Missouri law, which is in conflict with California's rejection of the common law rule of reasonableness. (See, Whelan Sec. County v. Kennebrew (2012) 379 S.W.3d 835.) While Defendants have cited numerous cases where California courts have "blue penciled" a geographical limitation, Defendants have failed to cite to any authority where a Missouri court "blue penciled" a geographical limitation.

In sum, the claims at issue implicate a nonwaivable statutory right, and Defendants have not satisfied their burden of demonstrating that a Missouri forum "will not diminish in any way the substantive rights afforded under California law." (Verdugo, supra, 237 Cal.App.4th at p. 147.) Therefore, the Court declines to enforce the forum selection clause.

CONCLUSION

Defendants' motion to dismiss is DENIED.

The order is signed and filed on this date.

Clerk to give notice. Certificate of Mailing is attached.

# Exhibit 10

FILED
Superior Court of California
County of Los Angeles

JAN 26 2024

David W. Slayton, Executive Officer/Clerk of Court
By: P. Salcido, Deputy

**Superior Court of California**

**County of Los Angeles**

**Department 61**

| | |
|---|---|
| GREGORY D. BARNES, et al.,<br><br>Plaintiffs,<br><br>vs.<br>LOCKTON COMPANIES, LLC, et al.,<br><br>Defendants. | Case No.: 23STCV24040<br><br>Hearing Date: January 26, 2024<br><br>**[TENTATIVE] RULING RE:**<br><br>DEFENDANTS LOCKTON COMPANIES, LLC, LOCKTON INVESTMENT ADVISORS, LLC, LOCKTON INVESTMENT SECURITIES, LLC, AND LOCKTON PARTNERS, LLC'S MOTION TO STAY PROCEEDINGS PENDING RESOLUTION IN CALIFORNIA SUPREME COURT<br><br>DEFENDANTS LOCKTON COMPANIES, LLC, LOCKTON INVESTMENT ADVISORS, LLC, LOCKTON INVESTMENT SECURITIES, LLC, AND LOCKTON PARTNERS, LLC'S MOTION TO DISMISS FOR FORUM NON CONVENIENS |

Defendants Lockton Companies, LLC, Lockton Investment Advisors, LLC, Lockton Investment Securities, LLC, and Lockton Partners, LLC's Motion to Stay Proceedings Pending Resolution in California Supreme Court is DENIED.

Defendants Lockton Companies, LLC, Lockton Investment Advisors, LLC, Lockton Investment Securities, LLC, and Lockton Partners, LLC's Motion to Dismiss for Forum Non Conveniens is DENIED.

Defendant to provide notice.

01/29/2024

## I. MOTION TO STAY PENDING APPEAL

"Trial courts generally have the inherent power to stay proceedings in the interests of justice and to promote judicial efficiency." (*Freiberg v. City of Mission Viejo* (1995) 33 Cal.App.4th 1484,

1489.) The decision of a trial court to stay proceedings is thus generally a matter of discretion. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 480.)

Defendants Lockton Companies, LLC, Lockton Investment Advisors, LLC, Lockton Investment Securities, LLC, and Lockton Partners, LLC (Defendants) seek a stay of this action pending a decision by the California Supreme Court in the case *Lockton Companies, LLC v. Superior Court*, No. S282136. Defendants' petition for review in that case was granted on December 13, 2023. (RJN Exh. 1.) Defendants argue that their petition in that case addresses the enforceability of the same forum selection clause at issue in Defendants' pending motion to dismiss for forum non conveniens. (Motion at p. 1.) Thus Defendants argue that this court should stay these proceedings and the pending motion to dismiss until the Supreme Court offers its guidance. Defendants argue that if the stay is not granted, the parties will likely expend substantial resources in the appellate courts seeking relief related to Defendant's motion to dismiss. (Motion at pp. 5–6.)

No stay is warranted here. Defendants' petition for review in the other case was granted on December 13, 2023, little more than a month before the scheduled hearing on this motion. Any stay granted here would thus be substantial and indeterminate in duration, likely causing prejudice and delay to Plaintiff Gregory Barnes (Plaintiff).

Moreover, as Plaintiff notes in opposition to the present motion, the Supreme Court is not currently undertaking any active review of the *Lockton Companies* appeal, but after granting Defendants' petition has deferred any further action in that matter pending disposition of a related issue in another appeal, *EpicentRx v. Superior Court*, No. S282521. (Opposition at p. 2.) The *Lockton Companies* appeal is thus unlikely to directly determine the enforceability of the forum selection clause at issue in Defendants' pending motion.

The relevance of the *Lockton Companies* and *EpicentRx* appeals to the present matter stands at a broader level of generality, and relates to the standards and burdens governing the application of such clauses in the forum non conveniens context. (RJN Exh. 4.) Specifically, appellate authority holds that "when the claims at issue are based on unwaivable rights created by California statutes . . . the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum will not diminish in any way the substantive rights afforded under California law." (*Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147, internal quotation marks and alterations omitted.) Defendants in the *Lockton Companies* appeal argue that this burden-shifting framework runs contrary to California Supreme Court precedent holding that it the party challenging the forum selection clause bears the "burden of establishing that enforcement of the . . . clause would be unreasonable." (*Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 496; RJN Exh. 4.) While relevant to the present dispute, extant case authority already provides guidance on this question. Courts have already ruled on the same forum selection clause as applied to different plaintiffs. (*See Kaufman v. Lockton Cos.*, LASC Case No. 22STCV23460; *Roderick v. Lockton Cos.*, LASC Case No. 23STCV24101; *Canales v. Lockton Cos.*, LASC Case No. 23STCV24107.)

01/29/2024

The motion is therefore DENIED.

## II. <u>INCONVENIENT FORUM</u>

"When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (Code Civ. Proc. § 410.30, subd. (a).)

> In determining whether to grant a motion based on forum non conveniens, a court must first determine whether the alternate forum is a "suitable" place for trial. If it is, the next step is to consider the private interests of the litigants and the interests of the public in retaining the action for trial in California. The private interest factors are those that make trial and the enforceability of the ensuing judgment expeditious and relatively inexpensive, such as the ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the availability of compulsory process for attendance of unwilling witnesses. The public interest factors include avoidance of overburdening local courts with congested calendars, protecting the interests of potential jurors so that they are not called upon to decide cases in which the local community has little concern, and weighing the competing interests of California and the alternate jurisdiction in the litigation.

(*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751.) The party moving for forum non conveniens bears the initial burden of establishing the propriety of dismissal. (*Ibid.*) "If the plaintiff is a California resident, the 'plaintiff's choice of a forum should rarely be disturbed unless the balance is strongly in favor of the defendant." (*National Football League v. Fireman's Fund Insurance Company* (2013) 216 Cal.App.4th 902, 917.)

However, Defendants move for dismissal based on the operation of a forum selection clause. This involves a different analysis:

> The law in this area is well-established. In California, the procedure for enforcing a forum selection clause is a motion to stay or dismiss for forum non conveniens, but a motion based on a forum selection clause is a special type of forum non conveniens motion. The factors that apply generally to a forum non conveniens motion do not control in a case involving a mandatory forum selection clause. When a case involves a mandatory forum selection clause, it will usually be given effect unless it is unfair or unreasonable. Moreover, a court will normally reject any claims that the chosen forum is unfair or inconvenient. Also, a court will usually honor a mandatory forum selection clause without extensive analysis of factors.

01/29/2024

(*Richtek USA, Inc. v. uPI Semiconductor Corporation* (2015) 242 Cal.App.4th 651, 661.)

Defendants Lockton Companies, LLC, Lockton Investment Advisors, LLC, Lockton Investment Securities, LLC, and Lockton Partners, LLC (Defendants) present the forum selection clause contained in various LLC member agreements executed by Plaintiff Gregory D. Barnes (Plaintiff), which states:

> Member and the Series agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims, or issues

> that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, and/or Member's membership in the Series . . . shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to choice of laws, irrespective to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity, or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series . . . shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; . . .Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The Parties hereto agree that the provisions set for in this Section 7.7. are fair and reasonable.

(Mundy Decl. Exh. A, § 7.7; *see also*, Exhs. F, J.) Because Plaintiff's case here addresses the enforceability of a non-compete clause contained in the agreements, Defendants contend that the forum selection clause applies, requiring the dispute to be tried in Missouri. (Motion at pp. 4–5.)

Defendants argue that the forum selection clauses are fair and reasonable. They have already initiated an action against Plaintiff in federal court in Missouri based on his departure from the company and attempts to engage in competitive activities. (Motion at p. 5.) Defendants further argue that each of them is organized under Missouri law and has its principal place of business there, making the Missouri forum reasonable. (Motion at p. 6.)

Plaintiff counters that enforcing the forum selection clause here would violate California public policy, as it would effect a waiver of Plaintiff's unwaivable statutory rights, specifically the prohibition against contracts that restrain individuals from "engaging in a lawful profession, trade, or business." (Opposition at p. 3; Bus. & Prof. Code § 16600.) Plaintiff argues that the forum selection clause also requires application of Missouri law "without reference to choice of laws," which, given Missouri's comparatively lax stance on contracts in restriction of trade, would allow Defendants to circumvent California law. (Opposition at p. 4, citing *Whelan Sec. Co. v. Kennebrew* (Mo. 2012) 379 S.W.3d 835, 841 [Missouri courts will enforce non-compete clauses so long as they are "no more restrictive than is necessary to protect the legitimate interests of the employer"].)

Plaintiff argues that while the burden is ordinarily upon the party opposing a forum-selection clause to prove that it is unfair and unreasonable, that burden "is reversed when the claims at issue are based on unwaivable rights created by California statutes." (*Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147.) In such a circumstance, "the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum will not diminish in any way the substantive rights afforded under California law."(*Ibid.*, citing *Wimsatt v. Beverly Hills Weight etc. Internat., Inc.* (1995) 32 Cal.App.4th 1511, 1520–1524.) Where "the forum selection clause has the potential to operate as a waiver," the party seeking its enforcement "bears the burden to show that it does not." (*Id.* at p. 152.)

01/29/2024

Plaintiff argues that because Plaintiff's claims are based on unwaivable statutory rights, and because trying the case in Missouri involves the potential for waiver of those rights — Defendants have declared their intention to fight the application of California law in Missouri — the forum selection clause should not be enforced. (Opposition at p. 6.)[1]

Defendants respond that the operative statute governing the non-compete clause is not Business & Professions Code § 16600, but rather Business & Professions Code § 16602.5, which expressly authorizes non-compete covenants imposed against the members of LLCs, specifically to the effect that "he or she or it will not carry on a similar business within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein." (Motion at p. 7.)

Defendant's argument is unpersuasive. Section 16602.5 expressly requires that such covenants apply "within a specified geographic area." The non-compete contract here not only contains no geographic limit, but specifically disclaims its existence: "[T]he restrictions imposed by this Agreement cannot be limited to a geographic location or region, and, therefore, it is reasonable that the restricted activities are not limited to a geographical scope or region." (Mundy Decl. Exh. A, § 5.5.) Although Defendant argues that this court may revise the geographic scope of the agreement pursuant to the rule of reasonableness (Motion at pp. 7–11, citing *Roberts v. Pfefer* (1970) 13 Cal.App.3d 93, 98.) But while "[c]ourts have 'blue penciled' noncompetition covenants with overbroad or omitted geographic and time restrictions to include reasonable limitations, . . . courts will not strike a new bargain for the parties "for the purposes of saving an illegal contract." (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1074.) "[A]ny portion of the agreement restraining competition not within an exception is per se invalid." (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1157.) The transfer of the forum to Missouri would thus likely involve the application of law more favorable to the restrictive covenant at issue, and likely prejudice Plaintiff's statutory rights.

Defendant argues that the Missouri forum would likely entail the same choice of law analysis under the "internal affairs doctrine" as would be conducted here. (Motion at pp. 11–12.) "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442.) This principle, however, is unlikely to be decisive in this case, as the dispute does not involve the management of Defendant entities, but restrictions upon Plaintiff that are contracted to take place after his departure from the company. Defendant also argues that both Missouri and California would otherwise apply choice of law analysis from section 187 of the Restatement (Second) of Conflicts of Law. (Motion at p. 11.) This argument is also unpersuasive, as the agreement states that Missouri law shall apply "without reference to choice of laws." (Mundy Decl. Exh. A,

01/29/2024

[1] Plaintiff cites a number of other cases in trial courts in which similar motions brought by Defendant against similarly situated plaintiffs have been denied. (*See Kaufman v. Lockton Cos.*, LASC Case No. 22STCV23460; *Canales v. Lockton Cos.*, LASC Case No. 23STCV24107; *Giblin v. Lockton Cos.*, LASC Case No. 22STCV39876.

§ 7.7.) But this analysis is also likely to play out differently in Missouri, as that determination would involve questions of "whether the chosen state's law is contrary to a *fundamental* policy" of the forum state. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 466.) As discussed above, this analysis is likely to be far more critical of the covenant at issue in California than in Missouri.

The motion is therefore DENIED.

Dated: January 26, 2024

Hon. Gregory Keosian
Judge of the Superior Court

01/29/2024

# Exhibit 11

**FILED**
Superior Court of California
County of Los Angeles

FEB 23 2024

David W. Slayton, Executive Officer/Clerk of Court
By: T. Le, Deputy

HEARING DATE: **January 31, 2024** TRIAL: Not set.

CASE: **Richard A. Roderick v. Lockton Companies, LLC – Pacific Series, et al.**

CASE NO.: **23STCV24101**

**(1) MOTION FOR ORDER STAYING PROCEEDINGS PENDING RESOLUTION IN CALIFORNIA SUPREME COURT;**
**(2) MOTION TO DISMISS THE COMPLAINT AND/OR STAY THIS ACTION ON GROUNDS OF *FORUM NON CONVENIENS***

**MOVING PARTY**: (1) & (2) Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC

**RESPONDING PARTY(S)** (1) & (2) Plaintiff Richard A. Roderick

Plaintiff seeks declaratory relief regarding the enforceability of restrictive covenants in his agreement with his former employers, Defendants herein.

Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC move for a stay of the proceedings pending the California Supreme Court review in *Lockton Cos., LLC, et al. v. Superior Court of Los Angeles County*, No. S282136, a writ proceeding related to the Superior Court proceeding *Sallie Giblin v. Lockton Cos., LLC – Pacific Series, et al.*, No. 22STCV39876.

Defendants also move to dismiss or stay this action on the ground of *forum non conveniens* pursuant to a forum selection clause.

**RULING**

**Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC's motion to stay action is DENIED. The Court will proceed to rule upon the merits of Defendant's motion to dismiss.**

**Defendants' motion to dismiss or stay this action on the ground of *forum non conveniens* pursuant to a forum selection clause is also DENIED.**

02/26/2024

**Motion To Stay Proceedings**

Request For Judicial Notice

Defendants request that the Court take judicial notice of the following:

(1) Exhibit 1: A true and correct copy of the December 13, 2023 order granting Lockton's petition for review in Lockton Companies, LLC, et al. v. Superior Court of Los Angeles County, No. S282136 in the Supreme Court of California; (2) Exhibit 2: A true and correct copy of Lockton's May 3, 2023 Petition for Peremptory Writ Mandate, Prohibition, or Other Extraordinary Relief in Lockton Companies, LLC, et al. v. Superior Court of the State of California, County of Los Angeles; Sallie Giblin, No. B328408 filed the Court of Appeal of California, Second Appellate District; (3) Exhibit 3: A true and correct copy of the September 25, 2023 order denying Lockton's Petition for Peremptory Writ of Mandate, Prohibition, or Other Extraordinary Relief in Lockton Companies, LLC, et al. v. Superior Court of the State of California, County of Los Angeles; Sallie Giblin, No. B328408; (4) Exhibit 4: A true and correct copy of Lockton's October 5, 2023 Petition for Review filed Lockton Companies, LLC, et al. v. Superior Court of Los Angeles County, No. S282136 in the Supreme Court of California; (5) Exhibit 5: A true and correct copy of Lockton's Motion to Dismiss filed on February 21, 2023 in Sallie Giblin v. Lockton Cos., LLC – Pacific Series, et al., No. 22STCV39876 in Los Angeles County Superior Court; (6) Exhibit 6: A true and correct copy of the First Amended Complaint filed on October 27, 2023 in Lockton Companies, LLC – Pacific Series et al. v. Alliant Ins. Servs., Barnes, Canales, Racunas, and Roderick, Case No. 4:23-cv-00705-SRB, filed in the Western District of Missouri.

Requests Nos. 1 – 6 are GRANTED per Evid. Code, § 452(d)(court records).

Discussion

Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC move for a stay of the proceedings pending the California Supreme Court review in *Lockton Cos., LLC, et al. v. Superior Court of Los Angeles County*, No. S282136, a writ proceeding related to the Superior Court proceeding *Sallie Giblin v. Lockton Cos., LLC – Pacific Series, et al.*, No. 22STCV39876.

Defendants argue that the same forum selection clause and motion to dismiss on the grounds of *forum non conveniens* is at issue in the above proceeding, so it would be judicially economical to stay this action pending the Supreme Court's decision.

However, as Plaintiff points out, although the Supreme Court granted review, it was on a "grant-and-hold" basis, pending its ruling on another case, as follows:

The petition for review is granted. Further action in this matter is deferred

02/26/2024

> pending consideration and disposition of a related issue in EpicentRx v. S.C. (EpiRx), S282521 (see Cal. Rules of Court, rule 8.512(d)(2)), or pending further order of the court. Submission of additional briefing, pursuant to California Rules of Court, rule 8.520, is deferred pending further order of the court.

(Def's RJN, Exh. 1.)

This stay is for an unknown duration, and is contingent upon another case. This Court is not persuaded that it should stay this entire action contingent upon the Supreme Court's writ review in two different actions other than the instant action. Moreover, it is likely that there will be a stay of at least some length if the Court rules on the merits of the motion to dismiss now, and a party seeks review of that order.[1]

As such, the Court in its discretion declines to issue the requested stay, and the motion to stay action is DENIED. The Court will proceed to rule upon the merits of Defendant's motion to dismiss.

**Motion To Dismiss or Stay**

Request For Judicial Notice

Defendant requests that the Court take judicial notice of the following:

(1) Exhibit 1: A true and correct copy of the Complaint (ECF No. 1) filed on October 4, 2023, in Lockton Companies, LLC – Pacific Series, et al. v. Gregory D. Barnes, et al., No. 4:23-cv-00705-SRB in the United States District Court for the Western District of Missouri; (2) Exhibit 2: A true and correct copy of the November 18, 2022 order (ECF No. 33) denying plaintiff's motion to dismiss on forum non conveniens grounds in Lockton Companies, LLC – Pacific Series, et al. v. Kaufman, No. 4:22-cv-00462-SRB in the United States District Court for the Western District of Missouri.

Requests Nos. 1 and 2 are GRANTED per Evid. Code, § 452(d)(court records).

Plaintiff requests that the Court take judicial notice of the following:

(1) A true and correct copy of the Court's December 6, 2023 Order denying Lockton's Motion to Dismiss the Complaint and/or Stay This Action on Grounds of Forum Non Conveniens, in the matter styled as Scott Canales v. Lockton Companies, LLC—Pacific Series., et al., No. 23STCV24107, in the Superior Court of the State of

[1] At the hearing on this motion, Plaintiff's counsel argued that in the event Defendant seeks writ relief of any order by this Court, the proceedings would not be fully stayed. Defendant's counsel appeared to indicate that in the event Defendant sought writ relief, it might also make a separate stay request. While it certainly is not a foregone conclusion that a stay request would be granted (or even that one will be made) the Court has taken into account the current status of proceedings and the parties' stated intentions in deciding this issue.

02/26/2024

California, County of Los Angeles; (2) A true and correct copy of the Court's March 29, 2023 Order denying Lockton's Motion to Dismiss the Complaint and/or Stay This Action on Grounds of Forum Non Conveniens, in the matter styled as Sallie Giblin v. Lockton Companies, LLC—Pacific Series., et al., No. 22STCV39876, in the Superior Court of the State of California, County of Los Angeles; (3) A true and correct copy of the Court's December 13, 2023 Minute Order denying Lockton's Motion to Dismiss the Complaint and/or Stay This Action on Grounds of Forum Non Conveniens, in the matter styled as Eric Kaufman v. Lockton Companies, LLC—Pacific Series., et al., No. 22STCV23460, in the Superior Court of the State of California, County of Los Angeles; (4) A true and correct copy of the First Amended Complaint filed on October 27, 2023 in the matter styled as Lockton Pacific Companies, LLC—Pacific Series v. Alliant Insurance Services, Inc., No. 23-cv-00705, in the United Stated District Court for the Western District of Missouri.

Requests Nos. 1 – 4 are GRANTED per Evid. Code, § 452(d)(court records).

Plaintiff's supplemental request for judicial notice of a ruling filed in Department 73 on December 13, 2023 in the matter styled as Eric Kaufman v. Lockton Companies, LLC—Pacific Series, et. al., No. 22STCV23460, in the Superior Court of the State of California, County of Los Angeles is GRANTED per Evid. Code, § 452(d)(court records).

Discussion

Defendants Lockton Companies, LLC – Pacific Series, Lockton Investment Advisors, LLC, and Lockton Partners, LLC move to stay or dismiss this action based on *forum non conveniens* pursuant to a mandatory forum selection clause. Defendant cites that forum selection clause contained in the Pacific Series and LIA Member Agreements and Roderick s Partner Agreement with Lockton Partners:

> 7.7 Governing Law and Forum Selection.
>
> (a) Member and the Series agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth herein, **shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or**

02/26/2024

**Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri**; provided, however, the Series shall pay promptly, upon demand from time-to-time by Member, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 7. 7 are fair and reasonable.

(b) Member acknowledges and agrees that, in light of the making of this Agreement in Missouri, the Lockton Entities' substantial contacts with Missouri, and the interests of Member and the Lockton Entities in ensuring that disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the Series, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Other Series, Affiliates and Lockton Entities as set forth herein are resolved on a uniform basis and in accordance with Missouri's organizational laws, pursuant to which the Series, the Other Series, the Affiliates and certain other Lockton Entities are organized, including but not limited to Missouri's series limited liability company law (including but not limited to Mo. Rev. Stat. §347.186) and its limited liability company laws, Missouri has a substantial relationship to Member, the Lockton Entities and this Agreement, and there is a reasonable basis for the parties' choice of Missouri law and forum in this Section 7.7.

(Mundy Decl., Exs. A (Amended and Restated Member Agreement), C (LIA Member Agreement)§ 7.7(a)[bold emphasis added].)

5.9. Governing Law and Forum Selection.

(a) Producer Partner and the Company agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, **shall be subject to, governed by, and construed in accordance with the laws of**

02/26/2024

> **the State of Missouri without reference to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri**; provided, however, the Company shall pay promptly, upon demand from time-to-time by Producer Partner, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Producer Partner hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 5.9 are fair and reasonable.
>
> (b) Producer Partner acknowledges and agrees that, in light of the making of this Agreement in Missouri, the Lockton Entities' substantial contacts with Missouri, and the interests of Producer Partner and the Lockton Entities in ensuring that disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein are resolved on a uniform basis and in accordance with Missouri's organizational laws, pursuant to which the Company, the Series, the Other Series, the Affiliates and certain other Lockton Entities are organized, including but not limited to Missouri's limited liability company laws and its series limited liability company law (including but not limited to Mo. Rev. Stat. §347.186), Missouri has a substantial relationship to Producer Partner, the Lockton Entities and this Agreement, and there is a reasonable basis for the parties' choice of Missouri law and forum in this Section 5. 9.

(Mundy Decl., Ex. E (Producer Partner Agreement) § 5.9(a)[bold emphasis added].)

"California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be

02/26/2024

unreasonable. [Citation.] This favorable treatment is attributed to our law's devotion to the concept of one's free right to contract, and flows from the important practical effect such contractual rights have on commerce generally." (*America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 11 [108 Cal. Rptr. 2d 699] (*America Online*).)

However, "California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy." (*America Online, supra*, 90 Cal.App.4th at p. 12; see *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 200 [127 Cal. Rptr. 2d 847] ["a forum selection clause will not be enforced if to do so would bring about a result contrary to the public policy of this state"].)

As explained in *Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147 [187 Cal. Rptr. 3d 613], "[t]he party opposing enforcement of a forum selection clause ordinarily 'bears the "substantial" burden of proving why it should *not* be enforced.' [Citations.] That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually designated forum 'will not diminish in any way the substantive rights afforded … under California law.'" (See *America Online, supra*, 90 Cal.App.4th at p. 10 [party seeking enforcement must "prove that enforcement of the forum selection clause would not result in a significant diminution of rights"].)

[*351]

In *Hall v. Superior Court* (1983) 150 Cal.App.3d 411 [197 Cal. Rptr. 757] (*Hall*), this court refused to enforce a forum selection clause in a case in which two California investors had exchanged their interests in an oil and gas limited partnership in return for stock in one of their coinvestors, a Utah corporation. As in this case, the parties in *Hall* agreed to both forum selection and choice of law provisions, which identified Nevada as the selected forum and chose its laws to govern the transaction. Although the trial court enforced the forum selection clause, this court reversed.

We explained in *Hall* that "[w]hile 'California does not have any public policy against a choice of law provision, where it is otherwise appropriate' [citation] … [citation], 'an agreement designating [a foreign] law will not be given effect if it would violate a strong California public policy … [or] "result in an evasion of … a statute of the forum protecting its citizens."'" (*Hall, supra*, 150 Cal.App.3d at pp. 416–417.) We then reasoned that if the pending litigation were transferred to Nevada where Nevada law would be applied, the investors would lose the benefit of California's

02/26/2024

> Corporate Securities Law of 1968 (Corp. Code; § 25000 et seq.), which would otherwise govern the exchange. The investors would thus be denied California's unwaivable protections against fraud and deception in securities matters. (*Hall, supra*, 150 Cal.App.3d at p. 417.) Consequently, the trial court erred by enforcing the provision.

(*G Companies Management, LLC v. LREP Arizona, LLC* (2023) 88 Cal.App.5th 342, 350-351.)

The Court addresses Defendants' argument that Business and Professions Code § 16600 does not govern the subject agreements, but rather, Business and Professions Code, § 16602.5 applies because the noncompetition agreement was made in connection with the sale or dissolution of an interest in a limited liability company.

Here, Plaintiff alleges that under Section 1 of the Series Member Agreement, he was required to make a capital contribution of $200 in exchange for one Producer Unit in the Southern California series, which Plaintiff alleges reflects a profit-sharing interest rather than an ownership interest. (*See, e.g.,* Complaint, ¶ 15.)

¶ 32 of the Complaint alleges that Section 1 of the LIA Member Agreement states Plaintiff will make a $200 capital contribution to LIA in exchange for one Producer Unit, which Plaintiff alleges reflects a profit-sharing interest rather than an ownership interest. Plaintiff did not obtain any "Corporate Units."

Bus. & Prof. Code, § 16602.5 provides:

> **Any member may**, upon or **in anticipation of** a dissolution of, or **the termination of his or her interest in, a limited liability company** (including a series of a limited liability company formed under the laws of a jurisdiction recognizing such a series), agree that he or she or it **will not carry on a similar business** within a **specified geographic area** where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person deriving title to the business or its goodwill from any such other member of the limited liability company, carries on a like business therein.

(Bus & Prof Code § 16602.5 [bold emphasis added].)

As is relevant to this motion, the Complaint alleges that the various agreements contain restrictive covenants. ¶ 19 of the Complaint cites Section 5.3 of the 2007 Series Member Agreement (Complaint, Exh. 1), which bars Plaintiff from soliciting or doing business with any of Lockton's "Client Accounts" for two years after leaving the Series.

¶ 27 of the Complaint cites an unspecified section of the 2016 Amended Series Member Agreement, which allegedly bars Plaintiff from competing against Lockton for two years after leaving Lockton. ¶ 28 alleges:

02/26/2024

[A] section of the 2016 Amended Series Member Agreement[2] asserts "this Agreement cannot be limited to a geographic location or region, and, therefore, it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted."

¶ 31 of the Complaint alleges that a provision of the amendment extends the period of the restrictive covenants recited in Sections 5.3 and 5.4 of the 2016 Amended Series Member Agreement from two years to four years.

¶ 36 alleges that Section 5.4 of the LIA Member Agreement (Complaint, Exh. 2) purports to bar Plaintiff from competing against Lockton for two years after leaving Lockton. The LIA Member Agreement also indicates that:

> the restrictions imposed by this Agreement cannot be limited to a geographic location or region, and, therefore, it is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted.

¶ 39 of the Complaint alleges that an unspecified provision of an amendment extends the period of the restrictive covenants in the LIA Member Agreement from two years to four years.

The Court finds that Bus. & Prof. Code, § 16602.5 does not apply to the above restrictive covenants because they are not limited to a "specified geographic area," which is a specific limitation set forth in § 16602.5. Rather, the scope of the covenants are "any geographic region," the overbreadth of which places the covenants outside the scope of § 16602.5.

Defendants argue that the overbroad portions should be set aside because the common law rule of reasonableness to § 16602.5—a statutory exception to § 16600—applies. In this regard, Defendants argue that California law enforces non-solicitation agreements to the extent that they reasonably provide for the protection of a valid interest.

Case law supports the proposition that statutory exceptions to § 16600 incorporate the common law rule of reasonableness:

> As the California Supreme Court explained in *Edwards*, "'[S]ection 16600 embodies the original, strict common law antipathy toward restraints of trade, **while the section 16601 and 16602 exceptions incorporated the**

[2] ¶ 5.4 of the 2007 Agreement states: "[I]t is reasonable that the restricted activities are not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities could be conducted."

02/26/2024

> **later common law "rule of reasonableness" in instances where those exceptions apply.**'" (*Edwards, supra*, 44 Cal.4th at p. 948.) In *Howard v. Babcock* (1993) 6 Cal.4th 409 [25 Cal. Rptr. 2d 80, 863 P.2d 150], our high court explained: "Not every agreement between partners in restraint of competition is permitted. **We have held that the common law 'rule of reason' should apply to evaluate the noncompetition agreement under Business and Professions Code section 16602.**" (*Id.* at p. 416.) Because section 16602 incorporates the common law "rule of reasonableness," courts **have at times enforced partnership covenants not to compete *to the extent* that such agreements are lawful under section 16602, even if the agreements were facially invalid when taken as a whole.** (*Swenson v. File* (1970) 3 Cal.3d 389, 395 [90 Cal. Rptr. 580, 475 P.2d 852] (*Swenson*); *Roberts v. Pfefer* (1970) 13 Cal.App.3d 93, 98 [91 Cal. Rptr. 308] [trial court directed to make findings as to the reasonableness of a covenant's restriction barring doctor from practicing within a portion of the county; statute at the time allowed restriction only as to city or town].)
>
> In *Swenson*, for example, our high court explained the applicable version of section 16602 "substantially restrict[ed] the scope and effect" of the covenant not to compete at issue in the case. (*Swenson, supra*, 3 Cal.3d at p. 395.) The covenant contained two provisions, a blanket prohibition on servicing the firm's current or former clients, and one restricting the departing partner from servicing clients within a 20-mile radius of the partnership offices. Neither provision appeared to fall within the section 16602 exception. Yet, despite the infirmity of the provisions as written, section 16602 did not invalidate the covenant in its entirety, "for under section 16600 a contract in restraint of trade is only 'to that extent void.' Thus, **the rule of severability may be invoked to uphold defendant's covenant to the extent that it falls within the limits permitted by section 16602.**" (*Swenson*, at p. 395.) **The court noted the blanket prohibition on servicing the firm's clients was facially invalid due to the lack of any geographic restriction.** Still, it reasoned both provisions could be upheld "to the extent that serving such clients would also constitute, under former section 16602, 'carrying on' an accounting business within the Cities of Pasadena or Azusa, where the partnership offices are located. But neither subsection may validly be construed as enjoining defendant from serving clients, regardless of the location of their offices, unless defendant 'carries on' business with those clients in Pasadena or Azusa." (*Ibid.*, fn. omitted.) The analysis then turned to whether the departing partner had carried on business with clients in Pasadena and Azusa. The court invoked the common law concept of reasonableness to answer that question. (*Id.* at pp. 396–397.)

(*SingerLewak LLP v. Gantman* (2015) 241 Cal. App. 4th 610, 622-24 [bold emphasis added].)

02/26/2024

However, the Court cannot re-write the contract to comport with § 16602.5's "specified geographic area" in order to enforce the remainder of the non-compete covenants. That is because the geographic area is contractually not limited, and it would require the Court to devise a "specified geographic area" to which the parties did not agree.

> "We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." (*Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 59 [92 Cal. Rptr. 2d 597].) Courts may find an implied term in a contract only in limited circumstances" on grounds of " 'obvious necessity' " "where the term is 'indispensable to effectuate the expressed intention of the parties.' " (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 473 [47 Cal. Rptr. 2d 12] [declining to imply additional requirements into exclusive distributorship to give manufacturer flexibility to meet changing market conditions].)

(*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 361-362.)

In this regard, Bus. & Prof. Code, § 16600 applies to "every contract," which would include the subject contracts.

The Court agrees with Defendants, however, that Labor Code, § 925(a) would not apply because that only applies to contracts of employment entered into, modified, or extended on or after January 1, 2017.

The Court agrees with Defendants' argument that the internal affairs doctrine would normally apply, because the agreements at issue involve the termination of members' interests in the LLC. However, the specific issue—the non-compete effect of the covenants—implicates a public policy which gives California a more significant relationship to the issue than Missouri would have.

> " 'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' (*Edgar v. MITE Corp.* (1982) 457 U.S. 624, 645 [73 L. Ed. 2d 269, 102 S. Ct. 2629] [citation].)" (*Vaughn v. LJ Internat., Inc.* (2009) 174 Cal.App.4th 213, 223 [94 Cal. Rptr. 3d 166] (*Vaughn*).) " 'States normally" look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care.' " (*Vaughn, supra*, at p. 223.)

> "Matters falling within the scope of the [internal affairs doctrine] and which involve primarily a corporation's relationship to its shareholders

02/26/2024

include steps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares." (Rest.2d Conf. of Laws, § 302, com. a, p. 307; see *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442 [8 Cal. Rptr. 3d 56] (*State Farm*) [adopting the Restatement's definition of "internal affairs"].) "[I]t would be impractical to have matters of the sort mentioned in the previous paragraph, which involve a corporation's organic structure or internal administration, governed by different laws." (Rest.2d Conf. of Laws, § 302, com. e, p. 310.)

" 'The policy underlying the internal affairs doctrine is an important one ... : "Under the prevailing conflicts practice, neither courts nor legislatures have maximized the imposition of local corporate policy on foreign corporations but have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs.' " (*State Farm, supra*, 114 Cal.App.4th at p. 443.) Applying local law to the internal affairs of a foreign corporation " ' "produce[s] inequalities, intolerable confusion, and uncertainty, and intrude[s] into the domain of other states that have a superior claim to regulate the same subject matter." ' " (*Id.* at p. 444.)

**There is, however, a vital limitation to the internal affairs doctrine: "The local law of the state of incorporation will be applied ... *except where, with respect to the particular issue, some other state has a more significant relationship ... to the parties and the transaction*** ... ." (Rest.2d Conf. of Laws, § 309, italics added.) Indeed, "[t]here is no reason why corporate acts" involving "the making of contracts, the commission of torts and the transfer of property" "should not be governed by the local law of different states." (*Id.*, § 302, com. e, p. 309.)

(*Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 358-59 [bold emphasis added].)

In this regard, the Court finds that a California Court would apply California law, rather than Missouri law. The Court must now examine whether Missouri law differs from Bus. & Prof. Code, § 16600. In this regard, it appears that Missouri law is more flexible than § 16600, because an unreasonably broad non-solicitation clause will still be given effect, without giving effect to the unreasonable terms or modifying the terms of the contract to be reasonable:

02/26/2024

In balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. *Id.* "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* A non-compete agreement must be narrowly tailored temporally and [*842] geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable "only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Id.* The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space. *Id.*

Applied to this case, the non-compete agreements must be reasonable to be enforced against Mr. Kennebrew and Mr. Morgan. Specifically, the customer and employee non-solicitation clauses in Mr. Kennebrew's and Mr. Morgan's employment contracts and the clause prohibiting working for a competitor in Mr. Kennebrew's contract must be no more restrictive than necessary to protect Whelan's legitimate interests.

In balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. *Id.* "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* A non-compete agreement must be narrowly tailored temporally and [*842] geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable "only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Id.* The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space. *Id.*

Applied to this case, the non-compete agreements must be reasonable to be enforced against Mr. Kennebrew and Mr. Morgan. Specifically, the customer and employee non-solicitation clauses in Mr. Kennebrew's and Mr. Morgan's employment contracts and the clause prohibiting working for a competitor in Mr. Kennebrew's contract must be no more restrictive than necessary to protect Whelan's legitimate interests.

**Customer Non-solicitation Clauses Overbroad**

The customer non-solicitation clauses in this case prohibit Mr. Kennebrew and Mr. Morgan from soliciting Whelan's existing customers for a period of two years. The customer non-solicitation clauses also prohibit Mr. Kennebrew and Mr. Morgan, for a period of two years, from soliciting any

02/26/2024

prospective customers whose business was sought by Whelan during the last 12 months of their employment. As written, the customer non-solicitation clauses are more broad than necessary to protect Whelan's legitimate interest in customer contacts.

An employer has a legitimate interest in customer contacts to the extent it seeks to protect against "'the influence an employee acquires over his employer's customers through personal contact.'" *Id.* at 611 (quoting *Schmersahl, Treloar & Co. v. McHugh*, 28 S.W.3d 345, 349 (Mo. App. 2000)). A customer is "one who repeatedly has business dealings with a particular tradesman or business." *Silvers, Asher, Sher & McLaren, M.D.s Neurology, P.C. v. Batchu*, 16 S.W.3d 340, 345 (Mo. App. 2000); *see also Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 434 n.4 (Mo. App. 2008). Furthermore, an employee's ability to influence customers depends on the "quality, frequency, and duration of an employee's exposure to an employer's customers[, which is] crucial in determining the covenant's reasonableness." *Copeland*, 198 S.W.3d at 611. Other circumstances also may be relevant to this determination, including the amount and location of the employer's customers, as well as the former employee's position with the employer. *See Mid-States Paint & Chemical Co. v. Herr*, 746 S.W.2d 613, 617 (Mo. App. 1988) (analyzing the former employee's position and the location of the employer's customers).

Although restrictive covenants generally must be tailored narrowly in both temporal and geographic scope, courts have enforced customer non-solicitation clauses without a geographic limitation when other limitations to the prohibited conduct exist or when the employee had significant contact with a substantial number of the employer's customers. In *Mills v. Murray*, for instance, the court enforced a three-year customer non-solicitation clause with no geographic limitation for an employer located in 11 states when the prohibition extended only to customers with whom the former employee dealt within the last 12 months. 472 S.W.2d 6, 11-12 (Mo. App. 1971); *see also Nat'l Starch & Chem. Corp. v. Newman*, 577 S.W.2d 99, 104-05 (Mo. App. 1978) (enforcing a two-year customer non-solicitation clause that was limited to customers with whom employee dealt). In *Schott v. Buessinik*, the court enforced a 15-month customer non-solicitation clause with no geographic limitation and a prohibition against contacting any of the employer's customers when it was a small, local employer. 950 S.W.2d 621, 626-27 (Mo. App. 1997). Furthermore, in *Systematic Business Services, Inc. v. Bratten*, the court enforced a customer non-solicitation clause despite it having no geographic limitation, prohibiting contact with all of the employer's customers, and involving a national company, when the employee utilized extensive customer lists and had substantial and significant contact with the employer's customers throughout the nation. 162 S.W.3d 41, 51 (Mo. App. 2005).

02/26/2024

Similar to *Mills, Schott* , and *Bratten*, the customer non-solicitation clauses in this case have no limitation as to the geographic scope of the prohibition. Unlike those cases, however, there is no additional limiting language or circumstances in the case that otherwise would limit the scope of the restriction. The customer non-solicitation clauses prohibit contact with *any* customer of Whelan regardless of whether Mr. Kennebrew and Mr. Morgan knew it was Whelan's customer or previously dealt with that customer. Whelan is a large, national corporation with 38 branches in 23 states, and Mr. Kennebrew and Mr. Morgan were assigned to the Dallas and Nashville branches, respectively. While Mr. Kennebrew and Mr. Morgan had significant client contact in those areas and possibly in the Houston area, there are no disputed facts showing that they had significant contact with a substantial number of Whelan's customers throughout the nation such as to warrant a national prohibition. The customer non-solicitation clauses for existing customers, therefore, are unreasonably overbroad.

The customer non-solicitation clauses also prohibit Mr. Kennebrew and Mr. Morgan from soliciting Whelan's *prospective* clients it sought during the last 12 months of their employment. In *Copeland*, this Court questioned whether an employer has a legitimate interest in prospective customers:

It could be argued that preventing a former employee from seeking new customers in competition with his or her former employer goes beyond protecting the employer's interest and is overly restrictive. However, in many situations it may be difficult to distinguish between competition for new or existing customers.

198 S.W.3d at 611 (internal citations omitted). This statement accurately defines the scope of an employer's legitimate interest in customer contacts. Courts enforce non-compete agreements only to the extent they protect the employer from *unfair* competition, not from all competition by a former employee. *Id.* at 610-11 ("[F]reedom from all competition . . . , however lucrative it might be to [the employer,] is not to be protected against. He must be prepared to encounter that even at the hands of a former employee." (quoting *Herbert Morris, Ltd. v. Saxelby*, 1 A.C. 688, 702 (1916)).

The prospective customer non-solicitation clauses in this case prevent Mr. Kennebrew and Mr. Morgan from soliciting a business that Whelan sought as a customer in any of its 38 branches during the last 12 months of their employment. As a provider of security services, Whelan's prospective customers potentially could include any business that might benefit from increased security, from retail facilities and warehouses to corporate offices and apartments. Preventing Mr. Kennebrew and Mr. Morgan from

02/26/2024

soliciting any of Whelan's prospective customers throughout the nation would not protect Whelan from "'the influence an employee acquires over his employer's customers through personal contact'" but instead would protect it from competition altogether by Mr. Kennebrew and Mr. Morgan. Although it may be difficult or impossible in some circumstances to distinguish between prospective and existing customers, *id.* at 611, the non-solicitation clauses in this case broadly restrict all solicitation of Whelan's prospective customers regardless of how tenuous the relationship is between Whelan and the business or how detached the former employees were from the solicitation by Whelan. *Cf. Gelco Exp. Corp. v. Ashby*, 689 S.W.2d 790, 796 (Mo. App. 1985) (directing trial court to enter an injunction preventing a former employee from soliciting the employer's existing customers and those "which it solicited within six months prior to that date" in the territory in which the former employee was directly responsible for soliciting those customers); *see also Kessler-Heasley Artificial Limb Co. v. Kenney*, 90 S.W.3d 181, 187 (Mo. App. 2002). Accordingly, the provision restricting solicitation of Whelan's prospective customers reaches beyond that necessary to protect its legitimate interest in customer contacts.5

Although the customer non-solicitation clause in Mr. Kennebrew's and Mr. Morgan's employment contracts are unreasonably broad as written, "ordinary rules of contractual construction and enforcement are not necessarily applicable to non-compete agreements." *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 437 (Mo. App. 2008). The general purpose of non-compete agreements is to protect an employer from unfair competition without imposing an unreasonable restraint on the former employee. *Copeland*, 198 S.W.3d 604 at 611. "Protection of the employer, not punishment of the employee, is the essence of the law." *Id.* (quoting *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 247 (Mo. App. 1993)). Accordingly, when the provisions of a non-compete clause impose a restraint that is unreasonably broad, appellate courts still can give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable. *See Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. banc 1985) (enforcing a non-compete clause but refusing to enforce it to the extent it was unreasonable); *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 304 (Mo. App. 1980); *see also Superior Gearbox Co.*, 869 S.W.2d at 249.6

The provisions of the customer non-solicitation clauses that prohibit Mr. Kennebrew and Mr. Morgan from soliciting any existing Whelan customer or any prospective customer from the last 12 months, throughout the nation, are unreasonably broad under the circumstances. Based on the circumstances of the case, this Court modifies the customer non-solicitation clause to eliminate the provision prohibiting Mr. Kennebrew

02/26/2024

> and Mr. Morgan from soliciting existing Whelan customers except those customers with whom Mr. Kennebrew and Mr. Morgan dealt, respectively, during their employment. This Court also modifies the customer non-solicitation cause to eliminate the prohibition against solicitation by Mr. Kennebrew and Mr. Morgan of Whelan's prospective customers. Because the customer non-solicitation clauses are enforceable as modified, this Court must determine enforceability of the remaining non-compete agreements.

(*Whelan Sec. Co. v. Kennebrew* (2012) 379 S.W.3d 835, 841-44.)

The Court now applies the California law on mandatory forum selection clauses, in light of the foregoing discussion.

First, California courts will not defer to a forum selection clause "if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy." (Citations omitted.)" *(G Companies Management*, *supra*, 88 Cal.App.5th at 350.) Likewise, where to enforce a choice of law provision would "result in an evasion of a statute of the forum protecting its citizens." (*Id.* at 351.) Bus. & Prof. Code, § 16600 embodies such a public policy of this state:

> [W]e are of the view that California courts "have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." (*Scott v. Snelling and Snelling, Inc.* (N.D.Cal. 1990) 732 F. Supp. 1034, 1042.) Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect. We reject Andersen's contention that we should adopt a narrow-restraint exception to section 16600 and leave it to the Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint rule under section 16600.

(*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 949-50.)

Where unwaivable rights created by California statutes are involved, " 'the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually designated forum 'will not diminish in any way the substantive rights afforded … under California law.' (Citation omitted.)" *(G Companies Management*, supra, 88 Cal.App.5th at 350.)

Defendants' argument in the Reply brief that the Bus. & Prof. Code, § 16600 statutory right is procedurally (as opposed to substantively) waivable, citing the FEHA and UCL, is not persuasive. For instance, employment discrimination claims may be litigated in other forums if the forum provides comparable substantive rights:

02/26/2024

> An employer and an employee may validly agree to select a forum other than California, and may validly select the substantive law of another jurisdiction, *provided* the employee has an adequate remedy for his or her discrimination claim in the selected forum.

(*Olinick v. BMG Entertainment* (2006) 138 Cal. App. 4th 1286, 1305.)

Here, by contrast, Plaintiff is not seeking redress for a tort committed against him, but rather is seeking a declaration as to the effect of the contractual provisions which Defendants may seek to enforce against him. As discussed above, Missouri law would not offer him an adequate remedy as to the contractual restraint on a lawful profession, trade or business prohibited by Bus. & Prof. Code, § 16600.

In light of the above discussion, if the case were transferred to a Missouri court, Plaintiff would lose the benefit of Bus. & Prof. Code, § 16600. *(G Companies Management*, *supra*, 88 Cal.App.5th at 351.) As such, Defendants have not met their burden of demonstrating that a transfer to a Missouri court would not diminish in any way the substantive right afforded under Bus. & Prof. Code, § 16600.

As such, the Court finds that the forum selection clause should not be enforced. Defendants do not offer an alternative reason to transfer this action to Missouri. As such, the motion to dismiss or stay this action is DENIED.

FEB 23 2024
DATE

CHRISTOPHER K. LUI
JUDGE, LOS ANGELES SUPERIOR COURT

02/26/2024

# Exhibit 12

FILED
Superior Court of California
County of Los Angeles

MAR 01 2024

David W. Slayton, Executive Officer/Clerk of Court
By: K. Mason, Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

DEPARTMENT 53

| | |
|---|---|
| MARK RACUNAS;<br>Plaintiff,<br>vs.<br>LOCKTON COMPANIES, LLC – PACIFIC SERIES, et al.;<br>Defendants. | Case No.: 23STCV24054<br>Hearing Date: March 1, 2024<br>Time: 10:00 a.m.<br>~~[TENTATIVE]~~ **ORDER RE:**<br>(1) DEFENDANTS' MOTION FOR ORDER STAYING PROCEEDINGS PENDING RESOLUTION IN CALIFORNIA SUPREME COURT<br>(2) DEFENDANTS' MOTION TO DISMISS COMPLAINT AND/OR STAY ACTION ON GROUND OF FORUM NON CONVENIENS |

MOVING PARTIES: Defendants Lockton Companies, LLC – Pacific Series and Lockton Investment Advisors, LLC

RESPONDING PARTY: Plaintiff Mark Racunas

**(1) Motion for Order Staying Proceedings Pending Resolution in California Supreme Court**

**(2) Motion to Dismiss and/or Stay Action on the Ground of Forum Non Conveniens**

The court considered the moving, opposition, and reply papers filed in connection with each motion.

**REQUEST FOR JUDICIAL NOTICE**

The court grants defendants Lockton Companies, LLC – Pacific Series and Lockton Investment Advisors, LLC's requests for judicial notice, filed on January 4, 2024 in support of

their motion to stay proceedings pending resolution in California Supreme Court. (Evid. Code, § 452, subd. (d).)

The court grants defendants Lockton Companies, LLC – Pacific Series and Lockton Investment Advisors, LLC's requests for judicial notice, filed on November 27, 2023 in support of their motion to dismiss and/or stay action on ground of forum non conveniens. (Evid. Code, § 452, subd. (d).)

The court denies plaintiff Mark Racunas's request for judicial notice, filed on January 4, 2024, as to Exhibits 1-3 because rulings from other Superior Court departments cannot be cited as binding or persuasive authority and therefore those rulings are not relevant to a material issue presented by the pending motion to dismiss. (*Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 825 ["Any matter to be judicially noticed must be relevant to a material issue"].)

The court grants plaintiff Mark Racunas's request for judicial notice, filed on January 4, 2024, as to Exhibit 4. (Evid. Code, § 452, subd. (d).)

The court denies plaintiff Mark Racunas's supplemental request for judicial notice, filed on February 16, 2024, as to Exhibits 1 and 2 because rulings from other Superior Court departments cannot be cited as binding or persuasive authority and therefore those rulings are not relevant to a material issue presented by the pending motion to dismiss. (*Malek Media Group LLC*, *supra*, 58 Cal.App.5th at p. 825.)

The court denies plaintiff Mark Racunas's supplemental request for judicial notice, filed on February 16, 2024, as to Exhibit 3 because it is not relevant to a material issue presented by the pending motion to dismiss. (*Malek Media Group LLC*, *supra*, 58 Cal.App.5th at p. 825.)

The court denies plaintiff Mark Racunas's second supplemental request for judicial notice, filed on February 27, 2024, because a ruling from another Superior Court department cannot be cited as binding or persuasive authority and therefore it is not relevant to a material issue presented by the pending motion to dismiss. (*Malek Media Group LLC*, *supra*, 58 Cal.App.5th at p. 825.)

**BACKGROUND**

Plaintiff Mark Racunas ("Plaintiff") filed the operative First Amended Complaint in this action on October 26, 2023, against defendants Lockton Companies, LLC – Pacific Series ("Pacific Series") and Lockton Investment Advisors, LLC ("LIA") (collectively, "Defendants"). The First Amended Complaint alleges one cause of action for declaratory relief, requesting that the court issue a judicial declaration that, *inter alia*, he may freely and fairly compete against Defendants and that the restrictive covenants set forth in his agreements with Defendants are void and unenforceable under California law. (FAC ¶¶ 1-2.)

Now pending before the court are two motions filed by Defendants. First, Defendants move the court for an order staying proceedings pending the resolution of *Lockton Cos., LLC, et al. v. Superior Court of Los Angeles County*, pet. granted December 13, 2023, S282136 ("*Giblin*") by the California Supreme Court. Second, Defendants move the court for an order dismissing or staying this action on the ground of forum non conveniens.

**MOTION FOR STAY OF PROCEEDINGS PENDING RESOLUTION IN CALIFORNIA SUPREME COURT**

Defendants request that the court stay proceedings in this action pending resolution of *Giblin* by the California Supreme Court. (Def. RJN Ex. 1 [order granting petition for review in *Giblin*].) Plaintiff opposes Defendants' request, contending that he would be prejudiced by a stay. Plaintiff further asserts that, because the petition was granted on a grant-and-hold basis, the Supreme Court is unlikely to review the issues raised in *Giblin*. (Def. RJN Ex. 1 [stating that "[f]urther action in this matter is deferred pending consideration and disposition of a related issue in *EpicentRX v. S.C. (EpiRx)*, S282521 [citation], or pending further order of the court"]; Opp., p. 3:16-30.)

The court finds that it is not in the interests of justice and judicial efficiency to stay proceedings in this action pending resolution of *Giblin*. (*Freiberg v. City of Mission Viejo* (1995) 33 Cal.App.4th 1484, 1489 ["Trial courts generally have the inherent power to stay proceedings in the interests of justice and to promote judicial efficiency"].) The court acknowledges, as Plaintiff has pointed out, that the California Supreme Court has deferred

review of *Giblin* pending the disposition of *EpiRx* and therefore may not review and rule on the issues regarding the forum selection clauses at issue in this action and *Giblin*. The court further finds that Plaintiff would be unduly prejudiced by an indefinite stay of this action.

The court therefore exercises its discretion to deny Defendants' motion to stay proceedings in this action. (*Freiberg*, *supra*, 33 Cal.App.4th at p. 1489.)

**MOTION TO DISMISS OR STAY ON GROUND OF FORUM NON CONVENIENS**

Defendants move the court for an order dismissing or, in the alternative, staying this action pursuant to the doctrine of forum non conveniens.

"When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." (Code Civ. Proc., § 410.30, subd. (a).) "'Section 410.30 is a codification of the doctrine of forum non conveniens [citation], but the principles governing enforcement of a forum selection clause are not the same as those applicable to motions based on forum non conveniens. [¶] In California, "forum selection clauses are valid and may be given effect, in the court's discretion and in the absence of showing that enforcement of such a clause would be unreasonable." [Citation.] [¶] The burden of proof is on the plaintiff, and the factors involved in traditional forum non conveniens analysis do not control. [Citation.] "Instead, the forum selection clause is presumed valid and will be enforced unless the plaintiff shows that enforcement of the clause would be unreasonable under the circumstance of the case." [Citations.]'" (*Korman v. Princess Cruise Lines, Ltd.* (2019) 32 Cal.App.5th 206, 213.)

1. The Forum Selection Clauses are Mandatory

"In a contract dispute in which the parties' agreement contains a forum selection clause, a threshold issue in a forum non conveniens motion is whether the forum selection clause is mandatory or permissive." (*Animal Film, LLC v. D.E.J. Productions, Inc.* (2011) 193 Cal.App.4th 466, 471; *Korman*, *supra*, 32 Cal.App.5th at p. 215.) "A clause is mandatory if it requires the parties to litigate their disputes exclusively in the designated forum, and it is permissive if it merely requires the parties to submit to jurisdiction in the designated forum."

(*Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147, n. 2.) "A mandatory clause ordinarily is 'given effect without any analysis of convenience; the only question is whether enforcement of the clause would be unreasonable.' But, if 'the clause merely provides for submission to jurisdiction and does not expressly mandate litigation exclusively in a particular forum, then the traditional forum non conveniens analysis applies. [Citation.]'" (*Animal Film, LLC*, *supra*, 193 Cal.App.4th at p. 471.)

Defendants submit (1) the Amended and Restated Member Agreement entered into by and between Plaintiff and Pacific Series on May 1, 2016, and (2) the Member Agreement entered into by and between Plaintiff and LIA on September 18, 2018 (collectively, the "Agreements"). (Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 1; Mundy Decl., Ex. B, Member Agreement, p. 1.)

The Agreements include the following provision: "Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in [Pacific Series or LIA], including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of [the Other Series,] Affiliates and Lockton Entitles as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; *provided, however*, [Pacific Series or LIA] shall pay promptly, upon demand from time-to-time by Member, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 7.7 are fair and reasonable." (Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 12, ¶ 7.7, subd. (a) [emphasis in original]; Mundy Decl., Ex. B, Member Agreement, pp. 11-12, ¶ 7.7, subd. (a) [emphasis in original].)

The court finds that the forum selection clauses set forth in the Agreements are mandatory because they expressly state that (1) any disputes, claims, or issues arising out of or relating to the agreements "*shall* be brought *exclusively* in any Federal Court in Kansas City,

Missouri or in the Circuit Court of Jackson County, Missouri[,]" and (2) those courts "shall have *exclusive jurisdiction* over these matters[.]" (Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 12, ¶ 7.7, subd. (a) [emphasis added]; Mundy Decl., Ex. B, Member Agreement, pp. 11-12, ¶ 7.7, subd. (a) [emphasis added].) The court finds that this language "'clearly designates'" the federal court in Kansas City, Missouri and the Circuit Court of Jackson County, Missouri "'as the exclusive'" forums and therefore finds that the forum selection clauses are mandatory. (*Korman*, *supra*, 32 Cal.App.5th at p. 215 ["'To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one'"]; *Verdugo*, *supra*, 237 Cal.App.4th at p. 147, n. 2.)

The court further finds that the forum selection clauses apply to Plaintiff's action for declaratory relief. Plaintiff seeks a judicial declaration that he may freely and fairly compete against Defendants and that the restrictive covenants set forth in the Agreements are void and unenforceable under California law. (FAC ¶¶ 1-2, 69.) Thus, Plaintiff's action involves disputes or claims arising out or relating to the enforceability of certain provisions of the Agreements and is therefore encompassed by the forum selection clauses therein. (Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 12, ¶ 7.7, subd. (a); Mundy Decl., Ex. B, Member Agreement, pp. 11-12, ¶ 7.7, subd. (a).)

2. Plaintiff's Action Involves Unwaivable Statutory Rights

"'When a case involves a mandatory forum selection clause, it will usually be given effect unless it is unfair or unreasonable. [Citation.]'" (*Korman*, *supra*, 32 Cal.App.5th at p. 216.) "The party opposing enforcement of a forum selection clause ordinarily 'bears the "substantial" burden of proving why it should *not* be enforced.'" (*Verdugo*, *supra*, 237 Cal.App.4th at p. 147 [emphasis in original].) "That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually-designated forum 'will not diminish in any way the substantive rights afforded . . . under California law.'" (*Ibid.*, and at p. 145 ["the burden is reversed when the underlying claims are based on statutory rights the Legislature has declared to be unwaivable"];

*G Companies Management, LLC v. LREP Arizona, LLC* (2023) 88 Cal.App.5th 342, 350 [quoting *Verdugo*, *supra*, 237 Cal.App.4th at p. 147].)

As set forth above, Plaintiff seeks a judicial declaration that the restrictive covenants set forth in the Agreements are unenforceable pursuant to California law and, specifically, that they are void and unenforceable pursuant to Business and Professions code section 16600 and California's public policy in favor of employee mobility and open competition. (FAC ¶ 60.)

Section 16600 provides that, except as otherwise provided by statute, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600, subd. (a).) This statute "shall be read broadly, in accordance with *Edwards v. Arthur Anderson LLP* (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter." (Bus. & Prof. Code, § 16600, subd. (b)(1).)

In their reply, Defendants (1) assert that section 16600 does not set forth an express statutory anti-waiver provision, (2) assert that rights established thereunder, while substantively non-waivable, are not procedurally non-waivable, and (3) therefore contend that the burden of proof on the enforceability of a forum selection clause does not shift to Defendants, comparing the rights at issue in this action to those presented in cases alleged under the Fair Employment and Housing Act and the unfair competition law. (Reply, pp. 2:27-3:27.) The court disagrees.

As noted by Defendants, Civil Code section 3513 provides that "a law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.) "[S]ection 16600 evinces a settled legislative policy in favor of open competition and employee mobility[,]" "protects Californians[,] and ensures that 'every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.'" (*Edwards v. Arthur Anderson LLP* (2008) 44 Cal.4th 937, 946.) This statute "was adopted for a public reason[,]" and therefore the benefits provided thereby cannot be waived. (*Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659; *SingerLewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 620 ["At least one court has indicated [the rights established by section 16600] is an unwaivable right"].) Although the

court notes, as set forth above, that Defendants argue that the rights established by this statute are not procedurally unwaivable because it does not include an express non-waiver provision, the court construes the non-waiver provision in Civil Code section 3513, pursuant to the authorities cited above, to be an express non-waiver statute that applies to section 16600. (*Ibid.*)

Thus, the court finds that (1) the rights established by section 16600 are unwaivable, and (2) the burden therefore shifts to Defendants to show that litigating Plaintiff's claims in Missouri will not diminish the rights afforded to him under California law. (*Weber, Lipshie & Co.*, *supra*, 52 Cal.App.4th at p. 659; *SingerLewak LLP*, *supra*, 241 Cal.App.4th at p. 622; Civ. Code, § 3513; *Verdugo*, *supra*, 237 Cal.App.4th at p. 147.)

3. Enforcing the Forum Selection Clauses Would Diminish Substantive Rights Afforded to Plaintiff under California Law

"As explained above, a defendant seeking to enforce a mandatory forum selection clause [in an action based on unwaivable rights] bears the burden to show enforcement will not in any way diminish the plaintiff's unwaivable statutory rights. By definition, this showing requires the defendant to compare the plaintiff's rights if the clause is not enforced and the plaintiff's rights if the clause is enforced. Indeed, a defendant can meet its burden only by showing the foreign forum provides the same or greater rights than California, or the foreign forum will apply California law on the claims at issue." (*Verdugo*, *supra*, 237 Cal.App.4th at p. 157.)

The court finds that Defendants have not met their burden to show that the foreign forum (i.e., Missouri courts) provides the same or greater rights than California or that the foreign forum will apply California law on the claims at issue. (*Verdugo*, *supra*, 237 Cal.App.4th at pp.147, 157.)

First, the court notes that Defendants assert that it is equally likely that this court could determine that Missouri law applies and that a Missouri court could determine that California law applies. (Mot., p. 12:10-22.) However, this does not establish that the Missouri courts "*will* apply California law on the claims at issue." (*Verdugo*, *supra*, 237 Cal.App.4th at p. 157 [emphasis added].)

Second, the court notes that Defendants have argued that enforcing the forum selection clauses will not violate Labor Code section 925. (Mot., pp. 13:25-15:12; FAC ¶ 72 [alleging that the forum selection clauses are unlawful pursuant to Labor Code section 925].) Because Plaintiff has not raised this argument in opposition, the court does not address it in ruling on Defendants' motion.

Third, the court finds that litigating this action in Missouri will diminish substantive rights afforded to Plaintiff under California law because it appears that the restrictive covenants set forth in the Agreements would likely not be enforceable under California law but may be enforceable in Missouri.

The Amended and Restated Member Agreement and Member Agreement both provide that, for a period of two years following the sale of Plaintiff's producer unit, Plaintiff shall not do the following: (1) directly or indirectly, for himself or on behalf of any other person, "render services for any competitor of [Pacific Series or LIA], or any Other Series or Affiliate, as applicable," and further shall not interfere with any employee's relationship with Defendants; (2) "directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage," or attempt to do so, "any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by" Defendants; and (3) directly or indirectly, on behalf of himself or any other person, accept, serve, or work on any such competitive business from any such Customer Account, or in any way do business with any of the Customer Accounts that may not be solicited. (Mundy Decl., Ex. A, Amended and Restated Member Agreement, pp. 7-8, ¶¶ 5.3, 5.4; Mundy Decl., Ex. B, Member Agreement, pp. 7-8, ¶¶ 5.3, 5.4.)

The Agreements further state that the signee-member (i.e., here, Plaintiff) "acknowledges and agrees that the nature of the business" of Defendants "is carried on wherever a Customer Account is located . . . such that the restrictions imposed by [the Agreements] cannot be limited to a geographic location or region, and therefore, it is reasonable that the restricted activities are

not limited to a geographical scope or region; rather, they extend to any geographical location where the restricted activities are or reasonably could be conducted." (Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 9, ¶ 5.5; Mundy Decl., Ex. B, Member Agreement, ¶ 5.5.)

The parties do not appear to dispute that, under Missouri law, the restrictive covenants set forth above would likely be enforceable. "Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. [Citation.] 'A non-compete agreement is reasonable if it is no more restrictive than necessary to protect the legitimate interests of the employer.' [Citation.] A non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee.'" (*Whelan Sec. Co. v. Kennebrew* (2012) 379 S.W.3d 835, 841-842.) Thus, because the Agreements include language purporting to establish the reasonableness of the scope of the restrictive covenants, a Missouri court may enforce those covenants against Plaintiff. (*Ibid.*; Mundy Decl., Ex. A, Amended and Restated Member Agreement, p. 9, ¶ 5.5; Mundy Decl., Ex. B, Member Agreement, ¶ 5.5.)

In contrast, a California court would be unlikely to enforce the restrictive covenants pursuant to Business and Professions Code sections 16600 or 16602.5. (Mot., p. 7:24-25 [asserting that section 16602.5 applies to the covenants here].)

"[U]nless a contractual restraint falls into one of section 16600's three statutory exceptions (§§ 16601 [sale of goodwill or interest in a business], 16602 [dissolution of a partnership], or 16602.5 [dissolution or sale of limited liability company], it ostensibly is void." (*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 935.) The exception set forth by Business and Professions Code section 16602.5 is as follows: "Any member may, upon or in anticipation of a dissolution of, or the termination of his or her interest in, a limited liability company (including a series of a limited liability company formed under the laws of a jurisdiction recognizing such a series), agree that he or she or it will not carry on a similar business within a specified geographic area where the limited liability company business has been transacted, so long as any other member of the limited liability company, or any person

clause is unreasonably broad, "courts can still give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable"].)

Thus, the court finds that Defendants have not met their burden to show that litigating Plaintiff's claims in Missouri will not diminish the substantive rights afforded to him under California law because it appears that the restrictive covenants at issue in this case (1) would be determined to be unenforceable and void under California law, but (2) would be determined (or modified) to be enforceable in Missouri. (*Verdugo*, *supra*, 237 Cal.App.4th at p. 147.) The court therefore exercises its discretion to deny Defendants' motion to dismiss or stay this action pursuant to the doctrine of forum non conveniens.

**ORDER**

The court denies defendants Lockton Companies, LLC – Pacific Series and Lockton Investment Advisors, LLC's motion for order staying proceedings pending resolution in California Supreme Court.

The court denies defendants Lockton Companies, LLC – Pacific Series and Lockton Investment Advisors, LLC's motion to dismiss and/or stay this action on the grounds of forum non conveniens.

The court orders plaintiff Mark Racunas to give notice of this ruling.

IT IS SO ORDERED.

DATED: March 1, 2024

Robert B. Broadbelt III
Judge of the Superior Court

# Exhibit 13

22STCV01285

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Armen Tamzarian

Electronically FILED by Superior Court of California, County of Los Angeles on 01/12/2022 11:35 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
MATTHEW D. CAPLAN (260388)
(mcaplan@cooley.com)
3 Embarcadero Center
20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

GREGORY C. TENHOFF (154553)
(tenhoffgc@cooley.com)
AMANDA A. MAIN (260814)
(amain@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Plaintiffs
LOCKTON COMPANIES, LLC - PACIFIC SERIES; PAUL RODRIGUEZ; and MICHAEL R. SZOT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

LOCKTON COMPANIES, LLC - PACIFIC SERIES, a series of a Missouri series limited liability company; PAUL RODRIGUEZ, an individual; and MICHAEL R. SZOT, an individual,

Plaintiffs,

v.

AON RISK INSURANCE SERVICES WEST, Inc., a California Corporation; AON PLC, an Ireland public limited company; AON GROUP, INC., a Maryland Corporation; AON CORPORATION, a Delaware Corporation; and DOES 1 through 50 inclusive,

Defendants.

Case No. 22STCV01285

**COMPLAINT FOR:**
**(1) DECLARATORY RELIEF; AND**
**(2) UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS ACTS AND PRACTICES (BUS. & PROF. CODE, § 17200 ET. SEQ.)**

## INTRODUCTION

1. Employee mobility is an essential and fundamental California public policy, rooted for over a century in California's statutory prohibition against restrictive covenants. Defendant Aon,[1] an insurance brokerage firm, knows this, yet has intentionally sought to deprive its California employees of the right to seek new employment with competitors in the marketplace by imposing patently unlawful restrictive covenants despite previous rulings by California courts striking down the same or similar Aon covenants. In so doing, Aon is competing unfairly and seeking to chill employee mobility.

2. California's strong public policy favoring employee mobility and open competition is a fundamental right for California citizens. For this reason, it is black letter law that restrictive covenants that restrict or prohibit free competition, specifically including client non-solicitation and non-servicing provisions applied to California employees, are unenforceable. *See* Cal. Bus. & Prof. Code §16600; *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008).

3. Section 16600's fundamental rights are not waivable. *See* Cal. Bus. & Prof. Code § 16600 (contract purporting to waive rights under Section 16600 is void); *Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 659 (1997) ("Business and Professions Code section 16600 was adopted for a public reason. It follows that [the employee] could not by agreement waive the benefit afforded under California law."). Thus, employers may not evade these rights by requiring their employees to sign agreements that contain restrictive covenants governed by another state's laws and be subject to arbitration. *See Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881 (1998).

4. Instead of complying with California law, Aon devised a scheme to circumvent it, thereby trapping its California employees and depriving them of their fundamental rights of employee mobility under California law. As a result, Aon has no incentive to treat its employees on par with its competitors.

---

[1] Defendants in this action are Aon plc, Aon Risk Insurance Services West, Aon Group Inc., and Aon Corporation (hereinafter collectively referred to as "Aon").

5. Aon's scheme to restrict California employees who wish to leave for other opportunities from openly competing in the marketplace involves the use of Restricted Stock Unit Agreements ("RSU Agreements") that represent a significant portion of compensation for senior employees at Aon. In order to obtain such compensation, employees are required to sign these RSU Agreements on a take-it-or-leave-it basis. These adhesion RSU Agreements contain unlawful restrictive covenants along with unconscionable arbitration provisions directing the use of Illinois law and requiring that these California matters involving California residents and employees be litigated (arbitrated) in an Illinois forum. In other words, Aon's strategy is to avoid a California court like this one at any cost.

6. Aon has previously litigated the enforceability of these illegal restrictive covenants in California and lost. However, rather than ceasing its unlawful behavior, and respecting what it must understand to be clear California law, Aon concocted this elaborate scheme to attempt to circumvent these rulings, some of which are preclusive, and to make a mockery of California fundamental public policy. Worse, unlike with employees residing in other states, Aon seeks to compel arbitration of its illegal restrictive covenants, and thereby tie up any California litigation over these matters with automatic appeal rights if arbitration is denied and by seeking a stay of any injunction entered by the courts. If allowed, the net effect is simple but devastating to its California employees: Aon could use Illinois law to block those departing California employees from moving to competitors in California and freely competing, in complete disregard for California's fundamental public policy supporting free employee mobility in the workplace, and further force these California employees to arbitrate disputes in Illinois under Illinois law. Aon's scheme represents a uniquely punitive combination of burdens imposed on California employees specifically designed to evade Section 16600. Indeed, examples of non-California Aon employee RSUAs show that Aon often does not require arbitration at all for non-California employees.

7. Plaintiffs Paul Rodriguez ("Rodriguez") and Michael R. Szot ("Szot") are Aon's latest victims. Rodriguez and Szot are California residents, who worked for Aon in California for

many years in the construction insurance and surety groups.[2] A significant portion of both Rodriguez and Szot's total compensation has been paid through RSUs. Aon presented these RSUs in the form of take-it-or-leave-it agreements containing restrictive covenants that are illegal under California law. Most egregiously, the covenants include post-employment prohibitions on soliciting, ***accepting business from and servicing*** former clients. These agreements impede the rights of California employees to choose where they want to work and to freely compete in the insurance and surety marketplace—which California law and fundamental public policy makes clear they must be allowed to do. These agreements also deprive clients of their broker of choice and hinder the ability of competitors (like Plaintiff Lockton) from competing fairly.

8. Aon's large bureaucracy and failure to respond nimbly to the needs of employees and clients has led to wave after wave of en masse employee exoduses over the last decade. Aon has responded by doubling down on the problem: for example, failing to fill open positions with qualified candidates, refusing to provide certainty about roles to executives and teams, and gaining the dubious distinction of being the only major brokerage firm to impose mass salary cuts during the COVID pandemic. Needless to say, none of this helped morale. This instability was compounded by the disintegration of an anticipated merger with another large competitor after 16 months of Department of Justice scrutiny, leaving Aon employees uncertain about their future, their positions, their leadership and the path ahead. To add insult to injury, Aon ultimately paid that competitor a $1 billion termination fee while Aon's leaders were begging for, and not receiving, sufficient money to retain qualified employees.

9. Rodriguez and Szot each held leadership roles at Aon and helped the company rebuild many times over after groups of employees left for other brokerages.

10. In January 2022, after years of dissatisfaction at Aon, Rodriguez and Szot chose to exercise their fundamental right of employment mobility, and left Aon to work for Lockton

---

[2] The construction insurance department assesses risk for construction projects and produces tailored insurance packages to cover them. The surety department issues surety bonds to construction projects to ensure that the project is completed within the terms of the contract. The surety bond assists, in part, with any cash flow problems that the contractor may have while completing the project.

Companies, LLC – Pacific Series ("Lockton" or the "Pacific Series") in California.

11. Lockton is part of a privately held insurance brokerage firm, providing insurance, risk management and employee benefits services to clients in California and across the world. Lockton prides itself on hiring the best talent, which makes for the best service and the most satisfied clients. Lockton chose to hire Szot and Rodriguez because of their skills and general experience, and because of the excellent fit of these two individuals with their existing team.

12. But Lockton's ability to compete freely (as it is entitled to do under California law) is dependent on others playing fairly as well. Lockton is happy to go toe-to-toe in the marketplace with Aon, where the best brokerage firm may succeed. Aon, however, has chosen a different path—designed to hamstring its competition by unfairly and unlawfully preventing it from assembling its desired team and from serving the clients that wish to follow their preferred brokers.

13. This unlawful practice has significant deleterious effects. Plaintiffs Szot and Rodriguez are put to a Hobson's choice. They can remain at Aon forever, dissatisfied and held prisoner by unlawful post-employment restrictions. Or they can leave but face the constant specter of a frivolous lawsuit or losing business over the threat of such a lawsuit (as Aon has repeatedly done in the past toward departing employees). For Lockton's part, it faces the same dilemma: if it dare chooses to hire talented Aon employees in California, it will suffer an unfair competitive scheme resulting in lawsuits in Illinois in contravention of settled California law and policy.

14. Fortunately, California does not require Plaintiffs to make such impossible decisions. This State demands free and fair competition and forbids the enforcement of covenants that would purport to direct otherwise. Aon may think it is above California law, but it chose to conduct business in California and employ California residents, and it must abide by the law and policy applicable here. Plaintiffs come to court to shine a light on Aon's sordid practice and ask the Court to immediately enjoin Aon's illegal gambit to elude California's clear and unequivocal prohibition against hindering employee mobility.

15. Plaintiffs bring this lawsuit seeking declaratory relief, damages, equitable relief and injunctive relief for Defendant Aon's violations of, among other things, California Business and Professions Code Sections 16600 and 17200, arising from Defendants' unlawful efforts to restrain


COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiffs from exercising their inalienable rights as California citizens, employees, and employer to engage in their chosen profession and lawfully compete. Should Aon seek to arbitrate this dispute, the Illinois choice of law and venue provisions in Section 10 and 11 of the RSU Agreements must be severed and arbitration be permitted to go forward in California under California law. Plaintiffs are filing contemporaneously herewith an application for an *ex parte* temporary restraining order seeking the relief specified herein, which they seek to have heard at the earliest practicable time consistent with the court's filing system and local rules with respect to such matters.

**PARTIES**

16. Plaintiff Lockton Companies, LLC - Pacific Series is a series of Lockton Companies, LLC, a Missouri series limited liability company ("Lockton Companies") under the Missouri Limited Liability Company Act, Chapter 347 of the Missouri Revised Statutes, which governs the relationship between and among Lockton Companies and each of its series. There are currently eight (8) operating series of Lockton Companies including the Pacific Series. The Corporate Member of Lockton Companies and the Pacific Series is another limited liability company, Lockton Insurance Agency, LLC. The only member of Lockton Insurance Agency, LLC is another limited liability company, Lockton Operating Companies, LLC. The only member of Lockton Operating Companies, LLC is another limited liability company, Lockton Partners, LLC. Lockton Partners, LLC is composed of individual members who are citizens of certain states, including California and Maryland.

17. Plaintiff Paul Rodriguez is a former employee of Aon Risk Insurance Services West, Inc. ("ARS West"), and is and at all times mentioned herein was residing and working in California. He previously resided and worked in San Francisco, California and is currently residing and working in Los Angeles, California. Rodriguez is currently an Executive Vice President and National Surety Growth Leader at Lockton, residing and working in Los Angeles, California.

18. Plaintiff Michael R. Szot is a former employee of ARS West and is, and at all times mentioned herein was residing and working in the Los Angeles, California area. Szot is currently Executive Vice President – Managing Director of Lockton's Construction Practice, working in Los

Angeles, California.

19. Plaintiffs are informed and believe that ARS West, formerly known as Aon Risk Services Inc., is a California corporation with its principal place of business in Chicago, Illinois. ARS West is a full-service insurance agency providing a range of insurance and surety products to clients, and at all times mentioned herein was, and is, licensed and authorized to do business in the State of California pursuant to and under the protection of the laws of California, and with offices located throughout California, including in Los Angeles.

20. Plaintiffs are informed and believe, and on that basis allege, that Defendant Aon plc is a public limited company incorporated under Irish law. Aon plc is the signatory to some of Rodriguez and Szot's Restricted Stock Unit Agreements. Plaintiffs are further informed and believe, and based thereon allege that ARS West is an affiliate and subsidiary of Aon plc.

21. Plaintiffs are informed and believe and, on that basis allege, that Defendant Aon Corporation is a Delaware corporation with its principal place of business in Chicago, Illinois. Aon Corporation is a signatory to some of Rodriguez and Szot's Restricted Stock Unit Agreements.

22. Plaintiffs are informed and believe and, on that basis allege, that Defendant Aon Group, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland, and is a subsidiary of Aon plc and affiliate or parent entity of ARS West. Aon Group, Inc. is the signatory to some of Rodriguez and Szot's Restricted Stock Unit Agreements.

23. Defendant DOES 1 through 50, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs at this time. Plaintiffs are informed and believe, and based thereon allege, that each of the said fictitiously named defendants is legally responsible in some manner for the events, acts, occurrences, and liabilities alleged and referred to herein. Plaintiffs will seek leave to amend this Complaint to insert the true names and capacities of said DOE defendants when the same has been ascertained.

24. Plaintiffs are informed and believe, and based thereon allege that all times herein mentioned, each of the Defendants was an agent, partner, successor, joint venturer, aider and abettor of, or engaged in a joint enterpriser with, each of the remaining Defendants, was acting within the course and scope of said agency, service, joint venture, joint enterprise at all times, and was aiding

and abetting such entities and operations. Any reference in the Complaint to "Defendants" shall include each and every DOE Defendant.

## FACTUAL ALLEGATIONS

### A. The Construction Insurance and Surety Brokerage Industry.

25. Aon and Lockton are both insurance brokerage companies that work to assess risk and provide creative insurance packages for clients across numerous industries. Rodriguez and Szot built their careers on their skills and knowledge in the industry and their reputations as seasoned construction industry surety and insurance experts.

26. Before starting a new construction project, engineering firms, construction companies and contractors must work with an insurance brokerage to assess the risks presented by the project. Insurance brokers, like Szot, evaluate and then broker individualized insurance coverage for the project. Because having proper insurance in place is required to run such clients' businesses and undertake the construction projects that sustain those client businesses, clients rely on the expertise and skill of their broker for their repeat needs.

27. Contractors and developers are also required to obtain surety bonds to bid on a project and ensure the performance of the job. Contractors rely on their brokers to timely recommend and obtain the correct surety bonds needed for new projects.

28. Plaintiff Rodriguez worked at Aon for almost 20 years, having been recruited to Aon from a competing broker (Marsh McLennan) in 2003. At all relevant times, he has been a California resident, been based in California, and maintained his resident insurance brokers license in California. The majority of clients with which Rodriguez worked are headquartered in California.

29. Plaintiff Szot worked at Aon for nearly fifteen years, as a producer and manager specializing in construction insurance. At all relevant times, he has been a California resident, been based in California, and maintained his resident insurance broker license in California. The majority of clients with which Szot worked are headquartered in California.

30. Rodriguez and Szot both focus on serving clients, primarily in the construction industry. Rodriguez specializes in surety, and Szot in construction insurance. They work with contractors and developers to understand their projects' specific needs, and rely on their skill,

judgment, knowledge of the industry, and expertise to meet their clients' goals.

B. **Plaintiff Paul Rodriguez and Michael R. Szot Become Dissatisfied at Aon.**

31. Over the course of their collective nearly four decades at Aon, Rodriguez and Szot each held multiple leadership positions in the insurance and surety departments. Despite their best efforts, large groups of employees repeatedly left for other brokerages such as Alliant and Marsh. As a result of their leadership positions, Rodriguez and Szot were repeatedly tasked with trying to rebuild teams after mass departures.

32. Each time Rodriguez or Szot was called in to rebuild a branch, they had to reassure worried clients, train new employees, and lift team morale, and each time that enhanced Aon's profitability. But the constant instability grated on them.

33. For example, Aon failed to fill many of the empty positions left behind by the departures with qualified candidates and refused to give Rodriguez and Szot the resources to do so. The constant turnover and departure of experienced team members meant scrambling to salvage clients and training new employees from the ground up – only to have them too, leave, after garnering sufficient training to become valuable in the marketplace.

34. In the spring of 2020, Aon gained the dubious distinction of becoming the only brokerage firm to cut its employees' salaries in response to COVID-19. Aon cut 70% of its global workforces' salaries by approximately 20%. At a time where everyone in the company (and the world) was looking for support from those around them, Aon left its employees to fend for themselves.

35. This past year, a prospective merger Aon had announced with Willis Towers Watson ("Willis")—another major, global insurance brokerage firm—failed. Rodriguez, Szot, and their colleagues worked to plan for a newly-merged world. But the deal was soon tied up in 16 months of anti-trust challenges from the United States Department of Justice and other antitrust regulators around the world, which meant 16 months of uncertainty for Aon employees about their jobs and their futures. Then, the deal fell apart in the summer of 2021, with Aon paying a $1 billion termination fee and Aon employees left with even greater uncertainty about the plan forward and the management team that would be left in place.

36. On January 12, 2022, after years of frustration, Rodriguez and Szot resigned, and notified Aon they would be joining Lockton's Pacific Series, consistent with their freedom to move under California law.

### C. California's Fundamental Public Policy Prohibits Restrictive Covenants.

37. As longtime California residents, Plaintiffs Szot and Rodriguez are entitled to work at the brokerage of their choosing, without unfair interference or restriction, using the skill, expertise, and general knowledge that they each have developed over their decades in the industry.

38. Having grown dissatisfied with working at Aon, Szot and Rodriguez should be able to leave their jobs and join a company that is a better fit with their personalities, skills, growth potential, and goals and would thereby better serve their customers. Lockton's Pacific Series is entitled to hire the employees of their choosing in California, free from unfair and illegal interference by former employers.

39. California law and policy emphatically favor employees' rights to engage in any lawful trade or business, and the state prides itself on fostering an environment that welcomes and supports open competition.

40. California's fundamental public policy favoring an employee's right to engage in any lawful trade or business has been codified by the state since 1872. Business and Professions Code Section 16600 provides: "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." This statute reflects the ideal in California that employee mobility and open competition are paramount rights that an employer must respect.

41. California Courts have confirmed beyond any doubt that Section 16600 should be interpreted broadly, holding that it forbids not only absolute prohibitions on the exercise of a profession, trade, or business, but also invalidates restrictive covenants such as client non-solicitation provisions. *See e.g., Edwards*, 44 Cal. 4th at 945, 948 ("In the years since its original enactment [in 1872] as Civil Code section 1673, our courts have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility. The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful

employment and enterprise of their choice.' It protects 'the important legal right of persons to engage in businesses and occupations of their choosing.'") (citations omitted).

42. Under California choice of law principles, the fundamental nature of Section 16600 means that, in most if not all circumstances, attempts by employers to evade this public policy by requiring employees to submit to foreign law or venue that would be less protective of their rights will not be enforced. *See, e.g., Application Grp., Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881 (1998). The Legislature then supplemented this already robust framework by implementing, in 2017, California Labor Code Section 925, which imposes a prohibition on foreign choice of law and venue provisions in certain employment contracts.

**D. <u>Aon's Unlawful Scheme to Prevent California Employees from Changing Jobs</u>.**

**1. Aon Tries to Impose Illegal Non-Solicits in RSU Agreements but Loses in California Court.**

43. Aon has long known that its California employees were entitled to these protections under California law, and has long understood the fundamental nature of this policy. Rather than abide by the law, and compete fair and square in the marketplace, however, Defendants conspired to develop a strategy to evade California law and to unlawfully restrict its California employees from freely competing should they leave Aon.

44. Initially, Aon embedded these non-competition covenants in its general employment contracts. For instance, Szot's 2007 Employment Agreement stated that for a period of two years after the end of his tenure at Aon, he could not "compete directly or indirectly in any way with the Business," and that—notwithstanding the fact that Szot resided and worked in California—the agreement was governed by Illinois law "without regard to the conflict of law principles, rules or statutes of any jurisdiction." That agreement has long since expired, but nevertheless reflects Aon's practices at the time—which even then flew directly in the face of California law.

45. Knowing that it could not blatantly bind California employees to a choice-of-law provision that would gut their rights under Section 16600, by 2021, Aon had revised Szot's Employment Agreement to state that California law governed the agreement and provided Rodriguez with a retention agreement (which was subject to the closing of the Willis merger)

governed by California law as well.

46. Aon instead attempted to dodge Section 16600 by placing restrictive covenants, such as provisions prohibiting the solicitation or servicing of clients (hereinafter, "Client Non-Competes"), in Restricted Stock Unit Agreements ("RSU Agreements") that employees must sign to receive significant portions of their compensation. For example, the Client Non-Competes in the RSU Agreements require that employees shall not, for a period of two years following their termination, "directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type of kind as the Business performed by Aon . . . ." These agreements are naked violations of Section 16600.

47. Notwithstanding their intended application for California residents, Aon intentionally drafted these RSU Agreements to sidestep California law by including a choice of law provision stating that Illinois law—which provides significantly less protection for an employee's right to mobility—governs the agreement. Aon also began including in the RSU Agreements forum-selection clauses stating that any litigation would take place in Illinois, evidently as a response to California court decisions that refused to enforce choice-of-law clauses inconsistent with an employee's rights under Section 16600.

48. Aon knew that its restrictive covenants, including the Client Non-Competes, violated California law and, therefore, made every effort to keep California courts from evaluating the enforceability of these RSU Agreements, and from ruling that they are void and unenforceable under California law.

49. Despite Aon's efforts to keep these provisions from being adjudicated in California, former employees sued Aon in California on multiple occasions seeking declaratory relief that such provisions were unenforceable and injunctive relief that prevented Aon from enforcing its restrictive covenants. Consistent with clear California law, California courts have repeatedly agreed, striking down Aon's restrictive covenants as void and unenforceable.

50. For example, in 2011, a group of employees left Aon to join Alliant Insurance Services—one of many examples in which Plaintiffs Szot and Rodriguez were left to pick up the pieces. Aon had imposed on these employees unlawful non-compete provisions in a number of

their stock and employment agreements. The agreements purported to be governed by Illinois choice of law and forum selection provisions. In order to exercise their rights as California citizens, the former Aon employees and Alliant filed an action against Aon in Los Angeles Superior Court, asserting claims arising from Aon's use of covenants not to compete with California employees in violation of Sections 16600 and 17200, *et seq.* *See Arkley v. Aon Risk Servs. Cos.* (Los Angeles Superior Court Case No. BC463382). Aon subsequently removed the case to federal court where the court ruled against Aon and in favor of the former employees and their new employer, finding that (1) the covenants not to compete were governed by California law, (2) the covenants not to compete were void and unenforceable under California Business and Professions Code §16600, and (3) Aon's use of illegal non-compete agreements violated the UCL as a matter of law. *See Arkley v. Aon Risk Servs. Companies, Inc.*, No. CV 12-1966 (C.D. Cal. 2012) (June 13, 2012 Order).

51. Although the court's judgment in *Arkley* resulted in a final judgment on the merits and Aon had the full and fair opportunity to vigorously litigate these issues, Aon persisted in its efforts to evade California law, and to illegally restrain employee mobility and competition.

52. As another example, in 2014, ten former Aon producers successfully challenged Aon's unenforceable client non-solicitation provisions in the RSU Agreements. *See Baldwin v. Aon Risk Services Cos.* (Fresno Superior Court Case No. 14CECG00572). Similar to the *Arkley* action, former Aon employees and Alliant filed an action against Aon in Fresno Superior Court, asserting claims arising from Aon's use of covenants not to compete with California employees in violation of Sections 16600 and 17200, *et seq.*

53. In October 2015, the California court in *Baldwin* granted summary adjudication holding that: "The covenants not to compete contained in the [RSU Agreements] are unenforceable pursuant to Business and Professions Code section 16600."

54. The California Superior Court also concluded that the restrictive covenants should be governed by California law notwithstanding the Illinois choice of law clause in the former employee's agreements. The order stated:

> [P]arties cannot avoid Business and Professions Code section 16600 by including provisions designating another state's law as governing their employment agreement. ***The 'strong public policy' underlying***

> ***section 16600 overrides any contractual provision designating another state's law as controlling as to the validity of a non-compete clause.***

(Oct 16, 2015 Order) (internal citations omitted) (emphasis added).

55. Following summary adjudication, the *Baldwin* court held a jury trial on plaintiffs UCL claim, and on defendants' cross-complaints. In its final July 12, 2017 Judgment and Statement of Decision, the court found that Aon's assertion of the restrictive covenants also constituted unfair competition in violation of California Business and Professions Code Section 17200.

56. The court's judgment in *Baldwin* resulted in a final judgment on the merits and Aon had a full and fair opportunity to vigorously litigate these issues. The issues decided by the court in *Baldwin* are identical to those being challenged here. The court in *Baldwin* also awarded the former Aon employees their attorneys' fees.

57. Yet again, in 2016, another former Aon employee, Michael Heffernan, successfully challenged Aon's unlawful Client Non-Compete provisions in the RSU Agreements. *See Heffernan v. Aon Risk Services Cos.* (Santa Clara County Superior Court Case No. 16CV29077).

58. In October 2017, following a bench trial, the California Superior Court entered a judgment in favor of former Aon employee Heffernan. The court held once again that Heffernan's RSU Agreement was governed by California law and that California was the proper forum to hear disputes relating to the agreement. The court concluded that the Illinois choice of law and forum selection clauses in the agreement would effectively eviscerate California public policy and deprive Heffernan of having a California court determine his rights and obligations under the agreement.

59. The Court also granted Heffernan's request for declaratory relief and held that Aon's non-compete provisions were unenforceable, null and void. With respect to the enforceability of the non-competes, the court stated:

> The covenants at issue purport to prohibit Heffernan, for a period of two years after the termination of his employment, from directly or indirectly calling upon, soliciting, accepting, engaging in, servicing or performing any business of the same type of kind as the business performed by Aon with respect to certain clients or prospective clients with whom he worked at Aon.
>
> Even narrowly drawn covenants not to compete are invalid, under California law. (See *Edwards v. Arthur Anderson LLP, supra,* 44

> Cal. 4th at pp. 948, 950) [declaring similar noncompete provision invalid and noting that '[s]ection 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it would have included language to that effect'].) The covenants at issue are therefore void and unenforceable pursuant to Business & Professions Code section 16600.

60. The court's judgment in *Heffernan* resulted in a final judgment on the merits and Aon had a full and fair opportunity to vigorously litigate these issues. Additionally, as will be discussed below, the Client Non-Compete found unenforceable by the court in *Heffernan* is identical to that being challenged here.

**2. Notwithstanding its Court Losses, Aon Begins to Use an Arbitration Clause to Try to Avoid California Law and Adverse Rulings.**

61. Having suffered several adverse court rulings, Aon went back to the drawing board to concoct another method of evading California law. Apparently, it was unwilling to leave its fate in the hands of California courts which would likely tell Aon what it already knew: its contracts were illegal, and it was competing unfairly.

62. Aon's solution: arbitration. On information and belief, Aon decided that if it could not enforce these restrictive provisions in California courts, then it would stay out of court all together and require that any dispute involving California employees and relating to the restrictive covenants in the RSU Agreements be resolved exclusively by arbitration in Chicago, Illinois under Illinois law.

63. Here is how the plan was to work: When a California employee filed an action in California, Aon would immediately file an arbitration in Illinois seeking to enforce the restrictive covenant and seeking a Temporary Restraining Order or Preliminary Injunction enforcing the agreement. Aon would then move to compel the California proceeding to arbitration and/or stay the California action pending the arbitration. With the California lawsuit dismissed or on hold, Aon is free, at that point, to proceed with its arbitration under Illinois law, safe in the knowledge that it will not have to contend with California's clear law and fundamental policy. Similarly, if the California court denied Aon's petition to compel arbitration, Aon might seek an immediate interlocutory appeal and ask for a mandatory stay of the court proceedings (presumably even including any injunctive relief the court had already issued); the net effect being again to force

California employees working in California to arbitrate the restrictive covenant issues in Illinois under Illinois law. This scheme, clever and mendacious as it may be, nonetheless runs directly afoul of Section 16600 and the law of unconscionable contracts.

64. Aon's playbook has played out on public court dockets repeatedly in the last few years as Aon has attempted to execute this scheme and strategy on multiple groups of California-based employees. But Aon should know better. It has already lost multiple times in California courts on these issues, with rulings that became final judgments. As both a legal and equitable matter, Aon should be precluded from seeking to enforce these unlawful covenants at this point.

65. To that end, Aon is a sophisticated company armed with experienced counsel that understands the nuances of California law (indeed—that is *why* it has designed its restrictive covenant agreements in the way it has). Yet it continues to impose these provisions on California employees—flying in the face of law and fundamental public policy.

66. Aon's strategy of using a combination of choice of law, choice of venue, and arbitration provisions is also substantively and procedurally unconscionable. The Agreement also purports to require the arbitrator to make determinations regarding arbitrability. It amounts to unlawful forum shopping and would allow Aon to side-step California law and public policy and effectively hold their former employees prisoner. In short: it is textbook unfair competition.

### 3. Rodriguez and Szot's Aon Agreements Contain the Same or Similar Unlawful Restrictive Covenants that Aon Knows to be Unlawful

67. Plaintiffs Paul Rodriguez and Michael R. Szot are the latest victims of Aon's illegal scheme.

68. Several years ago, Aon began requiring Szot and Rodriguez to sign RSU Agreements as a condition to receiving their full compensation. These RSUs comprised a material percentage of both Szot and Rodriguez's total compensation.

69. The RSU Agreements at issue contain restrictive covenants that not only are clearly illegal under California law, but also are materially indistinguishable from the agreements deemed unenforceable in prior California final judgments as described above.

70. Neither Szot nor Rodriguez was represented by counsel in connection with the

execution of the RSU Agreements. They were presented on a take-it-or-leave-it basis, with no opportunity or ability to negotiate the terms. In the process of electronically accepting the RSUs, the employees electronically agreed to the RSU Agreements.

71. Starting in 2018, the RSU Agreements required Szot and Rodriguez to acknowledge "that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent arbitration brought by Aon to enforce" the restrictive covenants therein. Therefore, Aon Risk Insurance Services West, a California entity, is an intended third-party beneficiary of the agreement.

72. Aon used these RSU Agreements in an effort to side-step the rights of Rodriguez and Szot as California citizens.

73. For example, Section 9(b) of the RSU Agreement contains a Client Non-Compete covenant, which Aon misleadingly titles a "Covenant Not to Solicit Clients and Prospective Clients." The covenant states that Rodriguez and Szot shall not, during employment and ***for a period of two years after the termination of their employment***:

> [d]irectly or indirectly, call upon, solicit, ***accept, engage in, service*** or ***perform***, other than on behalf of Aon, any business of the same type or kind as the Business Performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

RSU Agreement at 4 (emphasis added).

74. Of course, even a client *non-solicit* would be clearly barred by California law, but this provision goes much further, purporting to prohibit not only solicitation, but also *accepting* or *working for* (i.e., "servicing") current and previous Aon clients that would want to work with their new employer.



COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

75. This provision is contained in all of the RSU Agreements signed by Szot and Rodriguez that contain restrictive covenants, including a Client Non-Compete that is materially indistinguishable from provisions previously held unenforceable by California courts in the *Baldwin* and *Heffernan* cases.

76. The RSU Agreements also state that the entire agreement or certain provisions "shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction" and purport to set the exclusive venue of any arbitration arising therefrom in Chicago, Illinois. This provision is unenforceable as it seeks to evade California law and public policy.

77. Starting in 2015, the RSU Agreements purport to require Rodriguez and Szot to submit certain disputes to confidential, binding arbitration in Chicago, Illinois: including, but not limited to any claim that a RSU Agreement or covenants contained therein "is a contract of adhesion, lacks consideration, is substantively or procedurally unconscionable, is void against public policy, or is otherwise void or voidable for any reason." This provision is unenforceable because it is both procedurally and substantively unconscionable.

78. Aon cannot evade California law by requiring Rodriguez and Szot—who reside and work in California—to arbitrate this dispute under Illinois law in an Illinois forum. As a result, any attempt to arbitrate this dispute would require severing the Illinois choice of law and venue provisions. The RSU Agreements expressly provide for the modification or deletion of any term that is illegal or unenforceable. Arbitration can proceed under California law in California once the unenforceable and unconscionable terms are severed. Alternatively, even if arbitration were to proceed in Illinois, the Illinois choice-of-law provision must still be severed and the arbitrator must apply California law to the dispute.

79. Based on Aon's litigious and aggressive history surrounding enforcement of the unlawful restrictive covenants in its RSU Agreements, Plaintiffs anticipate that Aon will seek to enforce these agreements against Rodriguez and Szot, and by extension, against Lockton—likely through litigation and/or arbitration in Illinois (in a race to the courthouse process to try to trump the ability of this court to enter appropriate restraining orders). Plaintiffs have been forced to seek

this relief to ensure that a California court adjudicates the enforceability of the RSU Agreements following California law and California public policy, as is their right as California citizens and that they are all allowed to engage in the full and free competition which California law has guaranteed.

**E. California Law Governs Rodriguez and Szot's RSU Agreements.**

80. Rodriguez and Szot's RSU Agreements must be governed by California law notwithstanding the Illinois choice of law provision. Aon should not be permitted to evade California law and public policy.

81. California has a paramount interest in enforcing its laws and protecting its citizens. Both Rodriguez and Szot were at all relevant times California residents and held California resident insurance broker licenses. Additionally, they were both at all relevant times employed by ARS West in California. Reflecting Aon's awareness of this clear law, Szot's current employment agreement is governed by California, rather than Illinois, law.

**F. Urgent Relief is Necessary to Avoid Irreparable Loss of Plaintiffs' Ability to Compete.**

82. Plaintiffs seek urgent injunctive relief to ensure that they do not lose their fundamental right to openly compete in the marketplace. Based on Aon's past practice as recently as 2021, Aon is near certain to try to enforce its restrictive covenants on Plaintiffs in Illinois. If Plaintiffs Szot and Rodriguez are prevented, even for a portion of time, from servicing their clients and lawfully working in their desired profession, they will suffer irreparable harm. Further, Plaintiff Lockton has the right to compete freely and fairly for talent in California. Absent immediate relief, it will be irreparably harmed. There is no adequate legal remedy as the amount of damages resulting from the chain of negative events and delay cannot be computed.

83. Even if Aon does not immediately sue to enforce these agreements, there is a chilling effect with them still in effect, as Plaintiffs face an unwarranted and frivolous lawsuit at any moment, and clients do not know whether they can do business with Plaintiffs without fear of Aon's interference. Plaintiffs will constantly fear Aon trying to enforce these illegal agreements and disrupting their business—simply because they exercised the employee mobility rights enshrined

in California's clear law and policy.

84. It is likely that clients will choose Lockton due to the noteworthy skills of Rodriguez and Szot, which they attained through years of education and expertise. Third party clients have the right to choose the broker with whom they wish to work and Rodriguez and Szot have the right, under California law, to accept, service, and pursue this business.

85. Moreover, some of Szot and Rodriguez's former clients may wish to do business with Lockton to take advantage of Lockton's other resources and brokers as well. Allowing these illegal covenants to stand will unfairly hinder this process and impede on the rights of these third parties, giving Aon an improper and illegitimate leg up in the marketplace.

86. Without urgent relief from this Court, Plaintiffs face the prospect of being unable to accept and service these clients. This will cause harm both to Plaintiffs and the clients.

87. Plaintiffs are concurrently filing a motion for a temporary restraining order and preliminary injunction with this Complaint.

**FIRST CAUSE OF ACTION**

**(DECLARATORY RELIEF)**

**(By Plaintiffs against Defendants)**

88. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 87 inclusive.

89. Rodriguez and Szot's affiliations with Lockton are lawful and Defendants' use of restrictive covenants presents a threat to them and Lockton's ability to fairly compete in California for clients and will interfere with their and Lockton's lawful business unless and until a court deems such covenants unlawful and null and void as a matter of law.

90. An actual controversy has arisen and exists between Plaintiffs and Defendants concerning their rights, duties and obligations, if any, under the RSU Agreements. Plaintiffs contend that, *inter alia*:

a. The Client Non-Compete in Section 9(b) of the RSU Agreements violates California's public policy in favor of open competition and employee mobility and is thereby unenforceable and null and void as a matter of law;

b. The Client Non-Compete contained in Section 9(b) of the RSU Agreements

violates California Business and Professions Code Section 16600 and is thereby unenforceable and null and void as a matter of law. *See Edwards*, 44 Cal. 4th at 950 (declaring similar client non-compete provision invalid and noting that "[s]ection 16600 is unambiguous, and if the legislature intended the statute to apply to only restraints that were unreasonable or overbroad, it could have included language to that effect.")

c. The Illinois choice-of-law provision, the delegation clause of the arbitration delegation, and the choice of forum and venue provisions in Sections 10 and 11(j) of the RSU Agreements are null and void and unenforceable as a matter of law because they: (i) violate California law*; see, e.g.*, Cal. Bus. & Prof. Code § 16600; Cal. Labor Code § 925; (ii) are part of an elaborate scheme and pattern by Aon intended to circumvent California's public policy in favor of open competition and employee mobility in violation of California Business and Professions Code Section 16600; and (iii) are procedurally and substantively unconscionable. The attorney's fees shifting provision is also unconscionable. Any attempt to arbitrate this dispute would require severing the offending and unconscionable provisions and the application of California law in a California arbitration. Even if arbitration were to proceed in Illinois, at the very least, the Illinois choice-of-law provisions must be severed and the arbitrator must apply California law.

91. By reason of the premises set forth in the aforementioned paragraphs, an actual controversy exists between Plaintiffs and Defendants. Based on Aon's litigious history and past practice of enforcing non-solicitation provisions in RSU Agreements, Plaintiffs anticipate that Aon will seek to enforce the RSU Agreements under Illinois law in a race to trump this court's ability to enter appropriate restraining orders.

92. Plaintiffs desire a judicial declaration as a matter of law that the restrictive covenants and the Illinois choice of law provision, the delegation clause of the arbitration provision, and the choice of forum and venue provisions in the RSU Agreements are unenforceable and null and void

as set forth above. A judicial declaration is urgent, necessary and appropriate at this time. Should Aon seek to arbitrate this dispute, Plaintiffs request that the Court, at a minimum, declare the Illinois choice of law and venue provisions unenforceable and sever them such that any arbitration proceeding takes place in California and the arbitrator applies California law. Alternatively, even if arbitration were to proceed in Illinois, the Illinois choice-of-law provisions must be severed and the arbitrator must apply California law.

93. Plaintiffs also seek all necessary and appropriate injunctive relief, both preliminary and permanent, to effectuate a declaratory judgment and protect Plaintiffs' fundamental and non-waivable rights.

**<u>SECOND CAUSE OF ACTION</u>**

**(UNLAWFUL, UNFAIR, AND DECEPTIVE BUSINESS ACTS AND PRACTICES)**

**(CAL. BUS. & PROF. CODE § 17200, ET SEQ.)**

**(By Plaintiffs Rodriguez and Szot against Defendants)**

94. Plaintiffs Rodriguez and Szot re-allege and incorporate by reference paragraphs 1 through 93 inclusive.

95. Through the conduct described herein, especially by repeatedly pressuring and inducing California residents to enter into contracts containing unlawful restrictive covenants purportedly subject to arbitration provisions with Illinois choice of law and forum selection clauses, Defendants have engaged in unlawful business acts and practices within the meaning of California Business and Professions Code §17200 *et seq*. Defendants' acts and practices offend California's long held public policy in favor of open competition and employee mobility, and are unethical, oppressive, and unscrupulous activities that are substantially injurious to Plaintiffs.

96. Defendants' unlawful business practices are particularly egregious because numerous California courts have ruled against Aon on these same or similar covenants, so Aon knows full well they are unlawful, yet continues to impose and attempt to enforce them on California residents anyway.

97. Defendants' unlawful business practices include violations of California Business and Professions Code Section 16600, California Labor Code Section 925, California's public policy



COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

in favor of open competition and employee mobility, and the common law. Such acts and practices include, but are not limited to the following:

a. Requiring California employees to enter into facially impermissible restrictive covenants, as a condition of receiving part of their compensation, which violate California statutory and common law and California public policy;

b. Requiring California employees, as a result of receiving part of their compensation, to sign contracts of adhesion which contain unconscionable provisions that require that any disputes regarding the impermissible restrictive covenant and non-solicit agreements take place in arbitration in Illinois under Illinois law without regard to conflict of law principles.

c. Delegating the decision of whether the Illinois choice of law, arbitration and choice of forum and venue provisions are enforceable to an Illinois arbitrator in an attempt to evade California's strong public policy of employee mobility and open competition.

98. Plaintiffs reserve the right to allege other violations that constitute other unlawful business acts or practices. Plaintiffs are informed and believe, and based thereon allege, that Defendants' wrongful conduct in violation of § 17200, *et seq.* is ongoing and continues to this date.

99. Plaintiffs are informed and believe, and based thereon allege, that as a result of their unlawful business practices, Defendants have been able to reap unjust revenue and profit. Plaintiffs are also informed and believe, and based thereon allege that unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is necessary and appropriate.

100. Plaintiffs Rodriguez and Szot have each suffered injury in fact by incurring attorney's fees to enforce their rights under California law in the face of, or under the threat of, an illegal covenant not to compete. *See Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304 (2016). Rodriguez and Szot were required to challenge these unlawful covenants despite California courts previously finding them to be void and unenforceable and in light of Aon's litigious history and

repeated race to enforce such unlawful covenants.

101. Plaintiffs seek restitution of all money improperly obtained, collected or received by Defendants through the use of unlawful or unfair contracts with its employees, restitution of all attorney's fees and costs, an injunction prohibiting Defendants from continuing such acts and practices, and all other appropriate equitable relief, including declaratory, injunctive and restitutionary relief against Defendants, including but not limited to equitable relief necessary and appropriate to protect the individual Plaintiffs, who have been wrongfully harmed by Defendants' unfair competition.

**<u>THIRD CAUSE OF ACTION</u>**

**(UNLAWFUL, UNFAIR, AND DECEPTIVE BUSINESS ACTS AND PRACTICES)**

**(CAL. BUS. & PROF. CODE § 17200, ET SEQ.)**

**(By Plaintiff Lockton against Defendants)**

102. Plaintiff Lockton re-alleges and incorporates by reference paragraphs 1 through 101 inclusive.

103. Through the conduct described herein, especially by inducing California employees to enter into contracts containing unlawful non-compete provisions purportedly subject to arbitration provisions with Illinois choice of law and forum selection clauses, which are designed to fly in the face of California law, Defendants have engaged in unlawful and unfair business acts and practices within the meaning of California Business and Professions Code §17200 *et seq.* Defendants' acts and practices offend California's long held public policy in favor of open competition, and are unethical, oppressive, and unscrupulous activities that are substantially injurious to Plaintiff Lockton.

104. Defendants' unlawful business practices include violations of California Business and Professions Code Section 16600, California's public policy in favor of open competition and employee mobility, and the common law. Such acts and practices include requiring employees to sign agreements which contain unlawful and void restrictive covenants, which consequently prevent Lockton from fully competing in the marketplace by hiring former employees from Aon and conducting business with the clients who would otherwise exercise their free will to choose



COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Lockton as their insurance broker.

105. Plaintiff Lockton reserves the right to allege other violations that constitute other unlawful business acts or practices. Plaintiff Lockton is informed and believes, and based thereon alleges, that Defendants' wrongful conduct in violation of § 17200, *et seq.* is ongoing and continues to this date.

106. Plaintiff Lockton is informed and believes, and based thereon alleges, that as a result of their unlawful and business practices, Defendants have been able to reap unjust revenue and profit. Plaintiff Lockton is also informed and believes, and based thereon alleges that unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate here.

107. Plaintiff Lockton has suffered injury in fact by paying attorneys' fees to challenge the enforcement of an illegal covenant not to compete, which is necessary to allow it to hire employees and accept, serve, and pursue clients who would otherwise exercise their free will to choose Lockton as their insurance broker. *See Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304 (2016). Lockton is required to defend against these unlawful covenants despite California courts previously finding them to be void and unenforceable and in light of Aon's litigious history and repeated race to enforce such unlawful covenants.

108. Plaintiff Lockton seeks restitution of all money improperly obtained, collected or received by Defendants through the use of unlawful contracts with its employees, restitution of all attorneys' fees and costs it has incurred, an injunction prohibiting Defendants from continuing such acts and practices, and all other appropriate equitable relief, including declaratory, injunctive and restitutionary relief against Defendants, including but not limited to equitable relief necessary and appropriate to protect Lockton, a competitor, who has been wrongfully harmed by Defendants' unfair competition.

## PRAYER

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows,

1. For a judicial declaration that Plaintiffs may fairly and freely engage in open competition for actual and prospective clients of Aon, its subsidiaries and affiliates;

2. For a judicial declaration that the unlawful restrictive covenants in the Aon Agreements, including the RSU Agreements, are unenforceable, null and void as a matter of law;

3. For a judicial declaration that the Illinois venue and choice of law provisions and the delegation clause of the arbitration provision are unenforceable, and that California law governs the enforceability of the restrictive covenants;

4. For a Temporary Restraining Order and preliminary injunctive relief that:

a. Aon, and anyone acting in concert with Aon, shall immediately preserve all documents, information, and evidence that refers to, relates to or evidences the development, drafting, revisions, negotiations, implementation, and execution of the RSU Agreements.

b. Aon shall, prior to any preliminary injunction hearing and on a mutually agreed date, produce to Plaintiffs' counsel for deposition its person most knowledgeable on the development, drafting, revisions, negotiations, implementation, and execution of the RSU Agreements.

c. The delegation clause in Section 10(a) of the RSU Agreements is unconscionable and unenforceable under California law.

d. The Illinois choice-of-law provision in Sections 10(f) and 11(j) of the RSU Agreements is unconscionable and unenforceable.

e. The provision in Section 10(a) of the RSU Agreements requiring arbitration to take place "exclusively" in Chicago, Illinois is unconscionable and unenforceable.

f. Aon, and anyone acting in concert with Aon, shall not take any actions in California to enforce the RSU Agreements against Plaintiffs, including, without limitation, any action to interfere with Plaintiffs' ability to solicit, accept, engage, or service former Aon clients.

g. Aon, and anyone acting in concert with Aon, shall not take any actions in California to enforce the RSU Agreements against any other former Aon employee located in California.

h. Pursuant to California Labor Code Section 925, Aon, and anyone acting in concert with Aon, shall not require any former Aon employee primarily residing and working in California to adjudicate (either in arbitration or in court) outside of California any alleged claim arising in California (including, without limitation, any claims for violation of the RSU Agreements and claims for alleged trade secret misappropriation by these California residents).

i. If any arbitration proceeding is initiated by Aon or otherwise ongoing, any such arbitration proceeding shall take place within California; and the arbitrator shall apply California law to the dispute and, further, the Illinois choice of law and forum selection provisions set forth in Sections 10 and 11(j) of the RSU Agreements shall be severed from the RSU Agreements.

j. If any arbitration proceeding is initiated by Aon or otherwise ongoing in Illinois, the Illinois choice of law provisions set forth in Sections 10 and 11(j) of the RSU Agreements shall be severed from the RSU Agreements and the arbitrator shall apply California law to the dispute.

5. For permanent injunctive relief:

a. The delegation clause in Section 10(a) of the RSU Agreements is unconscionable and unenforceable under California law.

b. The Illinois choice-of-law provision in Sections 10(f) and 11(j) of the RSU Agreements is unconscionable and unenforceable.

c. The provision in Section 10(a) of the RSU Agreements requiring arbitration to take place "exclusively" in Chicago, Illinois is unconscionable and unenforceable.

d. Aon, and anyone acting in concert with Aon, shall not take any actions in California to enforce the RSU Agreements against Plaintiffs, including, without limitation, any action to interfere with Plaintiffs' ability to solicit, accept, engage, or service former Aon clients.

e. Aon, and anyone acting in concert with Aon, shall not take any actions in California to enforce the RSU Agreements against any other former Aon employee located in California.

f. Pursuant to California Labor Code Section 925, Aon, and anyone acting in concert with Aon, shall not require any former Aon employee primarily residing and working in California to adjudicate (either in arbitration or in court) outside of California any alleged claim arising in California (including, without limitation, any claims for violation of the RSU Agreements and claims for alleged trade secret misappropriation by these California residents).

g. If any arbitration proceeding is initiated by Aon or otherwise ongoing, any such arbitration proceeding shall take place within California; and the arbitrator shall apply California law to the dispute and, further, the Illinois choice of law and forum selection provisions set forth in Sections 10 and 11(j) of the RSU Agreements shall be severed from the RSU Agreements.

h. If any arbitration proceeding is initiated by Aon or otherwise ongoing in Illinois, the Illinois choice of law provisions set forth in Sections 10 and 11(j) of the RSU Agreements shall be severed from the RSU Agreements and the arbitrator shall apply California law to the dispute.

i. Prohibiting Aon from entering into covenants not to compete with California employees, including but not limited to covenants in the RSU Agreements.

6. For restitution for Defendants' acts of unlawful competition;

7. For reasonable attorneys' fees according to any applicable contractual provision or statute, including but not limited to California Business and Professions Code Section 17200 *et seq.*;

8. For the costs of the suit as provided by law; and

9. For such other and further relief, both legal and equitable, as the Court may deem just and proper.

Dated: January 12, 2022

COOLEY LLP

By: [signature]
Michael G. Rhodes

Attorneys for Plaintiffs
LOCKTON COMPANIES, LLC - PACIFIC SERIES; PAUL RODRIGUEZ; and MICHAEL R. SZOT